1  Phil Telfeyan (CA Bar No. 258270)
2  Attorney, Equal Justice Under Law
3  400 7th Street NW, Suite 602
4  Washington, D.C. 20004
5  (202) 505-2058
6  ptelfeyan@equaljusticeunderlaw.org
7  *Attorney for Plaintiffs Riana Buffin and Crystal Patterson*

8  **THE UNITED STATES DISTRICT COURT**
9  **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
10  **OAKLAND DIVISION**

11
12                                                    )
13  RIANA BUFFIN and CRYSTAL            )    15-CV-4959 (YGR)
14  PATTERSON, on behalf of themselves and  )
15  others similarly situated,                   )    MOTION AND MEMORANDUM IN
16                                                    )    PLAINTIFFS' MOTION FOR SUMMARY
17       Plaintiffs,                              )    JUDGMENT
18                                                    )
19              v.                                  )    Hearing: December 12, 2017, 2pm
20  VICKI HENNESSY in her official capacity  )    The Honorable Yvonne Gonzalez Rogers
21  as the San Francisco Sheriff, *et al.*,   )
22                                                    )
23       Defendants.                          )
24  _____  )

25                          **Table of Contents**

26  I.    Introduction ........................................................................................................... 1

27  II.   Factual and Procedural Background ...................................................................... 1

28         A.    Pre-Arraignment Procedures in the San Francisco Jail System ............................ 1

29         B.    Wealth Distribution in San Francisco's Jail Population ........................................ 3

30         C.    Plaintiffs' Encounters with the Criminal Justice System ...................................... 3

31               i.    Riana Buffin ................................................................................................ 3

32               ii.   Crystal Patterson ....................................................................................... 4

33         D.    Procedural Posture ...................................................................................... 5

34               i.    Sheriff's Decision Not to Defend ............................................................... 5

35               ii.   CBAA Intervention ..................................................................................... 5

| | | | |
|---|---|---|---|
| 1 | III. | The County's Use of Money Bail Violates the Fourteenth Amendment | 5 |
| 2<br>3 | A. | The County's Use of Money Bail Violates the Absolute Proscription Against Wealth-Based Discrimination in the Criminal Justice System | 6 |
| 4<br>5 | i. | Money Bail Violates Due Process and Equal Protection Because It Conditions the Length of Detention on Wealth-Status | 7 |
| 6<br>7<br>8 | ii. | Numerous Courts and Institutions Recognize that Equal Protection and Due Process Prohibit the Government from Jailing Citizens Who Are Too Poor to Pay Money Bail | 8 |
| 9<br>10 | iii. | San Francisco's Current Alternatives to Money Bail Do Not Satisfy Due Process or Equal Protection | 10 |
| 11<br>12 | B. | San Francisco's Money Bail System Implicates Fundamental Liberty and Fails Strict Scrutiny | 11 |
| 13<br>14 | i. | The County's Wealth-Based Detention Scheme Serves No Compelling Government Interest | 12 |
| 15<br>16 | ii. | The County's Wealth-Based Pretrial Scheme Is Neither Narrowly Tailored nor the Least Restrictive Means | 14 |
| 17 | a. | Money Bail Is Not Tailored to Any Governmental Interest | 14 |
| 18<br>19<br>20 | b. | The County's Attempt to Combine Non-Monetary Release Methods with Its Parallel Monetary Release Method Does Not Suffice for Narrow Tailoring | 15 |
| 21<br>22 | c. | Less Restrictive Alternatives to the County's Money-Based System Exist and Could Realistically Be Implemented | 16 |
| 23<br>24 | 1. | The County Should Provide Prompt Release for Arrestees Accused of Misdemeanors or Non-Violent Felonies | 16 |
| 25<br>26<br>27 | 2. | The County Should Employ Expedited Risk Assessment Procedures to Determine Suitability for Release of those Accused of Violent Felonies | 18 |
| 28<br>29<br>30 | C. | The Use of Money Bail Fails Even Rational Basis Review Because It Decreases Pretrial Liberty, Decreases Public Safety, Decrease Court Appearance, and Is Therefore Counterproductive to Any Governmental Interest | 22 |
| 31 | IV. | Conclusion | 25 |

1                                    **Table of Authorities**

2    **Cases**
3    *Bearden v. Georgia*, 461 U.S 660, 672–73 (1983) ................................................... 6, 7
4    *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................. 6
5    *Douglas v. California*, 372 U.S. 353 (1963) ................................................................. 8
6    *Frazier v. Jordan*, 457 F.2d 726  (5th Cir. 1972) ......................................................... 7
7    *Griffin v. Illinois*, 351 U.S. 12 (1956) .......................................................................... 7
8    *Holland v. Rosen,* 1:17-cv-04217-JBS-KMW, (D. N.J. Sept. 21, 2017) ................................ 9, 20
9    *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772 (9th Cir. 2014) (*en banc*) ........................ 8, 11, 12, 14
10   *O'Donnell v. Harris County*, 4:16-cv-01414 (S.D. Tex. Apr. 28, 2017) ................................ 9, 16
11   *Pugh v. Rainwater*, 572 F.2d 1053 (5th Cir. 1978) (*en banc*) ...................................... 9
12   *Tate v. Short*, 401 U.S. 395, 398 (1971) ....................................................................... 8
13   *United States v. Estrada de Castillo*, 549 F.2d 583, 586 (9th Cir. 1976) ........................ 7
14   *United States v. Salerno*, 481 U.S. 739 (1987) .................................................... 11, 20, 20
15   *Williams v. Farrior*, 626 F.Supp. 983, 985 (S.D. Miss. 1986) ....................................... 9
16   *Williams v. Illinois*, 399 U.S. 235 (1970) .................................................................. 7, 8

17   **Statutes**
18   18 U.S.C. § 3142(e). .................................................................................................... 19
19   Cal. Pen. Code § 1268, et seq. ...................................................................................... 1
20   Cal. Penal Code § 1269c ...................................................................................... 1, 3, 11
21   Cal. Penal Code § 1270.1 .................................................................................. 1, 3, 4, 13
22   Cal. Penal Code § 1305(a)(1) ...................................................................................... 12
23   Cal. Penal Code § 1318, et seq ..................................................................................... 1
24   Cal. Const. Art. I, § 12 ......................................................................................... 17, 20
25   D.C. Code § 23-1321. ...................................................................................... 18, 19, 20

26   **Other Authorities**
27   Sandy Allen & Ena Li, *A Look At Bay Area Poverty*, United Way Bay Area (2016) ................... 3
28   American Bar Assoc. *Standards for Criminal Justice: Pretrial Release*, 3rd Ed. (2007). .......... 13
29   American Bar Assoc., Commentary to ABA Pretrial Release Standard 10-5.3(e) (2007) ............ 9
30   Kristin Bechtel, *Dispelling the Myths: What Policy Makers Need to Know About Pretrial*
31       *Research*, Pretrial Justice Institute, 23 (2012). .................................................. 19
32   California Chief Justice, *Pretrial Detention Reform Workgroup* (Oct. 2017) ................... 9, 10, 22
33   Alexander Holsinger, *Exploring the Relationship Between Time in Pretrial Detention and Four*
34       *Outcomes*, Crime & Justice Inst., 3 (2016) ................................................ 24
35   Alexander Holsinger, *The Effects of Pretrial Detention on Self-Reported Outcomes*, Crime &
36       Justice Inst., 12 (2016) ............................................................................ 24
37   Michael R. Jones, *Unsecured Bonds: The As Effective and Most Efficient Pretrial Release*
38       *Option*, 11 (2013) .................................................................... 13, 15, 17
39   Kimbrell & Wilson, *Money Bond Process Experiences and Perceptions,* George Mason Univ.,
40       Dept. of Crim., Law & Soc. (2016) ............................................................. 6, 24
41   Lowenkamp et al., *Investigating the Impact of Pretrial Detention on Sentencing Outcomes,*
42       Arnold Foundation, 3 (2013) ...................................................... 13, 18, 22, 23
43   Cynthia Mamalian, *State of the Science of Pretrial Risk Assessment,* U.S. Dept. of Justice,
44       Bureau of Justice Assistance, 7, 14 (March 2011) .................................................. 19

1 San Francisco Health Improvement Partnership, *2017 Demographics, Summary Data for*
2    *Neighborhood (94124)*.................................................................................................. 3
3 U.S. Dept. of Justice, Nat'l Inst. Corr., *Fundamentals of Bail*, 26 (2014)................. 15, 17, 18, 20

4 **Rules**
5 Fed. R. Civ. P. 56(c) ............................................................................................................ 6

6 <u>**Notice of Motion and Statement of Issues**</u>

7    Plaintiffs hereby notice their Motion for Summary Judgment, scheduled to be heard at

8 2pm on December 12, 2017.

9    Plaintiffs respectfully request that this Court grant declaratory and injunction relief

10 against the use of money bail and against state laws that create San Francisco's wealth-based

11 detention system.  Plaintiffs' arguments and more detailed request for relief are outlined below.

12    The question before this Court is whether San Francisco's wealth-based release and

13 detention procedures are consistent with the federal Constitution's prohibition against wealth-

14 based discrimination in the criminal justice system.  For all the reasons below, the County's

15 money bail system violates the Fourteenth Amendment.

1    **I.    Introduction**

2        Wealth discrimination is inherent in San Francisco's pretrial system.  Wealth-status will

3    affect the length of detention for every release-eligible person arrested in San Francisco.  The

4    County operates a money bail system that runs parallel to all other pretrial release options, but

5    unlike the other options, it offers immediate release.  This means there will always be individuals

6    who spend more time in jail simply because they are unable to pay immediately.

7        Although the County employs some non-monetary release options (such as the Own

8    Recognizance ("OR") Project or pre-arraignment application to a magistrate), arrestees who are

9    poor suffer additional detention not faced by those who are wealthy.  Under current state law,

10   some individuals are ineligible for any form of non-monetary release before arraignment, but

11   they can nonetheless be released before arraignment if they can afford money bail.  *See* Ex. 1,

12   Stips. ¶¶ 24, 40; Cal. Penal Code §§ 1270.1, 1269c.  Wealthy individuals can purchase their way

13   out of jail even if they are ineligible for non-monetary release options, while poorer individuals

14   stay in jail.  For individuals ineligible for non-monetary pre-arraignment release, their wealth-

15   status is the sole determinant of whether they get out.  For individuals eligible for non-monetary

16   release, wealth-status still determines whether they purchase immediate freedom or wait in jail

17   for other processes.

18   **II.    Factual and Procedural Background**

19       **A.    Pre-Arraignment Procedures in the San Francisco Jail System**

20       In California, three paths to arraignment are available to an individual taken into custody

21   who is not eligible for citation release: release on bail (Ca. Pen. Code § 1268, et seq.), own

22   recognizance release (Ca. Pen. Code § 1318, et seq.), or detention.  In San Francisco, bail is set

23   according to the County's bail schedule and freedom is secured upon payment.  Ex. 1, Stips. ¶¶

24   29, 32.  Own recognizance release, in turn, is available through two non-monetary methods: the

1 OR Project or application to a magistrate for review.  Ex. 1, Stips. ¶¶ 21, 39.

2  Money bail is the first release option presented to an arrestee.  Before receiving any

3 written materials on non-monetary pre-arraignment release, arrestees receive a "booking card"

4 listing the cash amount required to secure their freedom.  Ex. 1, Stips. ¶ 16.  Release happens as

5 soon as payment is made directly from the jail's intake facility — often within an hour.  *See* Ex.

6 2, SHF000014 (showing that once the release deputy "verif[ies] the bail amount [posted] is

7 correct," they will "escort" the arrested individual directly from intake to the release desk); Ex. 1,

8 Stips. ¶ 20; Ex. 3, SHF000235 (spreadsheet showing individuals who paid tens of thousands in

9 surety bond or cash were released in one hour).  At no time during this process is an individual's

10 inability to pay the predetermined bail amount considered.  *See* Ex. 1, Stips. ¶¶ 29–32.  In other

11 words, those unable to pay sit in jail while those able to pay are immediately released.

12  Those who do not have immediate access to bail money are placed in a holding cell,

13 where they can try to arrange their release on bail.  Ex. 1, Stips. ¶¶ 36, 38.  If it is impossible for

14 an individual to come up with a large sum of money, she must await processing through either

15 the OR Project or apply for magistrate-ordered release.  Ex. 1, Stips. ¶¶ 2, 23, 25, 32.

16  The OR Project is a pretrial release program operated by the San Francisco Pretrial

17 Program and funded by the County to provide pretrial services under the supervision of the

18 Sheriff's Department.  Ex. 1, Stips. ¶ 20.  Pretrial detainees usually meet with an OR Project

19 employee who uses a Public Safety Assessment Tool to determine recommendations for pretrial

20 release.  Ex. 1, Stips. ¶¶ 21–23.  OR Project staff may then generate a report called an "OR

21 Workup" to submit to a duty judge.  Ex. 1, Stips. ¶ 23.  There is no established timeframe for

22 when this workup will be generated or completed and no guarantee it will be seen by a judge

23 before arraignment.  *See* Ex. 1, Stips. ¶¶ 24–26.  Arrestees may also apply directly to a

1    magistrate for reduction in bail or release on their own recognizance before arraignment, with the

2    exception of those accused of certain "serious" offenses.  Ex. 1, Stips. ¶¶ 39, 40; Cal. Penal Code

3    §§ 1270.1, 1269c.  Deputy Sheriffs decide who is eligible to apply during intake, but they are not

4    required to inform eligible arrestees that they have this option.  Ex. 1, Stips. ¶ 43; Ex. 4,

5    SHF000023 (showing that, when entering intake information, Sheriff's Department personnel

6    note release eligibility).  Instead, arrestees must find out about non-monetary release through OR

7    Project materials, if and when they get them, or by asking questions.  Stips. ¶¶ 37, 43.

8          **B.**    **Wealth Distribution in San Francisco's Jail Population**

9         On an average day, the highest percentage of jailed San Franciscans (who are otherwise

10   bail eligible) is comprised of residents of the 94102 ZIP code, by far the County's poorest

11   neighborhood.  Ex. 5, SHF000064 (chart breaking down bond-eligible jail population by ZIP

12   code).  Census data indicate that 50.6% of the 94102 population lives below the federal poverty

13   line.  *See* Sandy Allen & Ena Li, *A Look At Bay Area Poverty*, United Way Bay Area (2016).[1]

14   The next largest group are those identified as homeless, and the third largest consists of residents

15   of the 94124 ZIP code, where more than one in five (20.9%) families live below the federal

16   poverty line (compared to 7.8% of families countywide).  San Francisco Health Improvement

17   Partnership, *2017 Demographics, Summary Data for Neighborhood (94124)*.[2]  With 97% of

18   pretrial detainees facing bail over $10,000, it is no surprise that San Francisco's jail is filled with

19   the poorest residents in the County on any given day.[3]  *See* Ex. 6, SHF000053-000077.

20         **C.**    **Plaintiffs' Encounters with the Criminal Justice System**

21               **i.**    **Riana Buffin**

---

[1] https://uwba.org/files/galleries/Bay_Area_Poverty_Brief_June_2016.pdf
[2] http://www.sfhip.org/index.php?module=demographicdata&controller=index&action=index&id=131328&sectionId=0
[3] San Francisco's money-based system also disproportionately impacts racial minorities. On an average day, 49.3% of detained individuals who are otherwise bail-eligible are African-Americans. SHF000062.

1     Riana Buffin was arrested on October 26, 2015, and accused of grand theft.  Ex. 1, Stips.

2   ¶ 6.  Ms. Buffin was informed that she would be released if she paid $30,000 bail and kept in jail

3   if she could not.  Ex. 1, Stips. ¶ 7; Ex. 7, ECF Doc. 71-1, Buffin Decl. at ¶ 3.  Because she is

4   indigent, she could not afford bail.  *Id.* at ¶ 6.  She therefore had to wait for non-monetary release

5   processes.  *Id.* at ¶ 7.  Ms. Buffin was not interviewed by the OR Project for over 12 hours after

6   her booking.  Ex. 8, SHF000892; Ex. 9, SHF000899.  SFSD staff did not request her warrant

7   check until she had been confined for 44 hours.  Ex. 10, SHF000891.  After approximately 46

8   hours in jail, which she would not have endured had she been able to post bail, Ms. Buffin was

9   released — but not because San Francisco's non-monetary processes worked.  Rather, the

10  charges against her were dropped.  Ex. 1, Stips. ¶ 9.  Following her elongated detention, Ms.

11  Buffin lost her job at the Oakland Airport.  Ex. 11, ECF Doc. 71-3, Boudin Decl. at ¶ 16.

12              **ii.     Crystal Patterson**

13     Crystal Patterson was arrested on October 27, 2015, and accused of assault with a deadly

14  weapon other than a firearm.  Ex. 1, Stips. ¶ 10.  Ms. Patterson was informed that she would be

15  released if she could pay her $150,000 bail and kept in jail if she could not.  Ex. 12, 71-2,

16  Patterson Decl. at ¶ 3.  Due to the nature of her charge, Ms. Patterson was not eligible for pre-

17  arraignment release through the OR Project or magistrate application; therefore, the only

18  available path to pre-arraignment freedom was to pay bail.  Ex. 1, Stips. ¶ 40; *see* Cal. Penal

19  Code § 1270.1.  She could not afford $150,000 — which would have been returned at the

20  conclusion of her case — or the standard 10% required by private bail companies (a non-

21  refundable $15,000).  After 29 hours of detention, Ms. Patterson finally obtained a bond at a rate

22  of 1 percent ($1,500).  Ex. 1, Stips. ¶ 12.  She is still obligated to pay the bail company the

23  balance of the $15,000 at "the maximum interest rate allowable by law."  Ex. 13, ECF Doc. 25-1,

24  Patterson Bail Contract at p. 1.  Ms. Patterson was not arraigned and did not have an OR Workup

1  completed at any time before she purchased her freedom.  Stips. ¶ 16.  Shortly after she suffered

2  29 hours of wealth-based detention, Ms. Patterson's case was dismissed when the District

3  Attorney decided not to file charges.  Ex. 1, Stips. ¶¶ 12, 17.  She has never been charged with a

4  crime.  Ex. 1, Stips. ¶ 17; ECF Doc. 71-3, Ex. 11, Boudin Decl. at ¶ 18.

5       **D.**    **Procedural Posture**

6           **i.**    **Sheriff's Decision Not to Defend**

7       On November 1, 2016, Sheriff Vicki Hennessey answered Plaintiffs' Third Amended

8  complaint stating that she would not defend the discriminatory practice of money bail.  She

9  recognized that "[t]hose who can pay are released at the time of their choosing, regardless of any

10  threat they may pose to public safety and regardless of any flight risk.  Those who cannot pay

11  must wait.  This two-tiered system of pretrial justice does not serve the interests of the

12  government or the public, and unfairly discriminates against the poor."  ECF Doc. 101, at p. 1.

13           **ii.**    **CBAA Intervention**

14       On November 1, 2016, the California Bail Agents Association ("CBAA") moved to

15  intervene as a defendant. ECF Doc. 102, at p. 2.  CBAA claimed to have a "direct and unique

16  stake in the outcome of this case" because a favorable decision on Plaintiffs' constitutional rights

17  would "wipe out" CBAA's "[profit] interests in existing bail bond contracts" and "destroy"

18  CBAA's industry.  *Id.* at p. 1.  This Court granted CBAA's motion for permissive intervention

19  on March 6, 2017.  ECF Doc. 119, at p. 8.

20  **III.**    **The County's Use of Money Bail Violates the Fourteenth Amendment**

21       Wealth discrimination is inherent in the County's use of money bail.  Because the parallel

22  path of money bail both expedites and guarantees the release of wealthy arrestees, indigent

23  arrestees must wait longer for potential freedom through non-monetary processes (which, unlike

24  money bail, are not guaranteed).  This pattern is consistent with other money bail jurisdictions;

1   the overwhelming majority of bail-eligible individuals who remain in jail are detained solely

2   because they cannot afford bail (58%) or their family cannot afford bail (35%).  Kimbrell &

3   Wilson, *Money Bond Process Experiences and Perceptions,* George Mason Univ., Dept. of

4   Crim., Law & Soc. (2016).[4]

5       Arrestees are told about money bail at booking but do not learn about other release

6   methods until after they have been detained for some period of time.  In essence, San Francisco

7   takes a "money first, other considerations later" approach to pre-arraignment release.  For those

8   who can afford it, money bail yields instant results — before a pretrial risk assessment begins

9   and without an application to a magistrate.  Plaintiffs are entitled to judgment because there are

10  no genuine issues of material fact regarding the operation of San Francisco's money bail system.

11  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

12      San Francisco's money bail scheme is unconstitutional because (A) the County's use of

13  money bail violates the absolute prohibition against wealth-based discrimination in the criminal

14  justice system, (B) the County's wealth-based detention scheme infringes upon the fundamental

15  right to pretrial liberty and cannot survive strict scrutiny, and (C) the County's wealth-based

16  system fails even rational basis review because it actually undermines the legitimate state

17  interests of promoting pre-trial liberty, public safety, and court appearance.

18  **A.    The County's Use of Money Bail Violates the Absolute Proscription Against**
19  **Wealth-Based Discrimination in the Criminal Justice System**

20      San Francisco detains arrestees who cannot afford bail longer than those who buy their

21  freedom, violating the fundamental principle that a government cannot hold someone in jail

22  solely because she is unable to pay money.  *See, e.g.*, *Bearden v. Georgia*, 461 U.S 660, 672–73

23  (1983) ("[To deprive someone of] freedom simply because, through no fault of [her] own, [she]

---

[4]     https://university.pretrial.org/HigherLogic/System/DownloadDocumentFile.ashx?DocumentFileKey=4ce69b9e-36d1-328f-30e3-416ee82abbdf

1    cannot pay [a] fine . . . would be contrary to the fundamental fairness required by the Fourteenth

2    Amendment.").   The County's use of money bail violates this longstanding maxim because (i)

3    money bail conditions length on detention on wealth-status, (ii) numerous courts have

4    recognized that money bail violates the fundamental proscription of wealth-based detention, and

5    (iii) the County's non-monetary alternatives do not cure the wealth-based discrimination inherent

6    in the use of money bail.

7           **i.**        **Money Bail Violates Due Process and Equal Protection Because It**
8                    **Conditions the Length of Detention on Wealth-Status**

9    San Francisco operates an unconstitutional pay-or-jail scheme by using money to

10   determine who goes free and who waits for other processes.  *See, e.g.*, *Bearden,* 461 U.S. at 672–

11   73; *United States v. Estrada de Castillo*, 549 F.2d 583, 586 (9th Cir. 1976) ("[I]f a defendant,

12   because of his financial inability to pay a fine, will be imprisoned longer than someone who has

13   the ability to pay the fine, then the sentence is invalid.").  San Francisco's two-track system of

14   justice discriminates against the poor, unconstitutionally depriving them of liberty simply

15   because they cannot afford it.  *See Frazier v. Jordan*, 457 F.2d 726, 728 (5th Cir. 1972) (finding

16   a scheme that exchanged fines for jail time unconstitutional because "[t]hose with means

17   avoid[ed] imprisonment [but] the indigent [could not] escape imprisonment.").

18   The County's money bail system requires poorer individuals to remain in jail as they try

19   to fundraise their way to freedom, wait for the OR Project, or apply to a magistrate, while

20   wealthier arrestees pay bail and walk free.  This system of alternative processes for those who

21   can afford bail and those who cannot contravenes the fundamental principle that "[t]here can be

22   no equal justice where the kind of trial a [person] gets depends on the amount of money [s]he

23   has." *Griffin v. Illinois*, 351 U.S. 12, 19 (1956); *see also Williams v. Illinois*, 399 U.S. 235, 241

24   (1970) ("[T]he Court has had frequent occasion to reaffirm allegiance to the basic command that

1  justice be applied equally to all persons.").  By requiring lower-income individuals to remain in

2  jail while wealthy individuals can pay for immediate freedom, the County commits the "evil" of

3  "discrimination against the indigent." *Douglas v. California*, 372 U.S. 353, 355 (1963).

4       San Francisco's money-based system discriminates against people too poor to buy their

5  freedom, creating "a constitutional defect . . . [that] inheres in jailing an indigent for failing to

6  make immediate payment of any fine." *Tate v. Short*, 401 U.S. 395, 398 (1971) ("[T]he

7  Constitution prohibits [jailing an individual] solely because the defendant is indigent and cannot

8  forthwith pay the fine in full.").  Increasing jail time for those who cannot pay bail means "the

9  State has visited different consequences on two categories of persons since the result is to make

10  incarceration . . . applicable only to those without the requisite resources to satisfy the money

11  portion of the judgment." *Williams*, 399 U.S. at 242.

12       *Bearden*, *Tate*, *Williams*, and related cases compel the conclusion that the County's

13  money bail system is unconstitutional.  It makes no difference whether the wealth-based

14  deprivation of liberty occurs before trial (e.g., inability to afford money bail) or after trial (e.g.,

15  inability to pay a fine) because both deprivations infringe a fundamental right.  *See, e.g., Lopez-*

16  *Valenzuela v. Arpaio*, 770 F.3d 772, 780 (9th Cir. 2014) (*en banc*) 770 F.3d at 780 ("[W]hat is at

17  stake [in bail cases] is the individual's strong interest in liberty . . . and [the] *fundamental* nature

18  of this right.") (emphasis in original) (internal quotations omitted).  Just as it is unconstitutional

19  to imprison an individual because they cannot afford a fine, it is also unconstitutional to detain

20  someone longer because they cannot pay bail.  The logic and reasoning of cases forbidding

21  wealth-based detention has equal force in the context of money bail as it does with fines.

22       **ii.    Numerous Courts and Institutions Recognize that Equal Protection**
23  **and Due Process Prohibit the Government from Jailing Citizens Who**
24  **Are Too Poor to Pay Money Bail**

25       Numerous federal courts have recognized the unconstitutionality of money bail.  *See,*

1   *e.g., O'Donnell v. Harris County*, 4:16-cv-01414, at 172–73 (S.D. Tex. Apr. 28, 2017)

2   ("[S]ecured money bail operates to detain the impoverished while releasing those able to pay.

3   This liberty deprivation based on wealth violates the Equal Protection Clause."); *Williams v.*

4   *Farrior*, 626 F.Supp. 983, 985 (S.D. Miss. 1986) ("[I]t is clear that a bail system which allows

5   only monetary bail and does not provide for any meaningful consideration of other possible

6   alternatives for indigent pretrial detainee infringes on both equal protection and due process

7   requirements."). The County's practice of offering quick release to those who can afford money

8   bail while jailing all others is "invidious discrimination [that is] not constitutionally permissible."

9   *Pugh v. Rainwater*, 572 F.2d 1053, 1056–57 (5th Cir. 1978) (*en banc*) ("[P]retrial confinement

10  for inability to post money bail would constitute imposition of an excessive restraint.").

11      The legal community also recognizes that money bail impermissibly discriminates

12  against the poor. The American Bar Association "flatly rejects the practice of setting bail

13  amounts according to a fixed schedule . . . [because it] leads inevitably to the detention of some

14  persons who would be good risks but are simply too poor to post the amount of bail required."

15  American Bar Assoc., Commentary to ABA Pretrial Release Standard 10-5.3(e) (2007).

16  Similarly, the United States Department of Justice argues that when money bail keeps indigent

17  arrestees in jail, it "not only violates the Fourteenth Amendment's Equal Protection Clause, but

18  also constitutes bad public policy." Ex. 14, U.S. Dept. of Justice, ECF Doc. 2-2 at p. 1. The

19  judiciary also recognizes that money bail restricts liberty. *See, e.g., Holland v. Rosen,* 1:17-cv-

20  04217-JBS-KMW, at 10, 82–83 (D. N.J. Sept. 21, 2017) (rejecting the argument of bail as a

21  "liberty-preserving option" as "unpersuasive"); Recommendations of the California Chief

22  Justice, *Pretrial Detention Reform Workgroup* at 1 (Oct. 2017)[5] ("[T]he Workgroup determined

23  that California's current pretrial release and detention system unnecessarily compromises victim

---

[5] http://www.courts.ca.gov/documents/PDRReport-20171023.pdf.

1   and public safety because it bases a person's liberty on financial resources rather than the

2   likelihood of future criminal behavior and exacerbates socioeconomic disparities . . . .").

3          iii.     **San Francisco's Current Alternatives to Money Bail Do Not Satisfy**
4                   **Due Process or Equal Protection**

5          The County's non-monetary release alternatives do not save the system from

6   constitutional infirmity because they are slower than monetary release.  *See* Ex. 3, SHF0000235

7   (chart listing 2016 release methods by hour).  Compared to immediate paid release, the OR

8   Project is woefully inefficient: in 2016, of the 398 people released from custody in three hours or

9   less, not a single one was processed through the OR Project (by comparison, 39 individuals who

10  immediately paid money bail or secured private bond were released during this time, with the

11  balance released by citation or when charges were dropped).  *See* Ex. 15, Hatton Decl. ¶ 10; Ex.

12  3, SHF000235 (chart listing 2016 release methods by hour).  During 2016 (including the eight

13  months following San Francisco's implementation of a new "Pretrial Risk Assessment Tool"), of

14  the 4,088 people released within ten hours of confinement, only 10 were released through the OR

15  Project — compared to 1,112 individuals who were released on bail within the same timeframe.

16  *See* Ex. 15, Hatton Decl. ¶ 10; Ex. 3, SHF000235.  This data confirms that those who can afford

17  bail procure release much faster than those who must wait for the OR Project.

18         The vast majority of individuals released through the OR Project will wait more than ten

19  hours.  Of the 513 people released in 2016 through the OR Project, only 4% were released in less

20  than 24 hours; nearly 11% spent 24–48 hours waiting for their release; 71% waited at least two

21  full days; roughly 14% waited for at least three full days.  *See* Ex. 15, Hatton Decl, ¶¶ 15–16, Ex.

22  16, SHF000236.  A system that detains individuals longer because they cannot afford to purchase

23  a bond (while wealthier individuals go free) violates due process and equal protection.

24         Although some arrestees may apply to a magistrate for release on their own recognizance

1   under California Penal Code § 1269c, few know they have this right.  Ex. 1, Stips. ¶ 43; Ex. 17,

2   SHF000886.   Furthermore, there is no statutory deadline for a magistrate to review an

3   application.  *See, e.g.*, Cal. Penal Code § 1269c (not establishing any timeframe for magistrate

4   review).  But an arrestee applying to a magistrate will undoubtedly spend longer behind bars than

5   those who can post bail immediately, waiting for a process that is unguaranteed, lengthy, and

6   burdensome.   These unequal outcomes based on wealth-status violate the Fourteenth

7   Amendment's absolute prohibition against wealth-based inequality in the criminal justice

8   system.

9   **B.    San Francisco's Money Bail System Implicates Fundamental Liberty and**
10  **Fails Strict Scrutiny**

11         The County's money bail scheme, which restricts pretrial liberty on the basis of wealth,

12  infringes upon the fundamental right to be free from detention before trial.  *United States v.*

13  *Salerno*, 481 U.S. 739, 750 (1987) ("[An] individual [has] a strong interest in liberty. . . .  We do

14  not minimize the importance and fundamental nature of this right."); *Arpaio*, 770 F.3d at 780

15  ("[W]hat is at stake [in bail cases] is the individual's strong interest in liberty . . . and [the]

16  *fundamental* nature of this right.") (emphasis in original) (internal quotations omitted).   By

17  allowing wealth to dictate pretrial liberty, San Francisco violates a fundamental right.  Therefore,

18  this system must be reviewed under strict scrutiny.  *Id.* at 781 ("[T]he institutionalization of an

19  adult by the government triggers heightened, substantive due process scrutiny.").

20         San Francisco's wealth-based system fails strict scrutiny because (i) its "money-first,

21  other considerations later" pretrial system does not serve a compelling government interest, and

22  (ii) wealth-based detention is not the least restrictive alternative for achieving the state's

23  interests.  *Arpaio*, 770 F.3d at 781 (holding that pretrial detention "laws will satisfy substantive

24  due process only if they are narrowly tailored to serve a compelling state interest.").

i.   **The County's Wealth-Based Detention Scheme Serves No Compelling Government Interest**

San Francisco's pay-for-freedom scheme cannot pass strict scrutiny because it does not serve a compelling governmental interest.  The United States Supreme Court has recognized three compelling interests in the context of pretrial justice: maximizing pretrial liberty, public safety, and court appearance. *See Salerno*, 481 U.S. at 740, 745, 750–51.  The County's wealth-based detention scheme does not serve any of these interests.

First, the County's system does not further the government interest in maximizing pretrial liberty. *See Salerno*, 481 U.S. at 75 ("In our society, liberty is the norm, and detention prior to trial [] is the carefully limited exception.").  By definition, a monetary system of release means that those without money (or without access to money) cannot achieve release monetarily.

Second, the County's pay-for-freedom system does not serve public safety.  San Francisco is willing to let all Class Members walk free if they can afford to pay their way out.  By allowing arrestees to purchase freedom regardless of risk, the County admits that "[t]hose who can pay are released at the time of their choosing, regardless of any threat they may pose to public safety." *See* ECF Doc. 101, Answer of Def. Sheriff Hennessey, at p. 1.

For individuals freed on bail, the sole condition that triggers forfeiture of their money is a failure to appear — not criminal conduct.  Cal. Penal Code § 1305(a)(1).  Even if an individual freed on bail goes on a violent crime spree, as long as they show up in court, their money will be returned to them.  Therefore, money bail has no logical connection to ensuring public safety.

Money bail does not advance public safety because it allows wealthy individuals circumvent both pretrial supervision and pretrial risk assessment.  Monetary release "enable[s] the unsupervised release of more affluent defendants who may present real risks of flight or dangerousness, who may be able to post the required amount easily and for whom the posting of

1   bail may be simply a cost of doing 'business as usual.'" American Bar Assoc. *Standards for*

2   *Criminal Justice: Pretrial Release*, 3rd Ed. (2007).   Release under money bail is completely

3   detached from any consideration of public safety because it prevents supervision.  The County's

4   money bail scheme further fails to advance public safety by allowing wealthy arrestees to avoid

5   any public safety assessment.  *See* Cal. Penal Code §1270.1(a); Stips. ¶ 40.  Allowing potentially

6   dangerous detainees to circumvent the public safety assessment by purchasing freedom does not

7   serve the County's interest in public safety.

8        Third and finally, just as money bail does not advance the goals of pretrial liberty or

9   public safety, it also undermines the third recognized government interest in court appearance.

10  Studies show that low-risk arrestees held for 2–3 days were 22% *less* likely to appear in court

11  than those held for less than 24 hours.  Lowenkamp et al., Investigating the Impact of Pretrial

12  Detention on Sentencing Outcomes, Arnold Foundation, 3 (2013).[6]  This fact means that the use

13  of money bail to unnecessarily detain indigent arrestees who might otherwise be eligible for

14  release can actually decrease court appearance rates.  Studies also show that there are court

15  appearance rates can be maximized in systems that do not depend on money bail.  Michael R.

16  Jones, *Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option*, 11

17  (2013).[7]  In short, money bail does not further the goal of court appearance.

18       For any given offense, the County's Bail Schedule sets a money bail amount, which in

19  turn operates as a categorical denial of release for those unable to afford that amount, leaving

20  them to hope for unguaranteed and lengthier processes.  The very nature of a price tag is that it

21  prevents access to all those unable to afford it.  The County's money bail scheme does not

22  counteract any acute or documented problem, it provides absolutely no individualized

---

[6] www.arnoldfoundation.org/wp-content/.../LJAF_Report_state-sentencing_FNL.pdf.
[7] http://www.pretrial.org/download/research/Unsecured%20Bonds,%20The%20As%20Effective%20and%20Most%20Efficient%20Pretrial%20Release%20Option%20-%20Jones%202013.pdf.

1    consideration, and it is a categorical denial to those who cannot afford bail; it thus violates every

2    principle the Ninth Circuit has flagged as necessary to justify pretrial detention.  *See Arpaio*, 770

3    F.3d at 791 (holding that pretrial detention must respond to an "acute" problem, be based on

4    "individualized determination" of risk, and not create a "categorical" denial of release).

5            Because money bail fails to advance pretrial liberty, public safety, or court appearance, it

6    serves no compelling governmental interest.

7            **ii.     The County's Wealth-Based Pretrial Scheme Is Neither Narrowly**
8                    **Tailored nor the Least Restrictive Means**

9            San Francisco's wealth-based detention scheme is not narrowly tailored to protect any

10   governmental interests and does not represent the least restrictive means for achieving public

11   safety and court appearance.  Ex. 18, Aff. of Michael Jones, ¶ 39 ("Empirical studies have shown

12   that unsecured bond conditions are as effective as secured money bail at achieving public safety

13   and court appearance, but they do so with much less pretrial jail bed use and costs to the

14   system.").  The lack of narrow tailoring in the County's system is shown by (a) the total lack of

15   connection between money bail and any government interest, (b) the failure of non-monetary

16   alternatives to remedy the wealth-based infringement on pretrial liberty, and (c) the existence of

17   non-monetary systems that better fulfill the governmental interests.

18           **a.     Money Bail Is Not Tailored to Any Governmental Interest**

19           Public safety rates remain equivalent across jurisdictions that use money bail and those

20   that do not.  Jurisdictions that use less restrictive means than money-based detention, such as

21   unsecured bond or "in or out" models (where only the most serious offenses result in detention,

22   and all others are released) can process low-risk detainees in a matter of hours — importantly,

23   systems like these maintain objectively high "public safety" (no new crime) rates that are

24   virtually identical to the safety rates of jurisdictions using money bail.  U.S. Dept. of Justice,

1   Nat'l Inst. Corr., *Fundamentals of Bail*, 26 (2014).[8]   Other studies have found that unsecured

2   release is equally effective to money-secured bonds for achieving public safety, and for low-risk

3   individuals, unsecured bonds actually achieve *higher* public safety rates.   Michael R. Jones,

4   *Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option*, 10, 16 (2013).[9]

5   These results demonstrate the commonsense notion that an individual is not dangerous merely

6   because her family cannot afford bond, and likewise, an individual is not innocuous merely

7   because her family can.   By equating freedom with wealth status, San Francisco does not detain

8   the most dangerous offenders — just the poorest ones.

9       Similarly, no logical connection exists between likelihood to appear in court and wealth,

10   meaning that non-monetary release can also achieve high court appearance rates.   *Id.* at 11 ("The

11   lack of benefit from using [secured] bond type versus [unsecured, non-monetary bond] is not

12   surprising given that both bond types carry the potential for the defendant to lose money for

13   failing to appear.").   Unsecured release carries the same monetary penalty for a failure to appear;

14   thus secured money release serves only to extend jail time for poorer arrestees without creating

15   an additional incentive to appear in court.

16          **b.     The County's Attempt to Combine Non-Monetary Release**
17                  **Methods with Its Parallel Monetary Release Method Does Not**
18                  **Suffice for Narrow Tailoring**

19       That the County runs parallel tracks of both monetary and non-monetary release does not

20   make its pretrial justice system narrowly tailored.   In addition to the fact that money bail is both

21   guaranteed and immediate (unlike non-monetary methods), money bail violates equal protection

22   by affording different pretrial outcomes to individuals facing the same charge. *See O'Donnell v.*

23   *Harris County*, 4:16-cv-01414, at 172–73 (S.D. Tex. Apr. 28, 2017).   Harris County, like San

---

[8] http://www.clebp.org/images/2014-09-04_Fundamentals_of_Bail.pdf.
[9] http://www.pretrial.org/download/research/Unsecured%20Bonds,%20The%20As%20Effective%20and%20Most%
20Efficient%20Pretrial%20Release%20Option%20-%20Jones%202013.pdf.

1    Francisco, used money bail in tandem with a Pretrial Services Agency that gathered information

2    for hearing officers to use in own recognizance determinations.  *Id.* at 29–30.  Despite these

3    parallel systems, the court found that inability to secure financial release resulted in "de facto

4    detention orders" for poor arrestees. *Id.* at 172–73.  The court concluded that "secured money

5    bail operates to detain the impoverished while releasing those able to pay.  This liberty

6    deprivation based on wealth violates the Equal Protection Clause."  *Id.*

7            The use of money bail as a special pretrial option for the wealthy will always result in

8    two unequal systems: one for the rich and one for the poor. Money bail will always deprive

9    indigent arrestees of their liberty unfairly, and it will always lack a narrowly tailored connection

10   to government interests, including public safety.  Therefore, use of multi-factor risk assessment

11   tools will not cure the constitutional infirmity of money bail when the two are used together.

12           c.      **Less Restrictive Alternatives to the County's Money-Based**
13                   **System Exist and Could Realistically Be Implemented**

14          Further illustration that San Francisco's scheme is not narrowly tailored is the existence

15   of less restrictive alternatives that further all governmental interests.  Experts, scholars, and other

16   jurisdictions show that the County can implement a non-monetary scheme that (1) provides for

17   prompt release for those accused of non-violent felonies and (2) quickly processes those accused

18   of violent felonies to assess suitability for release, all without monetary options.

19           1.      **The County Should Provide Prompt Release for**
20                   **Arrestees Accused of Misdemeanors or Non-Violent**
21                   **Felonies**

22          San Francisco should release those accused of misdemeanors and non-violent felonies

23   with non-monetary conditions, followed by robust risk assessment procedures for remaining

24   detainees.  Indeed, California law already guarantees the right to release to virtually all of those

25   accused of misdemeanors and non-violent felonies; the California Constitution provides for

1   guaranteed pre-arraignment release (through bail) for all arrestees except those accused of capital

2   crimes, violent felonies, or felonies with proof of a specific threat of harm. Cal. Const. Art. I, §

3   12.  Plaintiffs request only that those individuals *already* guaranteed immediate release by the

4   state constitution are not denied that right because they cannot pay for it.

5         A system that automatically releases those accused of misdemeanors and non-violent

6   felonies on non-monetary conditions not only furthers governmental interests, but it also

7   comports with pretrial freedom eligibility guidelines already contemplated by the California

8   Constitution.  While current law authorizes release of such individuals with money bail, a more

9   narrowly tailored system would secure all the same interests by allowing release without money

10  bail (and, thus, without wealth-based discrimination).  Jurisdictions that detain only the most

11  violent offenses at the arrest threshold have nearly identical public safety rates as jurisdictions

12  using money bail.  U.S. Dept. of Justice, Nat'l Inst. Corr., *Fundamentals of Bail*, 26 (2014).[10]

13  When lower-risk individuals are released on non-monetary conditions instead of detained due to

14  poverty, public safety rates are *higher* than in money-bail jurisdictions.  Michael R. Jones,

15  *Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option*, 10, 16 (2013).[11]

16  Charge-based release promotes court appearances; detaining low-risk offenders at the arrest

17  threshold actually correlates with *increased* failure to appear.  Studies show that low-risk

18  arrestees held for 2–3 days were 22% less likely to appear than those held for less than 24 hours.

19  Lowenkamp et al., *Investigating the Impact of Pretrial Detention on Sentencing Outcomes*,

20  Arnold Foundation, 3 (2013).[12]

21         Washington D.C. uses a universal release scheme rather than money bail and still has

---

[10] http://www.clebp.org/images/2014-09-04_Fundamentals_of_Bail.pdf.

[11] http://www.pretrial.org/download/research/Unsecured%20Bonds,%20The%20As%20Effective%20and%20Most%20Efficient%20Pretrial%20Release%20Option%20-%20Jones%202013.pdf.

[12] http://www.arnoldfoundation.org/wpcontent/uploads/2014/02/LJAF_Report_hidden-costs_FNL.pdf.

1    both high court appearance percentages and low levels of new crime. U.S. Dept. of Justice, Nat'l

2    Inst. Corr., *Fundamentals of Bail*, 26 (2014).[13]   The District of Columbia releases 85–91% of

3    arrestees on unsecured release, detaining only those with the most serious charges or

4    demonstrable dangerousness. *Id.*  Money does not factor into this process at any time. *See* D.C.

5    Code § 23-1321. Not only does D.C. release most arrestees on unsecured bond, it maintains

6    pretrial public safety rates equal to those in money bail jurisdictions. U.S. Dept. of Justice, Nat'l

7    Inst. Corr., *Fundamentals of Bail*, 26 (2014)[14]; *see also* Ex. 19, Aff. of Judge Truman Morrison,

8    ¶ 12 (In D.C. in 2015, "more than 91% [of arrestees] were released and 98% of released

9    defendants remained arrest-free from violent crimes during pretrial release.").

10         While the County's release of non-violent arrestees can and should be without monetary

11    conditions, the County may impose non-monetary conditions.  Easily implementable non-

12    monetary conditions include orders to follow the law and appear for court.  At the Sheriff's

13    discretion, further conditions (such as stay-away orders) may be appropriate, but in each

14    instance, the conditions should be non-monetary so as not to advantage wealthy arrestees over

15    those who are poor.

16         **2.**    **The County Should Employ Expedited Risk Assessment**
17                       **Procedures to Determine Suitability for Release of those**
18                       **Accused of Violent Felonies**

19        Because all arrestees are considered innocent and because a single criminal charge can

20    never predict all future behavior, an individual's criminal charge should factor as only one part

21    of the pretrial release determination. San Francisco should use expedited risk assessment and

22    own recognizance procedures for arrestees who are not automatically released on non-violent

23    charges.  Risk assessments have proven effective in numerous jurisdictions.  San Francisco

---

[13] http://www.clebp.org/images/2014-09-04_Fundamentals_of_Bail.pdf.
[14] http://www.clebp.org/images/2014-09-04_Fundamentals_of_Bail.pdf.

1   already has experience using objective risk assessment reports through the OR Project; it would

2   be an easy transition to rely on those objective criteria while taking money out of the equation.

3        Risk assessment protocols that use objective data coupled with arraignment

4   determinations are more consistent with due process and do more to avoid wealth discrimination.

5   Money bail allows high-risk offenders to circumvent risk assessment with a check; objective risk

6   assessments coupled with judicial discretion "minimize the number of low-risk individuals who

7   are unfairly detained [while] maximiz[ing] the number of high-risk defendants who are not

8   released prematurely."  Cynthia Mamalian, *State of the Science of Pretrial Risk Assessment,* U.S.

9   Dept. of Justice, Bureau of Justice Assistance, 7, 14 (March 2011).[15]   In 2009, 41% of

10   jurisdictions were already using validated risk assessment instruments, assigning "risk levels,"

11   rather than money bail to determine pretrial release.  Kristin Bechtel, *Dispelling the Myths: What*

12   *Policy Makers Need to Know About Pretrial Research*, Pretrial Justice Institute, 23 (2012).[16]

13        Risk assessment protocols can safely and effectively balance compelling government

14   interests and the fundamental right to liberty.  The federal government has successfully

15   abandoned money bail to adopt a system of detaining only individuals who show either a flight

16   risk or a danger to others, determined only after careful procedures are followed.  *See* 18 U.S.C.

17   § 3142(e).  Washington, D.C. uses similar individualized risk assessments; for all but the most

18   serious offenders, judicial officers order unsecured release unless they carefully determine that

19   no alternative condition can reasonably assure court appearance or public safety.  *See* D.C. Code

20   § 23-1321.  D.C. maintains pretrial public safety rates equal to those in money bail jurisdictions.

21   U.S. Dept. of Justice, Nat'l Inst. Corr., *Fundamentals of Bail*, 26 (2014).[17]   Objective risk

22   assessments coupled with judicial protocols comport with California's Constitution as well as

---

[15] https://www.bja.gov/publications/pji_pretrialriskassessment.pdf
[16] https://www.pretrial.org/.../Dispelling%20the%20Myths%20(November%202012).pdf
[17] http://www.clebp.org/images/2014-09-04_Fundamentals_of_Bail.pdf.

1   Supreme Court principles.  *See* Cal. Const. Art. I, § 12(b)–(c) (authorizing mandatory detention

2   for those who show clear and convincing evidence of danger); *Salerno*, 481 U.S. at 751–52

3   (approving procedural due process by which a judicial officer "determin[es] the appropriateness

4   of detention [] guided by [objective] enumerated factors").

5       New Jersey successfully replaced its money bail system with a system "that relies upon

6   an objective evaluation of an individual defendant's level of risk." *Holland v. Rosen,* 1:17-cv-

7   04217-JBS-KMW, at 6, 10 (D. N.J. Sept. 21, 2017). In New Jersey, defendants are assigned the

8   "least restrictive" non-monetary conditions available to ensure their appearance in court.  *Id.* at

9   76.  Non-monetary conditions include own recognizance, phone and in-person check-ins with

10  pretrial services, and GPS monitoring.  *Id.*  As a result of risk-based, non-monetary release

11  processes, New Jersey experienced a 35.4 percent decrease in pretrial population over a two-year

12  period. *Id.* at 23.  The "numerous [non-monetary release] tools at [a jurisdiction's] disposal [can]

13  maximize court appearance and public safety for the vast majority of defendants without

14  resorting to detention." Ex. 19, Aff. of Judge Truman Morrison, ¶ 14.

15      Many California counties have significantly reduced their need for expensive jail beds by

16  implementing risk assessment and non-monetary release conditions, and the "Pretrial Services

17  [programs that manage defendants] do[] just as well, if not better, than bail agents in terms of

18  getting defendants to their court dates." Ex. 20, Aff. of Gerry Herceg, ¶¶ 17, 26, 31 (noting also

19  that, in 2015, 99.3% of defendants released on OR in Santa Clara County remained arrest-free

20  during the pretrial stage). Non-monetary pretrial release conditions administered through a

21  pretrial services agency have been extremely effective in San Francisco, and evidence suggests

22  they would continue to be effective if expanded. Ex. 21, Aff. of Allison McCovey ("92% of

23  [Supervised Pretrial Release] clients were not charged with a new offense during the pretrial

1   stage . . . with additional resources, SFPDP could provide pretrial supervision services to

2   additional defendants.").

3       It would be unfair to detain those accused of non-violent felonies at all — after all, such

4   individuals are guaranteed release under the California Constitution — but for those who are

5   detained, a risk assessment that is conducted as quickly as possible can determine suitability for

6   release.   Ideally, the County would make this determination within 24 hours, resulting in a

7   system that releases those accused of non-violent offenses promptly, within three hours of

8   booking; releases those accused of violent felonies as promptly as a risk-determination can be

9   made, within 24 hours of booking; and detains those who are arrested for violent felonies and

10  who are considered too risky to release until a judge (at arraignment) can evaluate suitability and

11  conditions for release.  And while suitable conditions of release can be employed, money bail

12  should never play a role.

13      Public proposals for reform in California share these basic ingredients.  *See*

14  Recommendations of the California Chief Justice, *Pretrial Detention Reform Workgroup* at 50–

15  56 (Oct. 2017).[18]  While this Court has some flexibility in tailoring an injunction consistent with

16  the Constitution's proscription on wealth-based detention, the injunction should at least meet

17  these basic elements: (a) San Francisco should not offer release based on money bail for any

18  offenses, (b) consistent with the existent provisions of the California Constitution, those accused

19  of non-violent offenses should be released immediately (except for the minimal time need for

20  processing at the jail, which should be approximately three hours or less), (c) those accused of

21  violent offenses should undergo expedited processing by the OR Project to determine eligibility

22  for non-monetary release as quickly as possible (ideally, within 24 hours), and (d) those not

23  released pre-arraignment should appear before a judge as quickly as possible (within 24 hours).

---

[18] http://www.courts.ca.gov/documents/PDRReport-20171023.pdf.

1    Liberty is the norm in our society — by adopting universal release for non-violent

2   arrestees and robust risk assessment procedures for all others, San Francisco can advance

3   legitimate governmental interests in the least restrictive manner, free from unconstitutional

4   wealth discrimination.

5    **C.    The Use of Money Bail Fails Even Rational Basis Review Because It**
6    **Decreases Pretrial Liberty, Decreases Public Safety, Decrease Court**
7    **Appearance, and Is Therefore Counterproductive to Any Governmental**
8    **Interest**

9    Because San Francisco's money bail system infringes the fundamental right to pretrial

10   liberty, it must pass strict scrutiny.  But in addition to failing strict scrutiny, the use of money

11   bail would even fail a rational basis analysis because money bail actually contravenes

12   government interests in pretrial freedom, public safety, and judicial integrity.  Detaining low-risk

13   individuals because they cannot afford an arbitrary payment, even for a short period, has far-

14   reaching and long-lasting negative effects on defendants and the community.   Wealth-based

15   detention increases unnecessary detention, because there will always be individuals who are

16   detained solely because they cannot afford money bail.  By increasing detention rates, money

17   bail undermines any legitimate government interest.

18    By increasing unnecessary detention, the use of money bail actually *decreases* public

19   safety.  Low-risk individuals detained for as little as two or three days are 39% *more* likely to

20   engage in new pretrial criminal activity than those released within a day.  Low-risk individuals

21   held for five to seven days are 50% *more* likely to commit a new crime pretrial.  Lowenkamp et

22   al., *Investigating the Impact of Pretrial Detention on Sentencing Outcomes,* Arnold Foundation,

23   3 (2013).[19]  In addition to increasing pretrial recidivism rates, unnecessary detention of low-risk

24   offenders also increases the likelihood of long-term recidivism.  Low-risk individuals who spend

---

[19] http://www.arnoldfoundation.org/wpcontent/uploads/2014/02/LJAF_Report_hidden-costs_FNL.pdf.

1   two to three days detained are 17% *more* likely to engage in new criminal activity up to two

2   years later compared with those released in less than twenty-four hours.   *Id.*   In short, the

3   unnecessary detention caused by the use of money bail actually *increases* recidivism rates and

4   thus directly undermines public safety.

5        Even a few days of detention can have life-altering repercussions based on loss of

6   income, inability to take care of children, or being barred from medical care.  *See* Alexander

7   Holsinger, *The Effects of Pretrial Detention on Self-Reported Outcomes*, Crime & Justice Inst.,

8   12 (2016).[20]   Pretrial detention for just three days or less has been negatively associated with

9   employment, finances, residential stability, and the welfare of dependent children and family

10  members.  Alexander Holsinger, *Exploring the Relationship Between Time in Pretrial Detention*

11  *and Four Outcomes*, Crime & Justice Inst., 3 (2016)[21]; *see also* Kimbrell & Wilson, *Money Bond*

12  *Process Experiences and Perceptions,* George Mason Univ. Dept. of Crim., Law & Soc., 19

13  (2016)[22] (30% of study participants lost their jobs as a result of pre-release incarceration).  These

14  negative impacts are predictable, because when someone is unnecessarily detained, she may miss

15  work and thus risks losing her job.  If she is a parent or caretaker, she will not be able to care for

16  dependent relatives while detained.  If she is the breadwinner for a family, she may miss a rent

17  payment, risking eviction for her family.   These community costs are felt not just by the

18  detainee, but by society as a whole, and they are caused by unnecessary detention.  Because

19  money bail entails unnecessary detention of those who cannot pay, the County's money bail

20  system increases these societal harms.

21        Unnecessary detention of individuals who are otherwise eligible for release costs the

---

[20] http://www.crj.org/assets/2017/07/13_bond_supervision_report_R3.pdf
[21] http://www.crj.org/assets/2017/07/12_Exploring_Pretrial_Detention.pdf
[22]   https://university.pretrial.org/HigherLogic/System/DownloadDocumentFile.ashx?DocumentFileKey=4ce69b9e-36d1-328f-30e3-416ee82abbdf

1  taxpayers money.  In San Francisco, the county jail spends an average of $245.13 per day on

2  each detainee.  Ex. 22, SHF000100.  Arrestees released through either the OR Project or

3  magistrate-ordered OR spend an average of 11.7 days in jail before release, and in 2016,

4  approximately 2,856 individuals were processed and released through these programs.  Ex. 16,

5  SHF000236.  Thus, the County's "money-first, other considerations later" scheme costs

6  approximately $8 million dollars annually by using inefficient OR programs to unnecessarily

7  detain low-risk individuals.  *See* Ex. 22, SHF000100; Ex. 16, SHF000236.

8       Unnecessary detention creates a harmful ripple effect throughout the entire criminal

9  justice system.  Not only are valuable taxpayer dollars wasted by unnecessarily detaining

10  indigent arrestees, but "the whole [money bail] system wastes limited law enforcement

11  resources," further jeopardizing public safety.  Ex. 23, Decl. of San Francisco Sheriff Ross

12  Mirkarimi, ¶ 8.  Elongated detention for indigent arrestees also results in negative outcomes for

13  defendants, who cannot participate in the defense of their case while detained, or who sometimes

14  plead guilty simply out of desperation.  Ex. 18, Aff. of Michael Jones, ¶ 18 ("Several studies

15  with rigorous research designs have demonstrated that defendants detained pretrial because they

16  did not post their money bail were more likely to be convicted and to plead guilty than were

17  released defendants with similar demographics.");  Ex. 24, Decl of Jeff Adachi, ¶ 7–10

18  ("Someone who is detained is more likely to plead guilty – even if they are innocent — to

19  shorten their time in jail. . . .[t]he worse outcomes faced by detained defendants are particularly

20  unjust when the detention is wealth-based").

21       San Francisco not only violates the Equal Protection and Due Process Clauses by

22  conditioning freedom on ability to pay, but its unconstitutional scheme is also counterproductive

23  for defendants, the community, and the integrity of the criminal justice system.  San Francisco's

1    reliance on money bail is irrational because it is counterproductive to any governmental interest,

2    undermining pretrial liberty, public safety, and judicial efficiency.

3    **IV.    Conclusion**

4           For the reasons articulated above, Plaintiffs respectfully request that this Court:

5    a.    Declare unconstitutional and enjoin the use of money bail and all pretrial processes that
6          condition release on a monetary sum extracted from a criminal defendant;

7    b.    Declare unconstitutional and enjoin the Felony-Misdemeanor Bail Schedule established
8          by the Superior Court of California, County of San Francisco;

9    c.    Declare unconstitutional and enjoin the enforcement of all state laws that create wealth-
10         based pretrial release processes, including but not limited to California Penal Code
11         sections 1270.1, 1269b, and 1269c;

12   d.    Enter an Order and judgment permanently ordering Defendants to release all individuals
13         eligible for release as defined by the California Constitution, Article I, Section 12;

14   e.    Enter an Order and judgment preliminarily and permanently enjoining Defendants from
15         detaining any release-eligible individual arrested in San Francisco County as defined by
16         the California Constitution, Article I, Section 12, absent some legal and non-monetary
17         impediment to their release (e.g., revocations or other legal holds); AND

18   f.    EITHER: (1) Enter an injunction ordering Defendants to adopt a non-monetary remedial
19         solution to pre-arraignment release consistent with the criteria outlined herein;
20         specifically, to adopt a policy of immediately releasing all individuals accused of non-
21         violent felonies and misdemeanors with appropriate non-monetary conditions, and to
22         offer prompt, robust risk assessment and own recognizance release processes for
23         remaining defendants that adequately balance government interests in pretrial liberty,
24         public safety, and maximizing court appearance without unconstitutionally discriminating
25         on wealth status;

26         OR: (2) Enter an Order consistent with (a) through (e) and also afford all Parties the
27         opportunity for subsequent briefing to detail the appropriate non-monetary remedial
28         solutions to replace San Francisco's unconstitutional monetary release system.

29                                    Respectfully submitted,

30                                    */s/ Phil Telfeyan*
31                                    Phil Telfeyan (California Bar No. 258270)
32                                    Attorney, Equal Justice Under Law
33                                    400 7th Street NW, Suite 602
34                                    Washington, D.C. 20004
35                                    (202) 505-2058
36                                    ptelfeyan@equaljusticeunderlaw.org

1 **<u>Certificate of Service</u>**

2      I certify that on October 31, 2017, I electronically filed the foregoing document with the

3 Clerk of the Court using the CM/ECF system, which will send notice of such filing to all

4 attorneys-of-record in this case.

5                               */s/ Phil Telfeyan*
6                               *Attorney for Plaintiffs*