Phil Telfeyan (CA Bar No. 258270)
    ptelfeyan@equaljusticeunderlaw.org
Equal Justice Under Law
400 7th Street NW, Suite 602
Washington, D.C. 20004
Telephone: (202) 505-2058

LATHAM & WATKINS LLP
    Robert E. Sims (CA Bar No. 116680)
        bob.sims@lw.com
    Steven M. Bauer (CA Bar No. 135067)
        steven.bauer@lw.com
    Tyler P. Young (CA Bar No. 291041)
        tyler.young@lw.com
    Ariel E. Rogers (CA Bar No. 316910)
        ariel.rogers@lw.com
    David R. Derrick (CA Bar No. 316745)
        david.derrick@lw.com
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: +1.415.391.0600
Facsimile: +1.415.395.8095

*Attorneys for Plaintiffs*
*Riana Buffin and Crystal Patterson*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| RIANA BUFFIN and CRYSTAL PATTERSON, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO, ET AL.,<br><br>Defendants,<br><br>v.<br><br>CALIFORNIA BAIL AGENTS ASSOCIATION<br><br>Defendant-Intervenor. | CASE NO. 4:15-cv-04959-YGR<br><br>**PLAINTIFFS' REBUTTAL EXPERT REPORT OF MICHAEL R. JONES, PH.D.**<br><br>Pretrial Conference:    September 7, 2018<br>Trial:                          September 17, 2018 |

## Table of Contents

Nature of the Assignment     Page 1

Qualifications     Page 1

Prior Testimony     Page 3

Statement of Compensation     Page 3

Materials Considered     Page 3

Rebuttal Discussion     Page 3

    Money Bail Schedule     Page 4

    Bail Forfeiture     Page 5

    Promoting Appearance     Page 8

    Financial Costs     Page 11

    Evaluation of Release Types     Page 12

    Public Safety Assessment     Page 15

    The Proposed Alternatives     Page 21

    Decision-Making Framework     Page 23

    Jail Impact     Page 24

Conclusion     Page 24

Appendix A: Curriculum Vitae     Page 26

Appendix B: Materials Considered     Page 42

## Nature of the Assignment

1. I have been retained by the Attorneys for Plaintiffs to rebut the Expert Report of Robert Morris, Ph.D. (hereinafter "Morris Report"), dated July 6, 2018, in connection with the above referenced matter.

## Qualifications

2. I am the President of Pinnacle Justice Consulting, which I began in 2017. My associates and I (1) provide training and technical assistance for states, localities, and various justice system stakeholder organizations to enable them to improve their pretrial justice policies and practices

1

based on the most recent research and legal developments; (2) assist states and local jurisdictions to design and implement strategic initiatives to modernize their pretrial justice systems; and (3) perform empirical research, data analysis, system and program evaluation, and expert testimony for criminal justice systems.

3.  Since my deposition in this case in October of 2017, I have become a technical assistance provider qualified by the Laura and John Arnold Foundation (LJAF) to assist state and local jurisdictions to implement the Public Safety Assessment (PSA) and accompanying practices, such as the Decision Framework (DF; formerly known as the Decision Making Framework (DMF)) and pretrial process and outcome evaluation. In the process of becoming a qualified provider, I learned about the nature of the pretrial policies and practices in multiple counties and states nationally (e.g., the City and County of San Francisco; Ada County, Idaho; Montana). I have also become more familiar with California pretrial law and the pretrial policies and practices of nearby California counties through my direct work with them (e.g., Contra Costa County, Sonoma County).

4.  From 2010 to 2017, I worked at the non-profit Pretrial Justice Institute (PJI) where I served as a Senior Project Associate and then the Director of Implementation. At PJI, I directed the Bureau of Justice Assistance's three-year Smart Pretrial Demonstration Initiative, which was a three-jurisdiction project to test the cost savings and public safety enhancements that can be achieved by moving to a pretrial justice system that uses research-based risk assessment and risk management to improve pretrial outcomes; provided pretrial training and technical assistance to hundreds of jurisdictions; conducted numerous workshops at national and state conferences; performed empirical research; and developed several resource materials for decision-makers and practitioners.

5.  While at PJI, I presented to the California Supreme Court's Pretrial Detention Reform Workgroup at its inaugural meeting in January of 2017. I also provided pretrial training and technical assistance to several California counties (e.g., Sonoma, Santa Clara, San Mateo, Contra Costa, Humboldt) when they implemented a variety of new pretrial policies and practices, including risk assessment, risk management, and performance measurement.

6.  I have been working since 2004 as a technical resource provider and consultant for the U.S. Department of Justice's National Institute of Corrections, providing criminal justice and pretrial training and technical assistance to dozens of jurisdictions nationwide.

7.  Before my work at PJI, I served for nine years as a county employee working for a local criminal justice coordinating committee in Colorado, where I provided information, ideas, and analyses to justice decision-makers (e.g., judges, sheriff, district attorney, public defender, county commissioners, municipal law enforcement, city councils, probation, and various community-based service providers) for local system improvement, including in pretrial justice.

8. During my career, I have written numerous criminal justice, pretrial, and psychological articles that have appeared in peer-reviewed journals and elsewhere.

9. I received my Ph.D. in Clinical Psychology from the University of Missouri-Columbia.

### Prior Testimony

10. I have provided expert testimony on the subjects of this rebuttal in: *Daves, et al. v. Dallas County, Tex.,* 3:18-cv-154 (N.D. Tex. 2018); *Schultz, et al. v. State of Alabama,* et al., 5:17-cv-00270-MHH (N.D. Ala.); *Knight v. Sheriff for Leon County,* Fla., No. 4:17cv464 (N.D. Fla.); *Buffin v. Hennessy,* 4:15-cv-4959 (N.D. Cal. 2018); and *ODonnell v. Harris County,* 251 F. Supp. 3d 1052 (S.D. Tex. 2017).

11. I have made a copy of my curriculum vitae summarizing my professional experience and education to the Attorneys for Plaintiffs. It includes a list of all publications and reports I have authored (See Appendix A).

### Statement of Compensation

12. I am being compensated at the rate of $300 per hour for my substantive work and $150 per hour for any travel related to this case.

### Materials Considered

13. For this rebuttal report, I reviewed the Morris Report and I relied on the materials listed in Appendix B.

### Rebuttal Discussion

14. I prepared the comments below after reading the Morris Report. Dr. Morris provides a variety of analyses and some references to other studies (Pages 3 to 40), and largely relies on that content to formulate his opinions about Proposed Alternatives (Pages 40 to 44). Dr. Morris' curriculum vitae indicates he has experience publishing in academic, peer-reviewed journals, mostly stemming from his time serving as a professor. I have been familiar with his pretrial-related research for several years. I agree with a few of Dr. Morris' interpretations and conclusions and disagree on several, important others. My disagreements are based on my knowledge of previously published research and reports,[1] my own research, and my experience

---

[1] In forming my opinions, I rely on the findings from multiple studies authored by various researchers and scholars in the pretrial justice field, who used data from numerous local and state jurisdictions throughout the United States. These studies use adequate research methodology and were performed in jurisdictions that have many pretrial policies and practices similar to one another, including to San Francisco. Some studies were published in peer-reviewed journals that target academic audiences. Other studies, sometimes by the same researchers, were published in other venues (e.g., by a non-profit organization). Although the academic peer-review process can

over the past 10 years working directly with state and local pretrial justice systems across the United States as they have sought to improve their pretrial justice systems by putting research (and pretrial law) into practice.

*Money Bail Schedule*

15. On Page 40, first paragraph, the Morris Report states, "I am not aware of any peer-reviewed studies that have empirically addressed questions specifically in regard to the effectiveness of bail schedules. Clearly, bail schedules are used for operational efficiency where individualized methods are subjective and arguably too time consuming given the volume of pre-trial defendants in a given court." I agree that there is no empirical research, published in peer-reviewed journals or in any other venues I have encountered, addressing the effectiveness of money bail schedules. In addition, money bail schedules are inherently flawed in their design because they attempt to correlate the seriousness of an offense with the risk of nonappearance and attempt to mitigate that risk with secured money bail. However, it is well documented that as discussed below, using secured money bail to mitigate pretrial risk is very problematic to the court's goals of public safety and maximizing pretrial release and minimizing pretrial detention (Gouldin, 2018).

16. Although money bail schedules can efficiently get some defendants out of pretrial detention pre-arraignment, that efficiency is limited to persons who can financially afford to pay and excludes those who cannot. Moreover, as the research summarized below shows, any pre-arraignment efficiency gained comes at the expense of greater post-arraignment inefficiency, specifically unnecessary pretrial detention caused by delays in pretrial release (e.g., 5 days, 15 days, 30 days) or no pretrial release altogether for many persons.

17. On Page 4, first paragraph, when summarizing the ensuing table, the Morris Report states, "In sum, based on these data, defendants utilizing bail tend to spend less time in jail than the vast majority of defendants released via other mechanisms in San Francisco." This statement is an accurate portrayal of the data presented. With the exception of Local Citation Releases, Released on [Money] Bail was the quickest release mechanism for persons who were released. However, the data that Dr. Morris relied upon did not include the number of defendants who were not released because they could not afford to pay the amount specified on the schedule. Moreover, by having a system in place in which persons released after they pay money bail pursuant to the schedule, the court is prevented from ordering at the time of the defendant's release any conditions designed to mitigate safety risks that the defendant may pose to victims,

---

contribute to the improved quality of empirical research, it is not always necessary; many higher quality studies have been published elsewhere (e.g., see Bechtel et al., 2016). Furthermore, the venue of publication or the sophistication of analyses do not guarantee the usefulness of a study to an issue at hand – in this case, helping local justice system practitioners achieve the best pretrial results they can in their jurisdiction. Researchers' understanding of the relevant issues (e.g., legal parameters of pretrial decision-making), hypotheses tested, sampling methods used, data collected, statistical tests used) all interact to determine the quality and usefulness of a study.

witnesses, or the general community. Indeed, the money bail schedule's non-consideration of public safety seems problematic given that California statute is explicit in several places that "The public safety shall be the primary consideration" of the court's pretrial decisions (e.g., see Cal Penal Code § 1275(a)(1)). In my experience helping many jurisdictions work through implementing new pretrial practices, all of them have decided that they would accept the trade-off of having more defendants spend a few additional hours in jail pre-arraignment if it meant they had the opportunity to assess a defendant's risk and then decide, along with other known information such as the charges and circumstances of the alleged offense, whether to release the defendant pre-arraignment or wait to order the person released, with any relevant risk-mitigating conditions, at arraignment.

18. When I calculated the estimated impact of holding until arraignment all newly booked defendants on the jail population Jefferson County, CO, I calculated that this change in practice would require approximately 10 additional jail beds per year, but that increase would be off-set by a 200 to 300 pretrial inmate reduction on a daily basis if almost all these defendants were released immediately after arraignment. Indeed, San Francisco's data in the Morris Report indicate that a similar practice of using non-money-bail releases pre-arraignment would achieve similar quick release times. Moreover, as other counties do, including in California, if arraignment hearings were to occur much sooner than 48 hours after booking (e.g., within 12 or 24 hours), then defendants could be released from jail much more quickly than they are now. In sum, commercial surety money bail releases are not necessary for faster release times; these times can be achieved from other methods (e.g., local citation), and ones that do not depend on the defendant's ability to pay a commercial bail bondsman's service fees.

19. On Pages 7 to 9, the Morris Report summarizes the findings of his propensity score matching analysis of San Francisco data. I am purposefully not addressing in great detail this section of the Morris Report because the analysis (a) appears very similar to the analyses Dr. Morris performed on Harris County data, and that analysis was specifically rejected by the trial court in ODonnell v. Harris County (2017) (see, e.g., 251 F. Supp. at 1117-1120); (b) is problematic methodologically - It does not account for either defendants' release rates or public safety rates (no new arrest rates), both of which are necessary for evaluating the effectiveness of any pretrial release mechanism or pretrial risk mitigation strategy; and (c) is potentially problematic statistically – it uses propensity score matching (PSM), of which I have become aware in the past several years has many limitations that are difficult to overcome (e.g., sufficiently controlling for other factors that can have a strong influence on measured outcomes). I could not determine whether Dr. Morris' analyses used sufficient statistical controls to overcome these problems. Furthermore, other more appropriate research and statistical methods should be used when evaluating a jurisdiction's data for the purposes of evaluating various practices that have future public safety policy implications.

### Bail Forfeiture

20. On Page 10, third paragraph, the Morris Report states, "I say this noting that one should consider a distinction between a single missed court appearance and legal bond forfeiture. At

a minimum, a bond forfeiture (i.e., the nature of the outcome variable used in each of the above studies [referencing his prior analyses in Dallas and Harris Counties, Texas]) can be primarily considered an amplified measure of physical absence in court without having personal appearance data. Indeed, while judges have great discretion in forfeiting a bond, a reasonable assumption is that bond forfeitures are most likely the result of many failures to appear before the court (i.e., between court variation exists)." I disagree with the generalization of this statement from Texas to many other jurisdictions. A failure to appear in court is the ideal measure because it is a pure measure relevant to what the court desires – the defendant's presence at any given court hearing. Other measures such as Bond Forfeiture (BF), as Dr. Morris correctly notes later on page 27, are proxies for failure to appear (i.e., they approximate the actual measure, and are usually used because the actual measure is hard to obtain from most jurisdictions' court information systems). Bond Forfeiture and other proxy measures such as warrant issued for FTA, bond exoneration, and/or summary judgement in most jurisdictions can represent: (a) the court's response to a defendant's behavior (versus the defendant's actual behavior); (b) the court's response to an administrative error by the court (e.g., a commercial bail bondsman in California can be exonerated from all responsibilities on a bail bond if the court fails to promptly perform its duties (e.g., see CA Penal Code § 1305 et seq.)); and/or (c) a combination of (a) and (b). Thus, there is risk of data inaccuracy and contamination when using anything except actual failure to appear data because all other proxy measures will necessarily contain the justice system's *response* to (a) the failure to appear; (b) multiple failures to appear; and/or (c) failures to appear and other types of pretrial violations (e.g., new arrest, failed substance testing; curfew violation).

21. Because of these problems, and because of the current difficulty in tracking actual failure to appear, most jurisdictions use the next best proxy measure - warrant issued for failure to appear. This is used because of two important reasons: Of all possible proxy measures, it (1) is readily available in most jurisdictions; (2) has the least potential for the contaminated inclusion of the system's responses. With this information in mind, Bail Forfeiture should not be used as a proxy for failure to appear in any data analysis of San Francisco's or any other California county's data. Under my reading of California law, Bail Forfeiture refers to an order by a judge that the money bail amount must be paid to the court (see CA Penal Code § 1305 and People v. Nat'l Auto and Cas. Ins. Co., 2002). Thus, BF in California may not be an appropriate proxy for FTA when measuring monetary and non-monetary forms of pretrial release.

22. In the ensuing sentence on page 10, Paragraph 3, the Morris Report states, "I would also note that we should also consider the distinction between a forfeiture notice and a summary judgement as the difference between the two reflects the impact from surety bail agents locating defendants; this is something that diversion programs are ill equipped to handle." This statement is potentially misleading for two reasons. First, commercial bail bondsmen are not the only entities who can locate defendants; law enforcement also can and does perform that function in San Francisco (see Deposition of Timothy Conway, June 8, 2018). So, although the difference between a forfeiture notice and a summary judgement may include the impact

of commercial bail bondsmen locating defendants, it also can, and very more likely does, reflect the impact of police officers locating and arresting defendants who have a warrant for failure to appear.[2] Second, typical pretrial services agencies[3] are very well equipped to locate defendants. As part of their pretrial monitoring of defendants, pretrial staff, unlike commercial bail bondsmen, are responsible for monitoring a defendant's compliance with *all* court-ordered pretrial release conditions, including whether the person was arrested for a new offense, typically anywhere in the country (pursuant to the court's frequent order to obey all laws), and whether the person failed to appear, did not attend court-ordered substance testing, did not report for a check-in with pretrial staff, and most relevant to the current discussion, did not keep the pretrial staff person updated with current residence, employment, and relatives' contact information. In sum, a pretrial services staff person, in contrast to a commercial bail bondsman, comprehensively monitors released defendants and reports a defendant's non-compliance to the court well before a failure to appear might occur in the first place, enabling the court to take pre-emptive action.

23. On Pages 11 to 24, the Morris Report summarizes the results of analyses of several commercial bail bonding companies, comparing their bond forfeiture rates in San Francisco to those in all other California counties. It seems that Dr. Morris analyzed the outcome measure of BF because that is all the data the private companies provided. For the reasons discussed previously, the measure of BF should not be used as a gauge of an entity's (in this case a commercial bail bonding company) effectiveness in promoting court appearance because in California, and in many other states, a defendant can fail to appear and/or violate other release conditions multiple times before a bond forfeiture is ordered, or the court can vacate a BF it

---

[2] During my time as a county employee, my staff and I performed a brief investigation at the request of the local decision-makers (i.e., local judges, sheriff, city police, defense attorneys, pretrial services). We found that commercial bail bondsmen rarely, if ever, brought defendants who had failed to appear back to jail or court, as evidenced by: (1) Approximately 99% of arrests for which defendants with FTA warrants were booked into the county jail were performed by local law enforcement, with the remaining 1% by commercial bail bondsmen; (2) In a one-month sample, of the approximately 250 contacts between bail bondsmen and the local criminal court, none were to return a defendant who had FTA'd to court, and 100% were either bondsmen requesting to be absolved of the bond, bondsmen asking the court for the defendant's current address or contact information, or bondsmen asking when their client's next court date was scheduled; and (3) the Sheriff's Patrol Division Chief and several police chiefs from the county's largest municipalities, and their senior staff, reported that they could not recall any instances in their careers when commercial bail bondsmen contacted them so they could arrest a defendant who had FTA'd after the bondsmen had posted the defendant's bond.

[3] When Dr. Morris uses the term "diversion programs" in his sentence, I assume that he is referring to the traditional pretrial monitoring functions that the San Francisco Pretrial Diversion Project performs under its Assertive Case Management (ACM) and Own Recognizance (OR) functions, and not it's actual Pretrial Diversion (PTD) function, for which criminal proceedings are suspended while the person has the opportunity to successfully complete the diversion program's requirements. If my assumption is not correct, then the sentence has no relevance to this court case.

originally ordered because law enforcement arrested the person within the statutorily allowed 180 days (or up to 360 days if continued), even when the defendant had failed to appear one or multiple times (see CA Penal Code § 1305.6). Thus, these analyses have little relevance to the case at hand.

24. On Page 27, second paragraph, the Morris Report states, "In Decl. ¶ 4, Mr. Wells explicitly, and correctly, defines how bond forfeiture is measured, or represented, within the data and also notes that bond forfeiture may result from one or more failure to appears in court, depending on a judge's discretion. Mr. Wells stated that bond forfeiture is '…a reliable proxy for failure-to-appear rates.' To this statement, I completely agree. A formal bond forfeiture, as recorded in the county data (Harris and also elsewhere) represents one or more FTAs by an individual defendant and is absolutely a proxy for FTA; I believe this to be the best measure of FTA that many counties will have available for analysis. However, I will note that individual personal non-appearances in court is an important outcome and should be addressed and analyzed in tandem with bond-forfeiture. Unfortunately, in Texas, and in other US States, individual court appearances tend to not be formally documented and logged into a database." As discussed previously, because of California law, using BF as a proxy for FTA can be very misleading when comparing money bail and non-money-bail releases because it underestimates the number of failures to appear that have actually occurred. Thus, the data analyses reported on Page 27 may not be measuring what they purport to measure.

*Promoting Appearance*

25. On Page 25, third paragraph, the Morris Report states, "It is important to note that many jurisdictions rely on financially backed bonds to ensure that a defendant makes an appearance in court. Further, many large jurisdictions rely on financially backed bonds to prevent an overwhelming volume of detainees to manage." This statement may be true for some contemporary justice system officials who have grown accustomed to money bail, but it is inconsistent with my observations. In my ten years' experience consulting with system decision-makers from both small and large jurisdictions, many of them have told me that the primary reason they use secured money bail, whether cash or surety, is that they had never given much thought to it until they became aware of non-monetary options and the legal and practical advantages of such. That is, they said the primary reason for using secured money bail, either via schedule or in court, is that they had uncritically accepted the status quo and had not questioned it until that time. Also, my professional experiences match the newly adopted practices of many other large and small jurisdictions (e.g., some elected prosecutors have ordered their deputy attorneys to no longer request money bail for certain offenses; some chief judges, county commissioners, and city council members have passed resolutions eliminating or diminishing the role of money bail schedules or the use of money bail generally). Moreover, several states have passed new laws or are in the process of overhauling their money-bail-infused statutes and or court rules with ones that integrate pretrial assessment and non-money forms of risk mitigation. See the Pretrial Justice Institute's web site at https://university.pretrial.org/libraryup/newsclips for over 800 recent news articles

8

summarizing (usually favorably) pretrial system reform in various jurisdictions (approximately 100 pertain to California, with 10 referencing San Francisco's pretrial system).

26. On Page 25, fourth paragraph, the Morris Report states, "Adequate supervision of defendants will require sufficient funding, the amount of which will depend on the size of a given jurisdiction and the attributes of supervision that are utilized." I agree with this statement as is, and will expand upon its relevance to this case. Any criminal justice function performed by the government, whether enforcing laws, court case processing, criminal prosecution and defense, or pretrial monitoring/supervision of released defendants for purposes of both public safety and court appearance, requires sufficient funding and other features (e.g., quality leadership, trained and monitored staff, supporting infrastructure and technology; see National Implementation Research Network, 2015) to effectively achieve system and agency goals. Thus, the pretrial services agency in San Francisco is one example of an entity that would need sufficient funding to help the local justice system achieve its desired goals (which I am assuming minimally include public safety, court appearance, and an uncrowded jail facility). To fairly or properly compare outcomes such as court appearance and jail bed use for defendants who receive the agency's pretrial monitoring to equivalent defendants who encounter other forms of pretrial release (e.g., commercial bail bonding, cash bonding, own recognizance with no monitoring), an analyst would need to assure that the monitoring program is operating as effectively and efficiently as possible. Dr. Morris does not indicate that this quality assessment was done prior to the Morris Report's comparative analyses, nor have I encountered any pretrial experts who or written reports that describe such an analysis of San Francisco's pretrial diversion program. Without this information, any comparison of this program's outcome metrics may be misleading (i.e., a non-optimized program would likely achieve non-optimum results).

27. On Page 42, second paragraph, the Morris Report states, "As discussed above, implementation of the proposed system revision would be both challenging and expensive to implement, as shown by the case of Washington D.C.'s system of pretrial release. Also mentioned above, it is likely that the key component that is driving empirical results lending favor to surety bonds in terms of FTA is due to increased involvement from third parties who assume some part of the defendant's risk for successful completion of the justice process (i.e., the bondsman and the co-signers). This aspect of justice, which is unique to the U.S., has been relatively neglected by criminologists and should not be ignored given the current peer-reviewed literature." This statement is false. As discussed in Schnacke (2014), England and the United States have been using uncompensated third-parties/co-signers for centuries. The distinction the U.S. currently holds is that a parallel system of compensated sureties was created around the turn of the 20th Century when some people commercialized for profit their serving as a surety.

28. The Morris Report's claims about how commercial bail bondsmen operate regarding contacts with defendants and the defendants' social network are unsubstantiated. There is no evidence in any research studies or other documents about the nature and frequency of contacts, or whether they occur at all. I have attended several meetings over the past 10 years in which justice system decision-makers have asked commercial bail bondsmen to provide summaries

of their outcome measures, practices, and policies and procedures for interacting with defendants in a wide variety of ways (e.g., initial contracting, responding to compliance and non-compliance with release conditions, locating defendants who have failed to appear), and these decision-makers report that they have never received the requested information, including up to five years later. However, even if this information were transparently available to judges and other system officials, it may be irrelevant because judges rarely if ever know throughout any given defendant's pretrial case which bail bonding company posted the person's bond and which company policies and procedures are being followed (assuming the company has such policies and procedures). This further indicates that when more than one commercial bail bonding company operates in a jurisdiction, such as in San Francisco (see Morris Report), it would be very misleading to assume all or even most commercial bail bondsmen provide any intervention (e.g., routine check-ins) consistently or at all. In contrast, the San Francisco Pretrial Diversion Project's pretrial monitoring services are funded by the local government budget, rendering the agency directly accountable to the funding source, the County government, for all its processes and outcomes.

29. On Page 3, paragraph 1, the Morris Report states, "Further, we can assume that if the Bail Schedule were eliminated, third parties to the defendants (i.e., co-signers to a bond or bond agents) willing to formally assume, and perhaps mitigate, some of the risk for failure to appear (FTA) in court and bond forfeiture, via a surety bond, such would be prevented from producing any effect toward ensuring successful completion of the justice process, a prospect that has been partially supported by recent scholarly and peer-reviewed analyses." I agree with this statement as written in that surety bonds are designed to provide the possibility of mitigating failures to appear. However, in jurisdictions where commercial, for-profit bail bonding is either outlawed or statutorily allowed but very rarely used for a variety of reasons (e.g., New Jersey, Illinois, Kentucky, Wisconsin, Oregon, Massachusetts, Washington, D.C.), the potential benefit from having a third party to the defendant working to mitigate risk for failure to appear is satisfied through means other than compensated sureties (e.g., a pretrial services agency; that agency's or defense counsel's engagement with the defendant's family members). A commercial bail bondsman is therefore not necessary.

30. On Page 40, first paragraph, the Morris Report also states, "For non-financial bonds, there is no incentive from pretrial services agencies to be incentivized for the recovery of an absconding defendant." This statement is false. I have worked with several dozen pretrial services agencies in my career, and all of them include the recovery function in their practices. Their incentive to "recover" a defendant who has failed to appear or has fled (when that rare event occurs) is in their mission to serve the court's interest for the effective and efficient administration of justice and to promote public safety (e.g., very similar to the mission of other government/government-funded agencies such as the police, the courts, prosecution, defense, and detentions). Unlike commercial bail bondsman, pretrial services agencies do not need a monetary incentive to perform their functions. These agencies perform the recovery function in a variety of ways, depending on the jurisdiction. These include, but are not limited to: (a) Pre-FTA recovery: Most agencies notify the court (and often the prosecutor) when the

defendant does not remain in regular contact, well before a failure to appear could occur; (b) Post-FTA recovery: All agencies I have assisted attempt to contact a defendant and/or his family members immediately after a failure to appear to enroll the defendant in immediately coming to court, often before the judge issues a warrant for failure to appear; (c) Post-FTA recovery: Some agencies send staff to locate the defendant in the community and interact with the defendant to enroll the defendant in immediately coming to court, or when needed, they contact law enforcement to make a custodial arrest. These activities could be integrated into San Francisco's current pretrial monitoring functions, as needed.

31. On Page 41, last paragraph, the Morris Report states, "Further, the definition of indigence in this context should not exclude from consideration financially abled 3rd parties willing and able to assume some risk for court appearance and risk to public safety (e.g., surety agents, defendant family members, other indemnitors)." As discussed previously, commercial bail bondsmen only have a financial relationship to court appearance under California law; defendants' risk to public safety is irrelevant to the financial relationship.

### Financial Costs

32. On Page 26, paragraph 2, the Morris Report summarizes the 2016 annual budget of the Washington D.C. Pretrial Services Agency (text not copied here for brevity). It is unclear why this information is included in the Morris Report, other than perhaps to make the point that pretrial services functions can be expensive (although the label of 'expensive' is subjective).[4] Of course there are costs to operate a pretrial (or any other criminal justice) function or program. However, hypothetically extrapolating the costs of a county-level or even statewide pretrial services agency from the parameters of Washington, D.C.'s agency is misleading. This agency is a federal entity and it provides many additional, sometimes in-house services that most other local-level pretrial services agencies, including the San Francisco Pretrial Diversion Project, do not provide. Thus, comparing D.C.'s services and the costs of those services to those of San Francisco's program is inappropriate.

33. A resource for more accurately calculating a local pretrial services agency's anticipated expenses is available (see Pretrial Justice Institute, National Center for State Courts, & State Justice Institute, 2018). This calculation method was not performed as part of the Morris Report, and has not been performed for San Francisco by any other entity, to my knowledge. Moreover, I have consulted with other pretrial experts and bail reform advocates who have been involved in New Jersey's recent constitutional and statutory pretrial changes and Maryland's recent court rule changes, and these experts report that these jurisdiction's decision-makers also quickly rejected the comparisons of their potential pretrial programming to Washington D.C.'s because they understand the flaws of the comparison.

34. On Page 26, paragraph 2, the Morris Report states, "For example, in the budget report proposed by the D.C. Pretrial Services Agency (page 17), the need for additional funding includes the

---

[4] This point is not explicitly made, so I am making an assumption.

startup, maintenance, and development of a mobile app that allows for face-to-face interviews with Pretrial staff. Instead of requiring anyone to show up in person, the agency appears to be moving toward a technology based approach and does not require physical check-ins with a person in many, or most, cases. Conceivably, an individual can be anywhere in the world and accept a mobile invitation for any interview provided they possess the necessary technology. Such technology adds to operational costs considerably, is subject to network availability, and is not fully immune to tampering. Further, GPS tracking alone limits the ability of the Pretrial Services Agency to provide adequate supervision of a defendant. For example, much of the context around defendant success is the surrounding environment. In person meetings may provide tips to the interviewer regarding secondary issues (e.g., substance use, family issues, lifestyle health, etc.). If the job of an interviewer is to qualitatively assess whether the defendant is becoming at risk, the ability to 'read' a person's behavior would be better done in person, rather than via a two dimensional screen." Although I agree that these occurrences are possible, as many things are possible, there is no research to indicate they are more likely than not. That is, this paragraph appears to be a summary of Dr. Morris' speculation and not based on any research or common experience. Therefore, it has little relevance to evaluating current or potential practices in San Francisco.

### *Evaluation of Release Types*

35. On Page 36, second paragraph, the Morris Report states, "There is considerable peer-reviewed evidence to support the idea that certain types of money bail (e.g., surety bail) can have a mitigating impact on court appearance leading to bond forfeiture. Unfortunately, only a handful of studies have assessed this issue directly (i.e., whether one release mechanism over another impacts the risk of appearance among comparable defendants). I am currently aware of 4 studies, 3 of which were authored or coauthored by me, that support the idea that surety bail reduces the risk for court appearance among many defendants)." The four "studies" that Dr. Morris references are: Helland & Tabarrok (2004); Morris (2014); Morris (2013); Clipper, Morris, & Russell-Kaplan (2017). Although there are four different written articles, there are only three studies, as the Morris (2013) study and the Clipper et al. (2017) study use virtually identical data from 2008 in Dallas County, Texas, the same statistical methods, and report nearly identical statistical findings. Nonetheless, whether one counts three or four studies, these studies' findings show that commercial bail bonding was associated with lower pretrial failure rates than were other release mechanisms while attempting to assure defendants in the different groups were similar enough to be compared. The Morris Report provides similar analyses and results for San Francisco defendants (Page 8).

36. All these studies and analyses described in the paragraph above have commonalities in their study design, statistics used, and results demonstrated. My rebuttal does not get into the technicalities of the relative strengths and weaknesses of the statistics used because that is unnecessary for determining the studies' value to the case at hand. Rather, it is readily apparent that all these studies and the Morris Report's analysis (Page 8) have a serious flaw in the overall research design that render the studies and analysis irrelevant to this case. In summary, this research only looks at failure to appear as an outcome measure, and does not look at the impact

of the different release mechanisms on pretrial jail use, which is another outcome that is necessary to measure simultaneously when evaluating the value, utility, plausibility, effectiveness, or cost-effectiveness of any pretrial intervention (e.g., secured or unsecured money bail, court date reminders, pretrial monitoring) used in an attempt to mitigate pretrial failure (of all kinds, such as failure to appear, new arrests, new violent arrests).

37. I co-authored with three other researchers and pretrial experts a literature review of the effectiveness of money bail as a tool attempting to manage risk of new pretrial arrest and failure to appear (Bechtel et al., 2012). We reviewed the studies that had been published to date and that were at the time the most relevant, most inquired about, or the most cited in the national discussion about using money bail to manage pretrial risk.

38. My co-authors and I found that although a few published studies considered whether a connection existed between money bail and pretrial outcomes, all of them had one of the following three serious limitations that impede their usefulness for informing pretrial policy-making and practice.

39. First, some studies (e.g., Helland & Tabarrok, 2004) relied exclusively on data from the Bureau of Justice Statistics' State Court Processing Statistics data series, even though the Bureau itself later cautioned in a Data Advisory that its data should not be used for evaluating the effectiveness of various pretrial release methods (see Bureau of Justice Statistics, 2010). The Morris Report does not mention this data advisory when referencing the limitations of the Helland & Tabarrok study.

40. Second, some studies investigated the link between money bail and only one (court appearance) or occasionally two (court appearance or public safety) pretrial outcomes. Yet, no study also simultaneously looked at the link between money bail and the third goal[5] of any bail determination—pretrial release. Thus, we concluded that these studies were insufficient for guiding pretrial policy-making and practice because they failed to show that money bail could simultaneously and effectively address the court's three legally required goals: (1) maximize court appearance, (2) maximize public safety, and (3) maximize release from custody.

41. Indeed, Dr. Morris himself acknowledges that pretrial release is a goal of the pretrial justice system. Dr. Morris and his co-authors state in Clipper et al. (2017), page 6, while summarizing the findings of the Austin et al. (1985) study that provides empirical evidence for the effectiveness of pretrial services in ensuring court appearance, "Also worthy of note, all defendants included in the study were previously unable to be released before their trial. As a result, this study provides evidence of the possibility for an effective non-financially based program to achieve the goals of pretrial release (e.g., improving release rates), while additionally preserving community safety and compelling the defendant to return to court."

---

[5] See the American Bar Association's (2007) discussion, citing to U.S. Supreme Court case law and other federal resources, for why release, court appearance, and public safety are all important and simultaneous goals of the pretrial justice system.

42. Given that several studies, including my own, have shown that secured money bail can either prevent or delay pretrial release (Cohen & Reaves, 2007; M. Jones, 2013; Phillips, 2012; Reaves, 2013; Kimbrell & Wilson, 2016) any studies and analyses Dr. Morris (or any researcher) performs should include money bail's impact on pretrial release/jail bed use. Because Dr. Morris did not do this for his analyses in the Morris Report, the relevance of his analyses (first table on Page 6) to San Francisco's options for various pretrial policies and practices are difficult to determine.[6]

43. Third, the methodological design of some other studies did not meet social science standards.

44. To answer important research questions about the effectiveness of secured money bail and non-secured or non-financial release, three studies that address the important shortcomings of the previous studies were conducted. In 2013, I conducted a study that simultaneously looked at all three outcomes (court appearance, public safety, and release/detention rates). To ensure that the two groups of defendants (those who were released on secured money bail and those who were released on unsecured recognizance) that were compared to one another were the same, I did what no other study had done to date: I matched defendants in the different release-type groups (money bail vs unsecured recognizance) on their pretrial risk levels as measured by an actuarial pretrial assessment tool (i.e., Colorado Pretrial Assessment Tool).

45. I found that for defendants of all pretrial risk levels (lower, moderate, or higher):

a) Releasing a defendant on an unsecured bond (the court may require the defendant to pay money if he/she fails to appear) is as effective at achieving public safety as is secured money bail.

b) Unsecured bond is as effective at achieving court appearance as is secured money bail.

c) Unsecured bond frees up more jail beds than does secured money bail because: (a) more defendants with unsecured bonds are released; and (b) defendants with unsecured bonds have faster release-from-jail times, when compared to secured money bail.

d) The higher the secured money bail amount, the greater the pretrial jail bed use; but the higher money amounts did not improve the court appearance rate.

---

[6] By commonsense analogy, a researcher's exclusion of analyses on jail-bed-use/release rates/time-to-release when studying the potential benefits of a pretrial release intervention (e.g., requiring defendants to pay secured money bail prior to release) is equivalent to a drug company excluding analyses of a drug's serious or harmful side effects. That is, (a) if there were two drugs that research showed had beneficial effects on alleviating an ailment, (b) if Drug A performed the same as or better than Drug B by some margin, and (c) if Drug A caused very harmful or fatal side effects whereas Drug B did not, then commonsense reveals that people would likely overwhelmingly choose Drug B. Secured money bail, whether scheduled or used in court, because it is strongly linked to pretrial detention, is the equivalent to the analogy's apparently helpful but simultaneously very harmful Drug A.

e) Unsecured bond and secured money bail had the same number of defendants at-large on FTA warrants, indicating that secured money bail did not improve the number of defendants who were located and returned to custody after a failure to appear.

f) Finally, many defendants were incarcerated for the pretrial duration of their case and then were released to the community after they pled guilty and were sentenced (see M. Jones, 2013).

46. Based on these results, I concluded that jurisdictions can make data-guided changes to local pretrial case processing that would achieve their desired public safety and court appearance results while reserving more jail beds for higher-risk defendants and sentenced offenders. I concluded this because the data show that *if* money bail of any kind were to enhance defendants' court appearance, this study indicates that an unsecured bond can achieve the same court appearance rates as does secured money bail; however, it does so while increasing defendants' pretrial release rates, reducing delays in release times, and using far fewer jail beds, all of which avoid costs to the local justice system (M. Jones, 2013).

47. I helped author a second study (Brooker et al., 2014) to answer the same research questions addressed by the M. Jones (2013) study. This quasi-experimental study used a dataset and methodology different from the M. Jones (2013) study but resulted in a similar pattern of findings when investigating the link between secured money bail or unsecured bond and court appearance, public safety, and release from custody/jail bed use, simultaneously in one study. In summary when judges used more unsecured recognizance bonds, they achieved the same public safety and court appearance rates as did judges who used many secured bonds, but did so while using substantially fewer jail beds.

48. The Jones (2013) and Brooker et al. (2014) studies show that secured money bail detains more defendants in jail and delays their release, if they are released, than do unsecured bonds, and without improving either public safety or court appearance.

49. I have also reviewed the publicly available data on Washington D.C.'s Pretrial Service Agency's website (see Pretrial Services Agency for the District of Columbia, 2017a, 2017b, 2018). Washington, D.C. reports a consistent pretrial release rate of over 90% (94.33% in 2016 and 94% in 2017). Meanwhile, the arrest-free rate (a public safety measure of the percentage of non-surety released defendants who remain free of new arrests while the original case is pending) has met or exceeded the Agency's target rate of 88% since at least 2015. These data provide support that when courts rarely uses secured money bail, most all defendants are released on pretrial status and good public safety rates are simultaneously achieved.

*Public Safety Assessment*

50. On Page 30, third paragraph, the Morris Report states, "The PSA does not account for geography at all (from what I have read), which is a significant limitation that dramatically reduces its potential for external validity. Not only would a tool need to be adjusted for each

location, but it would need to be validated with data from that location. Further, there would need to be an on-going assessment of validity that accounted for both spatial and temporal dynamics concurrently. This requires both training and testing data from specific geographic locations." I agree and disagree with parts of these statements regarding the PSA. I agree, and strongly, that any jurisdiction that uses the PSA needs to collect its own data to determine to what extent the PSA is accurately predicting local defendants' actual pretrial performance for failing to appear, new arrests, and new violent arrests. The Laura and John Arnold Foundation itself recommends this practice (Laura and John Arnold Foundation, 2018, 16).[7] Furthermore, the Morris Report's first table on Page 6 demonstrates that the PSA's FTA Scale is doing a good job of identifying San Francisco defendants' failure to appear risk based on the scales 6 possible scores (i.e., as the scores increase from 1 to 6, the failure rate increases in distinct, stair-step fashion).

51. The Laura and John Arnold Foundation additionally recommends the practice of determining failure rates for the different possible scores on all three scales/flag (e.g., a score of 1 on the FTA or NCA scales indicates which % likelihood of failure to appear for local defendants; Laura and John Arnold Foundation, 2018, 9C). Based on these local results, a jurisdiction's decision-makers should periodically over time revisit their collective preferences (of course, within the parameters allowed by federal and state law) for how they want to allocate their resources to manage defendants who present different risk profiles, charges, and case circumstances. I have helped many jurisdictions institute this practice over the past 7 years and they are very satisfied with this ongoing, continuous improvement process. In contrast, San Francisco's money bail schedule (see Superior Court of California, County of San Francisco, 2017) cannot allow for this continual, data-guided adjustment because the money bail amounts are not based on any statistical analyses in the first place, nor are any outcomes for the various money amounts measured.

52. Furthermore, the Morris Report's claim that the PSA does not account for geography is untrue. The PSA was developed using 750,000 cases from rural, suburban, and urban localities in seven state court systems (CO, CT, FL, KY, ME, OH, and VA), the federal pretrial system (which is in all 50 states), and Washington, D.C (Laura and John Arnold Foundation, 2018, 13B).

53. On Page 30, third paragraph, the Morris Report also states, "Additionally, there should be no expectation that the same tool would be as effective in coming years as both technology and the justice systems change. For example, a tool that was built using data from a place and time where recreational marijuana defendants were used would not apply to a time and location where such behaviors were legal. Alternatively, a risk assessment tool may not have the same predictive validity for first time offenders versus the serial recidivist (aka lifecourse persistent

---

[7] I reference several publications by the Laura and John Arnold Foundation (LJAF), all of which were published in 2018, and several of which I co-authored. For ease of referencing, I adjusted the author-date citation method to include the LJAF's numerical reference to the various publications.

offender), etc." This statement is too simplistic and speculative to be helpful to San Francisco. Any criminal justice risk assessment tool should be validated and re-validated over time because laws, justice system practices, information systems, and the local community can change. When local decision-makers believe that circumstances have changed sufficiently to affect the validity of their assessment tools, then they should perform analyses (such as those described above) to determine whether their assessment tools need updating. The timeframes for these adjustments can vary from a few years to multiple years, depending on the local jurisdiction. The Laura and John Arnold Foundation has begun the process of updating the PSA for all jurisdictions (see Laura and John Arnold Foundation, 2018, RFP). Dr. Morris' marijuana example is speculative because there is no research supporting which changes to law and practice are substantial enough to warrant tool re-validation. Finally, if Dr. Morris is referring to research literature comparing the attributes of first-time offenders to repeat offenders, then there is no research to support that these studies' findings apply to defendants in the pretrial/unconvicted context.

54. On Page 30, fourth paragraph, the Morris Report states, "The PSA tool is extremely limited in what data are used as inputs to predict each of the three outputs it attempts to address." It is true that the PSA uses 9 factors to assess defendants' pretrial risk. These 9 factors were retained from analyses that tested hundreds of potential factors. These 9 factors, when used together, were statistically the most predictive of pretrial risk and fair to include for the three-quarter-million defendants whose data were analyzed. That is, many other factors, such as residence, employment, number of prior arrests, etc., do not appear on the PSA because they were found to be either (a) not predictive, (b) too weakly predictive to enhance the overall predictability of the tool, or (c) biased against a subgroup of defendants based on a factor such as race, ethnicity, or gender (Laura and John Arnold Foundation, 2018, 13B).

55. Furthermore, some of LJAF's goals in constructing the PSA were to develop a tool that could be scored with data typically readily available in any local U.S. criminal justice jurisdiction, regardless of size; with minimal staffing and manual labor; and as quickly (e.g., within a few hours) after booking as possible. The first version of the PSA achieved these, as well as other, goals (Laura and John Arnold Foundation, 2018, 13B).

56. On Page 30, fourth paragraph, the Morris Report also states, "More importantly, the PSA arbitrarily amplifies risk due to simplistic and naive scoring of risk attributes. For example, the PSA assigns 1 point for '1 or more' misdemeanor convictions and also 1 point for '1 or more' felony convictions. Thus, an defendant with a many felony convictions could be predicted to have the same risk as an defendant with only 1 misdemeanor conviction." This statement is true, and it is true for other existing pretrial assessment tools such as those developed for statewide use in Virginia, Ohio, and Colorado. However, the statement does not diminish the usefulness of using the PSA to inform pretrial decisions in San Francisco under California law. The proper use of the PSA includes the judicial officer's consideration of any individualized information about each assessed defendant that may indicate that the defendant may be higher risk than what the PSA is predicting. San Francisco judicial officers have been provided training on the Decision-Making Framework (DMF) process that included guidance for using

individualized information that includes assessed risk, current charges, and other case circumstances. Of course, in contrast, San Francisco's money bail schedule relies on charge alone and does not include any integration of statistically assessed risk and defendants' individual case circumstances.

57. On Page 31, fourth paragraph, the Morris Report states, "Simply put, misspecification occurs when the incorrect set of input variables (aka features) are used and/or when appropriate inputs are ignored. For example, a risk assessment tool that attempts to predict court appearance but ignores key theoretical drivers of appearance (e.g., employment status, marital status, geography, etc.) would perform better had it not ignored key features (this is also known as model under-fitting)." As discussed previously, this issue does not pertain to the PSA. The PSA tested hundreds of potential variables that most U.S. jurisdictions have about an individual in the limited frame time between arrest/booking and juridical decision-making (e.g., at arraignment). The most predictive of these items comprise the PSA.

58. On Page 31, last paragraph, the Morris Report states, "Model overfitting occurs when production results of the tool too closely resemble the data from which they were trained and do not hold up post-deployment. For example, if data from Kentucky defendants were used to train a risk assessment tool, then the tool has been tailored to that geographical, procedural, and cultural context. We would not want to assume that the results would apply equally to San Francisco defendants (e.g., major differences in what behaviors are deemed illegal). Indeed, there are validation techniques that are freely available to confirm whether overfitting exists at a single point in time." The general overfitting statement is true. The next sentence, which specifies a condition, would be true of the PSA only if the condition were met. As discussed previously, the condition is not met because the PSA was developed from data on defendants from a wide variety of U.S. locations, and Dr. Morris' analyses (Page 6) show that the FTA Scale does a good job of sorting San Francisco defendants into six distinct FTA risk levels.

59. On Page 32, fourth paragraph, the Morris Report states, quoting verbatim Brauneis and Goodman, "'The PSA algorithms, unlike many others, are fully disclosed. However, the Arnold Foundation has not revealed how it generated the algorithms, or whether it performed pre- or post-implementation validation tests and, if so, what the outcomes were. Nor has it disclosed, in quantitative or percentage terms, what "low risk" and "high risk" mean: is the chance that a "low risk" defendant will fail to appear one in ten or one in five hundred? Is the chance that a "high risk" defendant will fail to appear twice that of a low risk defendant or fifty times?'" My knowledge of the training and technical assistance provided to San Francisco and other jurisdictions that have implemented the PSA indicates this information has been available for the past several years (see Laura and John Arnold Foundation, 2018, 13B, for the most recent version of the stakeholder training). These materials list the failure rates associated with the PSA's FTA and NCA Scales and the NVCA Flag for sites used to develop the PSA, as well as the new, different sites used to validate the PSA. There are many similarities between defendants' pretrial performance in the original sites with those in the validation sites, indicating that the PSA has high potential to serve as a valid pretrial assessment tool in jurisdictions that wish to begin using it (e.g., like San Francisco). As discussed previously, a

jurisdiction should not assume that it will have failure rates equal to those of other jurisdictions. Those analyses should be done as soon as the jurisdiction has sufficient data, and local pretrial policies should be commensurately adapted to manage the nature and degree of local defendants' risks, as necessary.

60. On Page 32, last paragraph, the Morris Report states, "It is possible that the tool may impact certain members of certain ethnic groups unfairly by relying so heavily on criminal history and an indicator of risk. This key component of tool is driven from and by a system that has historically treated minorities unfairly (e.g., African American and Latino individual being more likely to be stopped in some jurisdictions), and thus, represents a tautology (i.e., the inputs may be the same as the outputs)." This potential issue exists for all criminal justice risk assessment tools. Researchers who develop and test these tools have the responsibility to test for and fix, if needed, any disparate assessment results arising from the tool. The LJAF developed the PSA with this approach in mind (see Bechtel et al., 2011, in which the PSA researchers tested the pretrial predictability of various demographic, community ties, and criminal history variables). Furthermore, fairness in assessment tools is important, and is often at odds with the accuracy of the tools, requiring researchers and practitioners to collaborate to balance the two, regardless of which statistical methods are used, including machine learning (Berk et al., 2017). Of course, San Francisco's money bail schedule is even more susceptible than a tested pretrial assessment tool to magnify racial and ethnic mis-classifications because it is based solely on the results of local law enforcement's charging practices and has no statistical support for its effectiveness in managing the pretrial risk of defendants of various races and ethnicities. Money bail's exacerbation of racial/ethnic disparities is summarized elsewhere (see C. Jones, 2013).

61. On Page 33, second paragraph, the Morris Report states, "The PSA over relies on criminal conviction history which is known to have been historically unfair to minority groups, and is prone to arbitrarily and recklessly assigns the same amount of weight (i.e., for risk) to extremely different defendants (e.g., a one-time conviction misdemeanant and a serial felon), is generally mis-specified, has not been appropriately validated, and more. These limitations should be considered fatal to the tool's predictive validity, particularly in production and at scale. A valid risk assessment tool should not be assumed to work without being correctly specified (i.e., using the inputs that matter for a given jurisdiction) and tested via data from the same local area." All of these criticisms of the PSA are inaccurate and have been addressed previously.

62. On Page 33, third paragraph, the Morris Report states, "Further, I have been unable to locate any data in order to appropriately validate the tool's utility; the Arnold Foundation does not release the data as far as I am aware, and if true, the validity of the tool is quite questionable." As discussed previously, (a) LJAF provides data validating in different jurisdictions the utility of the PSA in distinguishing among defendants' pretrial risk of FTA, NCA, and NVCA (see Laura and John Arnold Foundation, 2018, 13B), and (b) Dr. Morris' analyses in the first table on Page 6 provide evidence that at least the FTA Scale is valid for San Francisco's defendants. The Morris Report does not provide analyses for the NCA Scale and NVCA Flag.

19

63. On Page 34, second paragraph, the Morris Report states, "It is also unclear and, as far as I am aware, undisclosed whether these studies appropriately use external test data to validate the instrument (i.e., you would never want to test a model using the same data that was used to train the model), as doing so would invalidate all of the results." As discussed previously, LJAF provides data from the validation sites (see Laura and John Arnold Foundation, 2018, 13B).

64. On Page 34, last paragraph, the Morris Report states, "In sum, the validity of the PSA is questionable as the methods deployed in the validation studies that I am aware of are unclear concerning how the tool was validated, and/or use what could be considered amateurish methods given the state of machine learning/risk assessment available today." Questioning the validity of the PSA in the manner the Morris Report does is not justified given the information that has been available to San Francisco on the PSA. The methods (described previously) used to develop the PSA were comprehensive and consistent with, or exceeded, the methods used to develop other widely used pretrial assessment tools. As Berk et al. (2017) and Baird (2017) explain, less commonly used statistical methods such as machine learning/random forests have yet to demonstrate they have improved utility (i.e., more accuracy, more fairness, and result in more effective decision-making if implemented correctly) in the pretrial justice context over traditional methods, such as those used to develop the PSA.

65. On Page 35, last paragraph, the Morris Report states, "In short, measuring indigence is challenging to execute, highly subjective, and is conditional on how it is contextualized." I agree, and I believe the issue of indigence provides support for a non-money based pretrial system. The advantage of a risk-based pretrial justice system, such as the one San Francisco has begun (but has not completed) implementing, is that indigence does not play a role in how the system assesses or manages risk. That is, in a risk-based pretrial system, an individual defendant's access to wealth or financial resources does not affect whether the person is released or detained or which release conditions (e.g., simple recognizance, active monitoring) the person experiences. In contrast, though, in a pretrial system dependent on money bail to determine who is released and who is not, indigence can be the determining factor, regardless of the person's pretrial risk.

66. On Page 36, first paragraph, the Morris Report states, "There are too many potentially influential contexts that manifest over space and time that are unpredictable that could impact this risk. We would not know what could make a difference tomorrow and how such events impact defendants differently. Happenstance and significant life events (i.e., life turning points) could all impact the odds of appearance. For such a model to work, we would need to continually observe the defendant to measure abstract contexts and build their influence into the equation. Interestingly, the one thing about surety bail that may make a difference in dynamically accounting for risk is the contact points between the agent, the defendant, and most importantly, the indemnitors. Surety bail provides for routine check-ins. The bail agent's mission is to tap the defendant's social network on the risk of flight. This is not a one-time process, rather it is longitudinal (or develops over time)." It is true that there are many factors that influence defendants' court appearance. Despite various real-world events, pretrial risk

assessment tools such as the PSA can still be more predictive of defendants' behavior than other alternatives, such as doing no assessment or using a money bail schedule. That is, the PSA and other tools are not yet as good as they likely will be in the future, but they offer substantial decision-making advantages over other current alternatives.

67. Finally, as discussed above, the Morris Report describes several criticisms of the PSA. However, these criticisms are inaccurate or misconstrued. More importantly, though, the criticisms are illogical in the context of the Morris Report because whatever limitations the PSA (or any actuarial pretrial assessment tool) may have, money bail schedules, which the Morris Report attempts to defend, suffer from the same criticisms to a larger degree, as well as many more (as described previously).

### The Proposed Alternatives

68. On Page 40, second paragraph, the Morris Report states, "As noted above, I have been asked by counsel to evaluate each of the Proposed Alternatives to determine whether they are (1) plausible, and (2) as effective as the current regime at ensuring that persons appear in court and protecting public safety." The Morris Report mentions the term "public safety" in the context of evaluating the three Proposed Alternatives about one dozen times. However, for none of those times does the Morris Report provide any evidence that money bail is in any way associated with public safety.[8] The lack of a relationship between money bail and public safety manifests itself in at least three ways relevant to the Morris Report. First, lawfully in California, money bail of any kind cannot be forfeited for violations of public safety or defendants' being arrested during pretrial release (see CA Penal Code § 1305; Reem v. Hennessy, 2017). Thus, even though Dr. Morris states he was asked by counsel to evaluate the current regime and alternatives in promoting public safety, this request cannot be fulfilled because it is irrelevant to evaluate any potential impact of money bail on public safety because of California law.

69. Second, none of the Morris Reports' reported analyses of San Francisco data contain any measures related to public safety (e.g., new arrests, new arrests for violent offenses). This is very important because Cal Penal Code § 1275(a)(1) states, "The public safety shall be the primary consideration." Pretrial new arrest data are readily available through criminal history records in San Francisco for all persons released by any pretrial mechanism and would need to be analyzed to determine the plausibility and effectiveness of any current and potential

---

[8] On Pages 41 and 42, the Morris Report mentions that defendants who have active warrants for failure to appear could "potentially impact public safety." This statement is speculation only because there is no empirical research that has found an association (or has tested for one, to my knowledge) between money bail and public safety. This speculative association is the Morris Report's strongest argument for the link between money bail and public safety. Nonetheless, even if research were to show that defendants released on money bail had lower arrests rates, California judges still could not set money bail to protect the public's safety (see Reem v. Hennessy, 2017).

practices. Thus, the Morris Report did not properly evaluate the money bail mechanism or other release mechanisms.

70. Third, two of the three (or four) studies Dr. Morris references, one of which was published in a peer-reviewed journal and the other Dr. Morris authored,[9] provide empirical support that money bail does not increase public safety over non-monetary release mechanisms. Both studies found that new arrests did not differ among defendants released via money bail and those released via non-monetary mechanisms (Helland and Tabarrok, 2004; Morris, 2013).

71. On Pages 40 to 44, the Morris Report describes its conclusions about Alternatives 1 through 3. For the multitude of reasons provided in this rebuttal, the Morris Report's conclusions about the evaluation of the three Alternatives is either irrelevant, incomplete, flawed, or misleading. Nonetheless, the Morris Report introduces a few additional claims that warrant comment.

72. On Page 41, first paragraph, the Morris Report states, "Additionally, there is no concrete evidence that I have seen that would suggest that implementing text messages, pre-trial supervision, etc. would have a general impact for the defendant population of San Francisco (i.e., to ensure appearance and public safety), though it could for some defendants who have requisite technology. In any case, I believe it's safe to say that such an effect would be highly contextualized across the defendant population." There are several studies, one of which was the Austin et al. (1985) study that Dr. Morris cited in his Clipper et al. (2017) study, that demonstrate either that (a) court date notifications yield large gains in court appearance for a variety of populations (VanNostrand et al, 2011; Cooke et al., 2018; National Center for State Courts, 2014; Bornstein et al., 2012; Rosenbaum et al., 2012; Schnacke et al., 2012); or (b) pretrial monitoring or supervision can improve court appearance rates and/or sometimes public safety (Bechtel et al., 2016; Danner et al., 2015; Lowenkamp & VanNostrand, 2013; Goldkamp & White, 2006; Austin et al., 1985).

73. On Page 41, last paragraph, the Morris Report discusses the reinstitution of an interview. The PSA data and the Morris Report demonstrate that the PSA can be a useful predictor of pretrial risk for defendants in many jurisdictions, including in San Francisco. One of the PSA's advantages over other pretrial assessment tools is that an interview with the defendant is not needed to score the tool. My colleagues and I have worked with jurisdictions that have integrated the PSA scoring into the booking process such that it can be completed in less than one hour for nearly all defendants booked. When these same jurisdictions provide pretrial monitoring, they interview defendants at the pretrial monitoring/supervision intake for defendants for whom monitoring is ordered. During this face-to-face meeting, all the court's expectations of the defendant and the roles of the pretrial services staff are discussed. The specific nature of the pretrial monitoring is also individualized and customized to each defendant, as needed.

---

[9] When the Morris (2013) study was published four years later in Clipper et al. (2017), the analyses relevant to public safety were omitted.

*Decision-Making Framework*

74. On Page 35, first paragraph, the Morris Report states, "Overall, Judges in San Francisco County appear to have followed DMF Recommendations 50% of the time. OR (Minimum) recommendations were followed 60.7% of the time. Note that these statistics are based on all judges and could be subject to inter-judge variation. In other words, some Judges may follow the recommendations much more or less than others; these findings should be considered with caution." I agree that individual judge variation may be masked by an average for all judges. More importantly, though, is that a 50% concurrence rate between judicial officers and the DMF is very low compared to most jurisdictions. When the use of the DMF to guide pretrial decision-making is this low, any evaluation of practices that involve the DMF is impossible (i.e., it is not possible to evaluate something that is not (or is substantially not) used). Thus, a comparison in San Francisco of the effectiveness of a practice that does not involve the DMF (such as one based on money bail) with a practice that involves the DMF is not currently possible. A DMF would need to be more correctly implemented and used before it could be evaluated.

75. On Page 43, second paragraph, the Morris Report states, "While LJAF_00149-51 are all interesting, in the slide from BUFFIN_LJAF_00150 (shown below), the witness agreed that under the Plaintiff's proposal (i.e., eliminate financial methods of release, only use the Decision Making Framework/PSA), 52% of defendants would be denied release as shown in the red slice of the pie chart to the left. However, under the existing scheme, 100% of the group would be eligible for release (with the red slice on the right eligible to post sufficient sureties under the California Constitution). Though some defendants within this subset would be eligible and not necessarily able to post bond having the option to do so still seems less restrictive." This statement is misleading. The Decision-Making Framework (DMF) that San Francisco criminal justice decision-makers adopted as part of their implementation of the PSA has a category titled "Release Not Recommended," which is used for defendants who score at the higher risk levels for new arrest and failure to appear in court. However, all of these defendants, unless prohibited by the California Constitution and statutes or a judge's ruling in court, are still lawfully eligible for pretrial release. California law or a judge's ruling is the only thing that can lawfully prevent any given defendant from being released – a DMF alone cannot do that. Moreover, to the extent that San Francisco courts use practices that assign money bail amounts to the defendants who are higher risk (as indicated on the PSA's scales), these practices contradict themselves because the court would be allowing defendants to be released, pre- or post-arraignment, by posting money bail that cannot be lawfully forfeited if they do the very action they are at higher risk of doing (i.e., being arrested for a new crime or a new violent crime).

76. Additionally, based on my experience working with many jurisdictions implementing new pretrial policies and practices, I highly recommend that San Francisco stop using its current DMF and adopt a new one that is more consistent with California law, federal pretrial law, and empirical research on what works to manage pretrial risk. San Francisco's current DMF is based on an older template from LJAF. Because of that template's deficiencies and difficulties

jurisdictions have had in effectively implementing it (and San Francisco appears to be one of these), LJAF retained me and several other pretrial legal, research, and technical assistance experts to produce a new template (now called the Decision Framework, or DF, to distinguish it from the older DMF). This template corrects many of the flaws of the previous template and comes with several free, online resources that any jurisdiction using the PSA can use (Laura and John Arnold Foundation, 2018, 8 & 2018, 9).

### *Jail Impact*

77. Finally, on Page 44, the Morris Report's last sentence states, "In other words, the DMF would result in a 4.9% <u>increase</u> in the jail population, net of other effects" (emphasis in original). There are three aspects of this statement that make it false. First, a DMF (or a newer DF) could never result in any change to the jail's pretrial population. The DMF/DF is merely a printed resource provided to judges to help them make the most effective pretrial decisions they can. The DMF/DF cannot "result" in anything; only the persons who make decisions about defendants' release or detention can achieve certain results – that is, how judges use or don't use a DMF/DF would affect the jail population.

78. Second, judges' use or lack of use of a DF/DMF can only affect the jail's *pretrial* population. There are many subpopulations in a jail, including local pretrial, holds for other jurisdictions/agencies (other counties, state, or federal), and sentenced, to name a few. Any increase or decrease in the jail's local pretrial population would affect the total population in a prorated manner. For example, a 4.9% increase in the local pretrial population would increase the total population by 3.2%, if for example, the jail's pretrial population were 65% of the total (4.9 x .65 = 3.2).

79. Third, the Morris Report's calculations could only be true, the previous discussion notwithstanding, if all inmates in the subgroups compared (e.g., surety money bail vs other release mechanisms) had the same length of stay. I have done many jail analyses that show that the local jail's overall population (and this would apply to any sub-population as well) would only be significantly increased or decreased if there are local practice changes that affect the inmates who have long lengths of stay (e.g., 90 or more days). The Morris Report's longest length of stay of any pre-arraignment subgroup is capped at 48 hours (Page 4). Thus, for the three reasons above, the Morris Report's forecast of a 4.9% increase in the jail population cannot be true and is very over-inflated.

### <u>Conclusion</u>

80. As discussed above, the Morris Report has many flaws or limitations in the analyses performed, literature cited, assumptions made, arguments presented, and/or conclusions drawn, such that Dr. Morris does not fulfill counsel's request in any meaningful way: "I have been asked by counsel to evaluate and analyze the data made available to me, regarding each of the Proposed Alternatives to determine whether they are (1) plausible, and (2) as effective as the current system at ensuring that persons appear in court and protecting public safety, and (3) less restrictive than the use of the Bail Schedule" (Page 2). In contrast, the many non-

monetary pretrial practices that were either insufficiently addressed or mischaracterized in the Morris Report have been recommended by the California Chief Justice's Pretrial Detention Reform Workgroup (2017). Indeed, all of the Workgroup's recommendations are consistent with the material I presented to the Workgroup in 2017 and with the practices I again describe in this rebuttal. I am aware that San Francisco has begun to implement several of these practices, and based on my experience with similar jurisdictions who use similar risk-informed pretrial assessment and management practices, I strongly believe that San Francisco would most likely achieve its pretrial goals by continuing to fully implement these non-monetary practices.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 20, 2018

_Michael R. Jones_

Michael R. Jones

**Appendix A**

**Curriculum Vitae**

# VITA

## MICHAEL R. JONES, PH.D.

President
Pinnacle Justice Consulting
• Phone: 303-870-0378 • Email: mike@pinnaclejusrtice.com •

---

## MAJOR INTERESTS

- Legal and evidence-based pretrial justice policies and practices.
- Strategic planning, coordination, and data-guided analysis and decision-making for criminal justice systems and agencies.

## EDUCATION

**Ph.D.  Clinical Psychology  2003.**
University of Missouri-Columbia (APA-Accredited), Columbia, Missouri.
Internship: Colorado Mental Health Institute at Ft. Logan (APA-Accredited), Denver, Colorado.
Dissertation: "The varying threshold of juvenile competence to proceed in juvenile court: Opinions of judges, attorneys, and forensic examiners."
Major papers: "Juvenile sexual offending: Psychosocial correlates and implications for Treatment;" and "Juvenile adjudicative competence: Theory, research, and practice."

**M.A.  Child Clinical Psychology  1999.**
University of Missouri-Columbia (APA-Accredited), Columbia, Missouri.
Thesis: "The ecology of toddler maltreatment: A multilevel examination of toddler physical abuse and neglect."

**B.A.  Psychology  1993.**
St. Mary's College of Maryland, St. Mary's City, Maryland.
Graduated Magna Cum Laude and "With Distinction" from the Honors Program.

## PROFESSIONAL EXPERIENCE

### Pretrial Justice

**President**                                   2017-present
Pinnacle Justice Consulting.
Responsibilities include: providing training and technical assistance for states, localities, and various stakeholder organizations to understand and implement more legal and evidence-based criminal justice policies and practices; assisting states and local jurisdictions in designing and implementing strategic, system-improvement initiatives; performing empirical research, data analysis, and system and program evaluation; providing expert testimony; managing all strategic and operational facets of a corporation.

# VITA
## MICHAEL R. JONES, PH.D.

**Director of Implementation**                    2014–2017
Pretrial Justice Institute.
Responsibilities included: directing the Bureau of Justice Assistance's three-year Smart Pretrial Demonstration Initiative; providing pretrial training and technical assistance to hundreds of jurisdictions; conducting numerous workshops at national and state conferences; performing empirical research; and developing a variety of resource materials for stakeholders and practitioners.

**Senior Project Associate**                    2010–2014
Pretrial Justice Institute.
Responsibilities included: assisting jurisdictions in understanding and implementing more legal and research-based pretrial policies and practices; providing technical assistance; performing analyses and writing reports; managing multi-site data collection; and presenting at conferences and trainings.

### Criminal Justice Strategic Planning and Systems Coordination

**Justice System Consultant**                    2004–present
National Institute of Corrections (NIC); Other local government, non-profit, or national criminal justice agencies.
Responsibilities include: providing technical assistance to executives from city, county, and state criminal justice agencies to assist them in (a) understanding the dynamics placing demands on justice system resources, (b) developing cost-effective solutions to identified problems, and (c) developing or improving long-term planning and problem-solving capacity through the local criminal justice coordinating committee, a data-guided, collaborative policy planning process, and planning/analytic staff support; presenting at national conferences and trainings.

**Criminal Justice Planning Manager**                    2004–2012
Jefferson County, Colorado.
Responsibilities included: managing the Criminal Justice Planning Unit (self plus seven staff) that provided support to a local criminal justice coordinating committee; hiring, training, and supervising planning staff; facilitating, with elected officials and executives from municipal, county, and state government, systemic initiatives that led to improved effectiveness, efficiencies, and coordination among justice system agencies; conducting scientific research; analyzing and presenting data; facilitating groups and committees; identifying, writing, and managing grants; consulting to multiple committees and projects; promoting the implementation of evidence-based practices and programs.

# VITA
## MICHAEL R. JONES, PH.D.

---

**Criminal Justice Planner/Analyst**                    2003–2004
Jefferson County, Colorado.
Responsibilities included: providing planning and analytic services to a local criminal justice coordinating committee; providing principle decision-makers with information and ideas for improving systemwide policy planning efforts.

### Research and Project Management Experience

**Director**                    2014-2017
Smart Pretrial Demonstration Initiative.
Responsibilities included: overseeing all technical, operational, and financial aspects of the Bureau of Justice Assistance's three-year, three-million-dollar national Smart Pretrial Demonstration Initiative; coaching and coordinating technical assistance providers; training local on-site coordinators; writing, reviewing and approving initiative documentation; ensuring all deliverables are on-time, within budget, and of accepted quality.

**Project Coordinator**                    2008 to 2012
Jefferson County Bail Project, Jefferson County, Colorado.
Responsibilities included: serving as lead staff for the committee of local justice system officials working on the project; overseeing pilot projects, data collection and analyses, presentation of analyses and other information to officials and other stakeholders; writing summary reports; completing and submitting required grant reports; supervising other project staff.

**Project Director**                    2006 to 2012
Colorado Improving Supervised Pretrial Release (CISPR) Project.
Responsibilities included: coordinating and overseeing data collection, analyses, and interpretation; presenting findings and newly developed products to stakeholders; writing summary reports; completing and submitting required grant reports; supervising other project staff.

**Project Coordinator**                    2004-2005
Failure to Appear Reduction Project. Jefferson County, Colorado.
Responsibilities included: coordinating and overseeing data collection, analyses, and interpretation; presenting findings to and facilitating discussions among local justice system officials; supervising other project staff.

**Primary Investigator**                    2000-2003
Juvenile Competency Study (Dissertation), University of Missouri-Columbia.
Responsibilities included: conducting a comprehensive literature review; selecting and locating participants; developing a survey; writing computer programs for statistical analyses; writing a complete manuscript.
Supervisor: Joseph LoPiccolo, Ph.D.

# VITA
## MICHAEL R. JONES, PH.D.

**Graduate Research Assistant**                          1995-2000
Family Assessment Laboratory, University of Missouri-Columbia.
Responsibilities included: training, supervising, and writing letters of recommendation for undergraduate research assistants; writing training manuals; managing large data sets; reviewing manuscripts submitted for publication; presenting posters at conferences; writing a manuscript and book chapter for publication.
Supervisor: Charles Borduin, Ph.D.

**Primary Researcher**                          1999-2000
Ph.D. Qualifying Examinations, University of Missouri-Columbia.
Responsibilities included: conducting comprehensive literature reviews and writing two major area papers.
Supervisor: Charles Borduin, Ph.D.

**Graduate Research Assistant**                          1997-1999
Mid-Missouri Mental Health Center, Columbia, Missouri.
Responsibilities included: conducting structured assessments of inpatient children and adolescents; managing large data sets; writing manuscripts for publication; reviewing manuscripts submitted for publication by other researchers.
Supervisor: Javad Kashani, M.D.

**Primary Investigator**                          1996-1999
Toddler Maltreatment Study (Master's Thesis), University of Missouri-Columbia.
Responsibilities included: conducting an extensive literature review; conducting in-home interview- and observational-based assessments of toddlers and their families; writing computer programs for statistical analyses; supervising an undergraduate honors student; writing a manuscript for publication.
Supervisor: Charles Borduin, Ph.D.

### Clinical and Forensic Psychology Experience

**Psychology Intern**                          2001-2002
Colorado Mental Health Institute at Ft. Logan (APA-Accredited), Denver, Colorado.
Responsibilities included: conducting psychological evaluations and providing group, individual, and family therapy for children, adolescents, and adults with chronic mental illness; conducting certifications and 72-hour mental health hold evaluations; conducting dangerousness assessments; revising social skills programming; attending twice weekly seminars.
Supervisors: Aaron Townsend, Ph.D.; Dale Schellenger, Ph.D.; Neil Sorokin, Ph.D.

# VITA
## MICHAEL R. JONES, PH.D.

---

**Psychology Clerk**                 1999-2000
Biggs Maximum Security Forensic Center, Fulton State Hospital, Fulton, Missouri.
Responsibilities included: conducting competence to proceed evaluations of male and female patients; conducting competence to proceed screenings of male and female clients at admission and 60-day follow-up; designing the Competency Education class; providing Competency Education classes to male and female clients; conducting staff development training; observing expert testimony.
Supervisor: Michael Stacy, Ph.D.

**Psychology Clerk**                 1998
Guhleman Forensic Center, Fulton State Hospital, Fulton, Missouri.
Responsibilities included: delivering group (sex offenders, basic cognitive therapy) and individual therapy to male clients with personality disorders and who were found Not Guilty by Reason of Insanity; providing case management; serving on an interdisciplinary treatment team; conducting staff development training.
Supervisor: Marc Maddox, Ph.D.

**Staff Clinician**                 1996-1998
Psychological Services Clinic, University of Missouri-Columbia.
Responsibilities included: delivering outpatient psychotherapy to couples, adults, and families with a broad range of psychopathology; screening for National Depression Screening Day.
Supervisors: Debora Bell-Dolan, Ph.D.; David DuBois, Ph.D.; Charles Borduin, Ph.D.; Joseph LoPiccolo, Ph.D.

**Multisystemic (Family) Therapist**         1995-1997
13th Circuit Judicial Court, Boone County, Missouri.
Responsibilities included: conducting individual, family, couples, peer, and school interventions with juvenile offenders and their families; writing progress notes for the family court; testifying in family court.
Supervisor: Charles Borduin, Ph.D.

**Mental Health Worker**            1994-1995
Cleo Wallace Center, Colorado Springs, Colorado.
Responsibilities included: providing a safe and therapeutic day treatment, residential, and inpatient milieu for emotionally and behaviorally disordered children and adolescents.
Supervisor: Martha Holmes.

## Teaching and Advising Experience

**Adjunct Faculty Member**           2001
Department of Psychology, Westminster College, Fulton, Missouri.
Responsibilities included: teaching a senior-level, writing-intensive undergraduate psychology course entitled "Forensic Psychology." Enrollment = 19.
Supervisor: Ted Jaeger, Ph.D.

# VITA
## MICHAEL R. JONES, PH.D.

**Assistant Academic Advisor**                    2000-2001
>   Department of Psychological Sciences, University of Missouri- Columbia.
>   Responsibilities included: advising undergraduate psychology students about academic and career options; presenting information on graduate school programs and career options in psychology to undergraduate psychology students.
>   Supervisors: Andrew Beckett, M.A.; Dennis Wright, Ph.D.

**Guest Lecturer**                    1999-2001
>   Department of Psychological Sciences, University of Missouri-Columbia;
>   Westminster College, Fulton, Missouri.
>   "Introduction to Clinical Psychology" (4x).
>   "Abnormal Psychology" (2x);
>   "Tests and Measures" (1x).
>   Supervisor: Nan Presser, Ph.D.

**Teaching Assistant**                    1998
>   Department of Psychological Sciences, University of Missouri-Columbia.
>   Undergraduate course: "Abnormal Psychology." Enrollment = 275.
>   Responsibilities included: guest lecturing; tutoring students; preparing and proctoring exams.
>   Supervisor: Charles Borduin, Ph.D.

**Statistics Tutor**                    1991-1992
>   Department of Psychology, St. Mary's College of Maryland.
>   Responsibilities included: providing individual and group tutoring sessions to undergraduate psychology students; grading exams and weekly homework assignments.
>   Supervisors: Donna Eisenstadt, Ph.D.; Wesley Jordan, Ph.D.

## PUBLICATIONS AND REPORTS

Jones, M. R. (2018). Pretrial Justice System and Pretrial Program Assessment in Contra Costa County, California. South Easton, MA: Justice System Partners.

Schnacke, T. R., Brooker, C. M. B., & Jones, M. R. (2014). The Jefferson County Bail Project: Lessons Learned from a Process of Pretrial Change at the Local Level. Washington, DC: Pretrial Justice Institute.

Brooker, C. M. B., Jones, M. R., & Schnacke, T. R. (2014). The Jefferson County Bail Project: Impact Study Found Better Cost Effectiveness for Unsecured Recognizance Bonds Over Cash and Surety Bonds. Washington, DC: Pretrial Justice Institute.

Jones, M. R. (2013). Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option. Washington, DC: Pretrial Justice Institute.

# VITA
## MICHAEL R. JONES, PH.D.

Robertson, J., & Jones, M. R. (2013). Sonoma Pretrial Risk Assessment Tool (SPRAT) Report. Denver, CO: Voorhis/Robertson Justice Services.

Jones, M. R., & Schnacke, T. R. (2013).  Colorado Decision Tree for Setting Bond Type. Unpublished manuscript.

Jones, M. R. (2013). Pretrial Performance Measurement: A Colorado Example of Going from the Ideal to Everyday Practice. Washington, DC: Pretrial Justice Institute.

Pretrial Justice Institute (M. Jones as lead author). (2013). Colorado Pretrial Assessment Tool (CPAT): Administration, Scoring, and Reporting Manual, Version 1. Washington, DC: Pretrial Justice Institute.

Jones, M. R. (2013). Keeping your criminal justice coordinating committee going strong. *National Jail Exchange*, from http://community.nicic.gov/blogs/national_jail_exchange/archive/2013/02/12/ keeping-your-criminal-justice-coordinating-committee-going-strong.aspx.

Jones, M. R. (2012). Guidelines for Staffing a Local Criminal Justice Coordinating Committee. Washington, DC: U.S. Department of Justice.

Schnacke, T. R., Jones, M. R., & Wilderman, D. M. (2012). Increasing court-appearance rates and other benefits of live-caller telephone court-date reminders: The Jefferson County, Colorado, FTA Pilot Project and resulting Court Date Notification Program. *Court Review, 48(3)*, 86-95.

Bechtel, K., Clark, J., Jones, M. R., & Levin, D. J. (2012). Dispelling the myths: What policy makers need to know about pretrial research. Washington, DC: Pretrial Justice Institute.

A Joint Partnership among Ten Colorado Counties, the Pretrial Justice Institute, and the JFA Institute (M. Jones as lead author). (2012). The Colorado Pretrial Assessment Tool (CPAT). Washington, DC: Pretrial Justice Institute.

Austin, J., Bhati, A., Jones, M., & Ocker, R. (2012). Florida Pretrial Risk Assessment Instrument. Washington, DC: JFA Institute.

Schnacke, T. R., Jones, M. R., Brooker, C. M. B., & Enquist, M. (2011). The Jefferson County Bail Project: Project Summary Presented to the Attorney General's National Symposium on Pretrial Justice. Washington, DC: National Symposium on Pretrial Justice.

Schnacke, T. R., Jones, M. R., & Brooker, C. M. B. (2011). The Third Generation of Bail Reform. DULR Online, the Online Supplement to the Denver University Law Review. Denver, CO: University of Denver Sturm College of Law.

Schnacke, T. R., Jones, M. R., & Brooker, C. M. B. (2011). Glossary of Terms and Phrases Relating

# VITA
## MICHAEL R. JONES, PH.D.

---

to Bail and the Pretrial Release and Detention Decision. Washington, DC: Pretrial Justice Institute. [An updated (2015) version of this document published by the Pretrial Justice Institute is available online at https://university.pretrial.org/viewdocument/glossary-of-terms-an. The 2011 document may no longer be available.]

Schnacke, T. R., Jones, M. R., & Brooker, C. M. B. (2010). The History of Bail and Pretrial Release. Washington, D.C.: Pretrial Justice Institute.

Pretrial Justice Institute (M. Jones as one of three authors). (2010). Responses to Claims About Money Bail for Criminal Justice Decision-Makers. Washington, DC: Pretrial Justice Institute.

Jones, M. R., Brooker, C. M. B., & Schnacke, T. R. (2009). A Proposal to Improve the Administration of Bail and the Pretrial Process in Colorado's First Judicial District. Golden, CO: Jefferson County Criminal Justice Planning Unit.

Jones, M. R., & Ferrere, S. (2008). Improving pretrial assessment and supervision in Colorado. In *Topics in community corrections: Applying evidence-based practices in pretrial services* (pp. 13-17). Washington, DC: U.S. Department of Justice.

Borduin, C. M., Heiblum, N., Jones, M. R., & Grabe, S. A. (2000). Community-based treatment of serious antisocial behavior in adolescents. In W. E. Martin Jr. & J. L. Swartz-Kulstad (Eds.), *Person-environment psychology and mental health: Assessment and intervention* (pp. 113-141). Mahwah, NJ: Erlbaum.

Kashani, J. H., Jones, M. R., Borduin, C. M., Thomas, L., & Reid, J. C. (2000). Individual characteristics and peer relations of psychiatrically hospitalized aggressive youth: Implications for treatment. *Child Psychiatry and Human Development, 30,* 145-159.

Kashani, J. H., Jones, M. R., Bumby, K. M., & Thomas, L. A. (1999). Youth violence: Psychosocial risk factors, treatment, prevention, and recommendations. *Journal of Emotional and Behavioral Disorders, 7,* 200-210.

[The above article was republished in (2001). In H. M. Walker & M. H. Epstein (Eds.), *Making schools safer and violence free: Critical issues, solutions, and recommended practices.* Austin, TX: PRO-ED.]

Kashani, J. H., Suarez, L., Jones, M. R., & Reid, J. C. (1999). Perceived family characteristic differences between depressed and anxious children and adolescents. *Journal of Affective Disorders, 52,* 269-274.

## **EXPERT TESTIMONY**

*Daves, et al. v. Dallas County, Tex.,* 3:18-cv-154 (N.D. Tex. 2018) – Declaration (2018).

# VITA
## MICHAEL R. JONES, PH.D.

---

*Booth, et al. v. Galveston County, Tex.,* 3:18-cv-0104 (S.D. Tex. 2018) – Declaration (2018).

*Schultz, et al. v. State of Alabama,* et al., 5:17-cv-00270-MHH (N.D. Ala.) – Declaration (2018).

*Knight v. Sheriff for Leon County, Fla.,* No. 4:17cv464 (N.D. Fla.) – Declaration (2018); Deposition (2018).

*Buffin v. Hennessy,* 4:15-cv-4959 (N.D. Cal. 2018). – Declaration (2017); Deposition (2017).

*ODonnell v. Harris County,* 251 F. Supp. 3d 1052 (S.D. Tex. 2017) – Declaration (2017).

## PRESENTATIONS, WORKSHOPS, AND PANELS

Since 2013, numerous training workshops on a variety of criminal justice and pretrial justice topics delivered as part of technical assistance, training, and regional and national conferences.

Jones, M. R. (2013). *Mystery No More: The Latest on Pretrial Risk Assessments.* Webinar provided to the National Legal Aid and Defender Association, December.

Jones, M. R. (2013). Summary of Research -- *Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option.* Panel presentation at the International Drug Policy Reform Conference, Denver, Colorado.

Schnacke, T. S., & Jones, M. R. (2013). *Colorado's New Pretrial Bail Statute -- Law and Supporting Research.* Presentations at multiple meetings of state and local stakeholder groups in Colorado.

Jones, M. R. (2012). *Using Research to Improve Pretrial Policy: Lessons Learned from a Ten-County Colorado Project.* Presentation at the annual meeting of the American Society of Criminology, Chicago, Illinois.

Jones, M. R. (2012). *Pretrial Risk Assessment: Status, Issues, and Opportunities for Improvement.* Session discussant at the annual meeting of the American Society of Criminology, Chicago, Illinois.

Jones, M. R. (2012). *Empirically-Based Pretrial Risk Assessment in Santa Clara County, CA.* Presentation at the annual training of the County of Santa Clara Office of Pretrial Services, San Jose, CA.

Jones, M. R. (2012). *Overview of the Colorado Pretrial Assessment Tool (CPAT).* Presentations at multiple meetings of state and local stakeholder groups in Colorado.

Jones, M. R. (2012). *Pretrial Justice and Bail in Colorado.* Presentation to Criminal Courts Class, Johnson and Wales University, Denver, Colorado.

# VITA
## MICHAEL R. JONES, PH.D.

Jones, M. R. (2012-2010). *Criminal justice coordinating committees: Your role*. Presentation at the Orientation for New Pretrial Executives training, National Institute of Corrections, Aurora, Colorado.

Jones, M. R., & Clark, J. (2011) *Decreasing jail crowding while maintaining public safety: Pretrial solutions for sheriffs and jail administrators*. Webinar hosted by the Pretrial Justice Institute, November 29, 2011.

Jones, M. R. (2011). *Florida pretrial risk assessment: A six-county project*. Presentation at the Annual Training Institute of the Florida Association of Community Corrections, Palm Beach Gardens, Florida.

Jones, M. R. (2011). *Increasing public safety while reducing jail populations: The benefit of cost-effective bail setting and pretrial services programs*. Presentation at the annual meeting of the National Sheriff's Association, St. Louis, Missouri.

Jones, M. R. (2011). *Effectively using data with policy makers*. Presentation at the Large Jail Network meeting, National Institute of Corrections, Aurora, Colorado.

Jones, M. R. (2010). *Innovative pretrial practices: The Jefferson County, Colorado, Court Date Notification Program*. Roundtable presentation at the annual meeting of the American Society of Criminology, San Francisco, California.

Clark, J., & Jones, M. R. (2010). *Accountability and performance measurement in pretrial programming and decision making*. Workshop presented at the 38th Annual Conference and Training Institute of the National Association of Pretrial Services Agencies, San Diego, California.

Jones, M. R. (2010). *The Jefferson County, Colorado, Pretrial Pilot Project and the use of data-driven policies and strategies*. Panel presentation at the National Forum on Criminal Justice and Public Safety of the National Criminal Justice Association, Ft. Meyers, Florida.

Jones, M. R. (2010). *Information about the Jefferson County, Colorado, Pretrial Pilot Project*. Workshop presented at the Evidence Based Policy and Practice in Action Western Regional Meeting of the National Criminal Justice Association, Phoenix, Arizona.

Allen, K. M., & Jones, M. R. (2010). *The benefits and necessity of local criminal justice planning and coordination*. Presented to the Justice and Public Safety Steering Committee of the National Association of Counties, San Antonio, Texas.

Schnacke, T. R., Jones, M. R., & Brooker, C. M. B. (2009). *Jefferson County Pretrial Pilot Project*. Continuing Legal Education delivered to the Colorado Criminal Defense Bar, Jefferson County Chapter, Lakewood, Colorado.

# VITA
## MICHAEL R. JONES, PH.D.

Schnacke, T. R., & Jones, M. R. (2009). *Colorado bail law and practices: Current and future*. Continuing Legal Education delivered to the Boulder County Bar Criminal Law Section, Boulder, Colorado.

Brooker, C. M. B., Schnacke, T. R., & Jones, M. R. (2009). *A brief update on the Jefferson County Bail Project*. Presented to General Assembly Members and County Commissioners from Jefferson County, Colorado, Golden, Colorado.

Jones, M. R., Schnacke, T. R., & Brooker, C. M. B. (2009). *An update on the Jefferson County Bail Project and Pretrial Pilot Project*. Presented to the System Performance Committee of the Denver Crime Prevention and Control Commission, Denver, Colorado.

Jones, M. R., Schnacke, T. R., & Brooker, C. M. B. (2009). *A proposal to improve the administration of bail and the pretrial process in Colorado's First Judicial District - An overview*. Presented at the quarterly meeting of Colorado Chief Judges, Denver, Colorado.

Jones, M. R., & Brooker, C. M. B. (2009). *Upcoming improvements to the administration of bail and pretrial release in Colorado - An overview*. Presented at the Annual Joint Meeting of the County Sheriffs of Colorado and the Colorado Association of Chiefs of Police, Denver, Colorado.

Jones, M. R. (2008). *Brief overview of the Colorado Improving Supervised Pretrial Release (CISPR) Project*. Panel presentation at the 36th Annual Conference and Training Institute of the National Association of Pretrial Services Agencies, Milwaukee, Wisconsin.

Jones, M. R. (2007). *Why Jefferson County does criminal justice strategic planning and coordination*. Presented to a class at McLain Community High School, Lakewood, Colorado.

Jones, M. R. (2007). *The value and necessity of local criminal justice planning and coordination*. Presented to county commissioners at the Front Range District Meeting of the Colorado Counties Inc. Annual Summer Conference, Keystone, Colorado.

Jones, M. R., & Schnacke, T. R. (2006). *Jefferson County criminal justice strategic planning trends and projects*. Presented at a meeting of the Colorado First Judicial District Bar Association, Golden, Colorado.

Jones, M. R. (2006). *How to develop and staff a successful local criminal justice coordinating committee*. Presented at the Annual Conference of the Pennsylvania Commission on Crime and Delinquency, University Park, Pennsylvania.

Martin, J. A., Mattson, B. A., Lynn, J., & Jones, M. R. (2003). *The Youth Service Improvement Initiative.* Paper presentation at the 55th Annual Meeting of the American Society of Criminology (ASC), Denver, Colorado.

# VITA
## MICHAEL R. JONES, PH.D.

Jones, M. R., Martin, J. A., & Erler, D. E. (2003). *A strategic approach to assessing and improving your pretrial services program.* Quarter-day workshop presented at the 31st Annual Conference and Training Institute of the National Association of Pretrial Services Agencies (NAPSA), Broomfield, Colorado.

Jones, M. R. (2002). *Competence to proceed.* Presentation to psychology interns, Colorado Mental Health Institute at Ft. Logan, Denver, Colorado.

Jones, M. R. (2001). *What do I do with my B.A.? Graduate training and career options in psychology.* Presentation to undergraduate psychology students, University of Missouri-Columbia.

Jones, M. R. (2000). *Methods and materials for providing competency education class.* Presentation to competency education instructors at Fulton State Hospital, Fulton, Missouri.

Jones, M. R. (1999). *Graduate training and career opportunities in forensic psychology.* Presentation to Psi Chi Honor Society, University of Missouri-Columbia.

Borduin, C. M., Schaeffer, C. M., & Jones, M. R. (1997). *Multisystemic treatment and prevention of criminal activity in serious juvenile offenders.* One-day workshop presented to the Family Court of St. Louis County, Clayton, Missouri.

## POSTERS

Allan, W. D., Jones, M. R., & Kashani, J. H. (1999). *Implications of comorbid conduct disorder for psychiatrically hospitalized children with ADHD.* Poster presented at the annual meeting of the Association for the Advancement of Behavior Therapy, Toronto, Canada.

Kashani, J. H., Allan, W. D., & Jones, M. R. (1999). *The internal phenomenology of youth violence.* Poster presented at the annual meeting of the Association for the Advancement of Behavior Therapy, Toronto, Canada.

Jones, M. R., & Borduin, C. M. (1999). *Psychosocial correlates of toddler physical abuse and neglect.* Poster presented at the annual meeting of the American Psychological Society, Denver, Colorado.

Borduin, C. M., Schaeffer, C. M., Heiblum, N., & Jones, M. R. (1998). *A measure of adolescent peer relations: The Missouri Peer Relations Inventory.* Poster presented at the annual meeting of the American Psychological Society, Washington, D.C.

Borduin, C. M., Jones, M. R., Sprengelmeyer, P. G., & Williamson, J. M. (1996). *The ecology of toddler physical abuse and neglect.* Poster presented at the annual meeting of

# VITA
## MICHAEL R. JONES, PH.D.

the American Psychological Association, Toronto, Canada.

Lewis, J. E., & Jones, M. R. (1992). *Sexually traumatized children? False positives from use of anatomical dolls.* Poster presented at the annual meeting of the American Psychological Association, Washington, D.C.

## GRANTS/AWARDS

Edward Byrne Memorial Justice Assistance Recovery Act (ARRA) Grant for the Jefferson County Bail Project. (2009). $473,958.

Edward Byrne Memorial Justice Assistance Grant (JAG) for the continuation of the Colorado Improving Supervised Pretrial Release (CISPR) Project. (2008). $23,790.

Edward Byrne Memorial Justice Assistance Grant (JAG) for the Colorado Improving Supervised Pretrial Release (CISPR) Project. (2006). $20,000.

National Institute of Corrections (NIC)/Council of State Governments (CSG) Technical Assistance Award to Jefferson County, Colorado. (2003).

American Academy of Forensic Psychology (AAFP) Dissertation grant. (2001). $595.

American Psychological Association Division 41 (American Psychology-Law Society) Dissertation grant. (2000). $500.

American Psychological Association (APA) Travel Scholarship. (1996). $300.

## MEMBERSHIP IN PROFESSIONAL ORGANIZATIONS

| | |
|---|---|
| American Society of Criminology (ASC) | 2004-2017 |
| National Association of Pretrial Services Agencies (NAPSA) | 2004-2017 |
| National Criminal Justice Association (NCJA) | 2005-2012 |
| Justice Research and Statistics Association (JRSA) | 2005-2012 |
| American Psychological Association (APA) | 1992-2004 |
| APA Division 12 (Clinical) | 1996-2003 |
| APA Division 41 (Psychology and Law) | 1999-2004 |
| APA Division 53 (Clinical Child) | 2000-2003 |
| Colorado Psychological Association (CPA) | 2001-2003 |
| American Psychological Society (APS) | 1999 |

## MEMBERSHIP/PARTICIPATION IN COMMITTEES

| | |
|---|---|
| • Pretrial Innovators Network (PI-Net) | 2017- |
| • Jefferson County Child and Youth Leadership Commission | 2009-2012 |

# VITA
## MICHAEL R. JONES, PH.D.

| | |
|---|---|
| • Jefferson County Criminal Justice Strategic Planning Committee | 2003-2012 |
|    o Including various subcommittees | 2003-2012 |
| • Jefferson County Corrections Board (Colorado) | 2003-2012 |
| • Court Services Advisory Board (Jefferson County, Colorado) | 2003-2012 |
| • Justice Oversight Committee (Jefferson County, Colorado) | 2007-2008 |
| • Jefferson County Juvenile Services Planning Committee | 2005-2006 |
| • Response to Violations Subcommittee (Colorado 1st Judicial District Probation Department) | 2003-2009 |
| • Criminal Justice Executives Committee (Jefferson County, Colorado) | 2003-2008 |
| • Competency Working Group (Colorado Department of Criminal Justice) | 2003-2005 |
| • SAFE Jeffco (Jefferson County, Colorado) | 2003-2004 |
|    o Continuum of Care Subcommittee | 2003-2005 |
| • Restorative Justice Working Group (Jefferson County, Colorado) | 2003-2004 |
| • Multi-agency Information Sharing/Remote Booking Committee (Jefferson County, Colorado) | 2003-2005 |
| • Psychological Clinic Library Committee, Department of Psychological Sciences, University of Missouri- Columbia | 2000-2001 |
| • Psychological Clinic Liaison Committee, Department of Psychological Sciences, University of Missouri-Columbia | 1996 |

## CONTINUING EDUCATION/SPECIALIZED TRAINING

Jefferson County, Colorado. (2003-2011). *Multiple full-day and half-day leadership, management, staff development, and computer application training.*

SPSS. (2004-2005). *Basic, intermediate, and advanced training in the use of SPSS (database and statistical analysis software).*

National Association of Pretrial Services Agencies. (2003). *Pretrial 101 & 202.* Two, half-day workshops, Broomfield, Colorado.

Bureau of Justice Assistance. (2003). *Project Development and Implementation Training.* Two-day workshop, Colorado Springs, Colorado.

Missouri Department of Mental Health. (1999). *Assessment of juvenile and adult competency to stand trial and criminal responsibility.* One-day workshop, Lake Ozark, Missouri.

Reinicke, M. (1997). *Cognitive therapy of emotional disorders.* One-day workshop, Columbia, Missouri.

Craske, M. G. (1997). *Cognitive-behavioral conceptualization and treatment of panic disorder and agoraphobia.* One-day workshop, Columbia, Missouri.

# VITA
## MICHAEL R. JONES, PH.D.

Kendall, P. C. (1996). *Short-term therapy for children and adolescents.*
Two-day workshop, St. Louis, Missouri.

Haley, J. (1996). *Contemporary applications of directive therapy with adolescents and young adults.* One-day workshop, Lenexa, Kansas.

Borduin, C. M. (1995). *Multisystemic treatment of violent juvenile offenders.*
Three-day workshop, Columbia, Missouri.

**Appendix B**

**Materials Considered**

*Publications and Reports Originally Referenced in My Affidavit for this case, dated September 5, 2017*

A Joint Partnership Among Ten Colorado Counties, the Pretrial Justice Institute, and the JFA Institute. (2012). The Colorado Pretrial Assessment Tool (CPAT). Rockville, MD: Pretrial Justice Institute.

American Bar Association. (2007). ABA Standards for Criminal Justice, Third Edition: Pretrial Release. Washington, DC: Author.

Bechtel, K., Clark, J., Jones, M. R., Levin, D. J. (2012). Dispelling the Myths: What Policy Makers Need to Know About Pretrial Research. Rockville, MD: Pretrial Justice Institute.

Bornstein, B. H., Tomkins, A. J., Neeley, E. M., Herian, M. N., & Hamm, J. A. (2012). Reducing Courts' Failure-To-Appear Rate by Written Reminders. Psychology, Public Policy, and Law, Advance online publication. doi: 10.1037/a0026293

Brooker, C. M. B., Jones, M. R., & Schnacke, T. R. (2014). The Jefferson County Bail Project: Impact Study Found Better Cost Effectiveness for Unsecured Recognizance Bonds Over Cash and Surety Bonds. Rockville, MD: Pretrial Justice Institute.

Bureau of Justice Statistics. (2010). Data Advisory: State Court Processing Statistics Data Limitations. Washington, DC: U.S. Department of Justice.

Cohen, T. H., & Reaves, B. A. (2007). Pretrial Release of Felony Defendants in State Courts. Washington, DC: U.S. Department of Justice.

Crime and Justice Institute. (2015). A Cost-Benefit Model for Pretrial Justice. Boston, MA: Author.

Danner, M. J. E., Van Nostrand, M., & Spruance, L. M. (2015). Risk-Based Pretrial Release Recommendation and Supervision Guidelines: Exploring the Effect on Officer Recommendations, Judicial Decision-Making, and Pretrial Outcome. St. Petersburg, FL: Luminosity.

Danner, M. J. E., Van Nostrand, M., & Spruance, L. M. (2016). Race and Gender Neutral Pretrial Risk Assessment, Release Recommendations, and Supervision: VPRAI and Praxis Revised. St. Petersburg, FL: Luminosity.

Flores, A. W., Bechtel, K., Lowenkamp, C. T. (2016). False Positives, False Negatives, and False Analyses: A Rejoinder to "Machine Bias: There's Software Used Across the Country to Predict Future Criminals. And It's Biased Against Blacks. Federal Probation, 80(2), 38-46.

Gupta, A., Hansman, C., & Frenchman, E. (2016). The Heavy Costs of High Bail: Evidence from Judge Randomization. http://www.columbia.edu/~cjh2182/GuptaHansmanFrenchman.pdf

Heaton, P., Mayson, S., & Stevenson, M. (2017). The Downstream Consequences of Misdemeanor Pretrial Detention. Stanford Law Review, Vol 69, p 711.

Helland, E., & Tabarrok, A. (2004). The Fugitive: Evidence on Public Versus Private Law Enforcement from Bail Jumping. Journal of Law and Economics, 47, 93-122.

Holsinger, A. M. (2016a). Exploring the Relationship Between Time in Pretrial Detention and Four Outcomes. Boston, MA: Crime and Justice Institute.

Holsinger, A. M. (2016b). Analyzing Bond Supervision Survey Data: The Effects of Pretrial Detention on Self-Reported Outcomes. Boston, MA: Crime and Justice Institute.

Jones, C. E. (2013). "Give Us Free": Addressing Racial Disparities in Bail Determinations. Articles in Law Reviews & Other Academic Journals. Paper 301. http://digitalcommons.wcl.american.edu/facsch_lawrev/301

Jones, M. R. (2013). Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option. Rockville, MD: Pretrial Justice Institute.

Kimbrell, C. S., & Wilson, D. B. (2016). Money Bond Process Experiences and Perceptions. https://university.pretrial.org/viewdocument/money-bond-process-experiences-and

Laura And John Arnold Foundation. (2013). Developing a National Model for Pretrial Risk Assessment. Houston, TX: Author.

Laura And John Arnold Foundation. (2014). The Public Safety Assessment – Court Analysis of Race and Gender. Houston, TX: Author.

Lowenkamp, C. T., & VanNostrand, M. (2013). Exploring the Impact of Supervision on Pretrial Outcomes. Houston, TX: Laura And John Arnold Foundation.

Lowenkamp, C. T., VanNostrand, M., & Holsinger, A. (2013a). The Hidden Costs of Pretrial Detention. Houston, TX: Laura And John Arnold Foundation.

Lowenkamp, C. T., VanNostrand, M., & Holsinger, A. (2013b). Investigating the Impact of Pretrial Detention on Sentencing Outcomes. Houston, TX: Laura And John Arnold Foundation.

Morris, R. G. (2013). Pretrial Release Mechanisms in Dallas County, Texas: Differences in Failure To Appear (FTA), Recidivism/Pretrial Misconduct, and Associated Costs of FTA. https://www.utdallas.edu/epps/ccjs/dl/Dallas%20Pretrial%20Release%20Report%20-FINAL%20Jan%202013c.pdf

Morris, R. G. (2014). Pretrial Release Mechanisms in Dallas County, Texas: Differences in

Failure To Appear (FTA) and Associated Costs of FTA, 2012 Data Update. https://www.utdallas.edu/epps/ccjs/dl/Dallas%20Report%20-%202012%20FINAL%2012%2014%202014.pdf

National Center for State Courts. (2014). Reminder Systems for Courts. Court Technology Bulletin. Williamsburg, VA: Author.

Rosenbaum, D. I., Hutsell, N., Tomkins, A. J., Bornstein, B. H., Herian, M. N., & Neeley, E. M. (2012). Court Date Reminder Postcards. A Benefit-Cost Analysis of Using Reminder Cards to Reduce Failure to Appear Rates. Judicature, 95(4), 177-187.

Schnacke, T. R., Jones, M. R., & Wilderman, D. M. (2012). Increasing Court-Appearance Rates and Other Benefits of Live-Caller Telephone Court-Date Reminders: The Jefferson County, Colorado, FTA Pilot Project and Resulting Court Date Notification Program. Court Review, 48(3), 86-95.

Stevenson, M. (2017). Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes. Available at SSRN: https://ssrn.com/abstract=2777615 or http://dx.doi.org/10.2139/ssrn.2777615.

VanNostrand, M., Rose, K. J., & Weibrecht, K. (2011). State of The Science of Pretrial Release Recommendations and Supervision. Rockville, MD: Pretrial Justice Institute.

### *Other Publications and Reports Referenced in This Rebuttal*

Austin, J., Krisberg, B., Litsky, P. (1985). The Effectiveness of Supervised Pretrial Release. Crime and Delinquency, 31(4), 519-537.

Baird, C. (2017). A Question of Evidence, Part Two, Brief 6 of 6, Summary and Recommendations. Madison, WI: National Council on Crime & Delinquency.

Bechtel, K., Lowenkamp, C., & Holsinger, A. (2011). Identifying the Predictors of Pretrial Failure: A Meta-Analysis. Federal Probation, 75(2).

Bechtel, K., Holsinger, A. M., Lowenkamp, C. T., & Warren, M. J. (2016). A Meta-Analytic Review of Pretrial Research: Risk Assessment, Bond Type, and Interventions. American Journal of Criminal Justice, DOI: 10.1007/s12103-016-9367-1.

Berk, R., Heidari, H., Jabbari, S., Kearns, M., & Roth, A. (2017). Fairness in Criminal Justice Risk Assessments: The State of the Art. Cornell University Library, at https://arxiv.org/abs/1703.09207.

Cooke, B., Diop, B., Fishbane, A., Hayes, J., Ouss, A., Shah, A. (2018). Using Behavioral Science to Improve Criminal Justice Outcomes: Preventing Failures to Appear in Court. Chicago, IL: University of Chicago Crime Lab.

Deposition of Timothy Conway (June 8, 2018) in *Buffin v. City and County of San Francisco* (N.D. Cal. 2018).

Goldkamp, J. S., & White, M. D. (2006). Restoring accountability in pretrial release: the Philadelphia pretrial release supervision experiments. Journal of Experimental Criminology, 2, 143–181.

Gouldin, L. P. (2018). Defining Flight Risk. University of Chicago Law Review, 85, 677-742.

Laura and John Arnold Foundation. (2018, 8). 8 Guide to the Pretrial Decision Framework. Houston, TX: Author.

Laura and John Arnold Foundation. (2018, 9). 9 Guide to the Release Conditions Matrix. Houston, TX: Author.

Laura and John Arnold Foundation. (2018, 9C). 9C PSA Results Presentation. Houston, TX: Author.

Laura and John Arnold Foundation. (2018, 13B). 13B Stakeholder Education Presentation. Houston, TX: Author.

Laura and John Arnold Foundation. (2018, 16). 16 Guide to Outcomes and Oversight. Houston, TX: Author.

Laura and John Arnold Foundation. (2018, RFP). Request for Proposals To Conduct Research on the Public Safety Assessment, Risk Assessments, and Pretrial Detention. Houston, TX: Author.

National Implementation Research Network. (2015). Implementation Drivers: Assessing Best Practices. Chapel Hill, NC: University of North Carolina.

*ODonnell v. Harris County*, No. H-16-1414 (S.D. Tex. April 28, 2017).

Phillips, M. (2012). A Decade of Bail Research in New York City. New York, NY: New York Criminal Justice Agency.

*People v. Nat'l Auto. and Cas. Ins. Co.*, No. B148171, 98 Cal. App. 4th 277 (Cal. Ct. App. May 8, 2002).

Pretrial Detention Reform Workgroup. (2017). Pretrial Detention Reform: Recommendations to the Chief Justice. San Francisco, CA: Supreme Court of California.

Pretrial Justice Institute, National Center for State Courts, and the State Justice Institute. (2018). Estimating the Costs of Implementing Pretrial Assessment and Monitoring Services. Rockville, MD; Williamsburg, VA; Reston, VA: Authors.

Pretrial Services Agency for the District of Columbia (2017a). Arrest-Free Rates for Pretrial Defendants in Washington, DC. At

https://www.psa.gov/sites/default/files/2016%20Arrest-Free%20Rates%20for%20PSA%20Defendants.pdf

Pretrial Services Agency for the District of Columbia (2017b). Release Rates for Pretrial Defendants within Washington, DC. At https://www.psa.gov/sites/default/files/2016%20Release%20Rates%20for%20PSA%20Defendants%20-%20for%20Posting.pdf

Pretrial Services Agency for the District of Columbia (2018). FY 2017 Release Rates for Pretrial Defendants within Washington, DC. At https://www.psa.gov/sites/default/files/2017%20Release%20Rates%20for%20DC%20Pretrial%20Defendants.pdf

Reaves, B. A. (2013). Felony Defendants in Large Urban Counties, 2009 – Statistical Tables. Washington, DC: U.S. Department of Justice.

*Reem v. Hennessy*, No. 17-CV-06628-CRB, 2017 WL 6765247 (N.D. Cal. Nov. 29, 2017).

Schnacke, T. (2014). The Fundamentals of Bail: A Resource Guide for Pretrial Practitioners and a Framework for American Pretrial Reform. Washington, DC: U.S. Department of Justice.

Superior Court of California, County of San Francisco. (2017). Felony-Misdemeanor Bail Schedule. San Francisco, CA: Author.

1

## PROOF OF SERVICE

2

    I am employed in the County of San Francisco, State of California.  I am over the age of 18 years. My business address is Latham & Watkins LLP, 505 Montgomery Street, Suite 2000, San Francisco, CA  94111-6538.  My email address is victor.cayanan@lw.com

3

4

    On **July 20, 2018**, I served the following documents described as:

5

**PLAINTIFFS' REBUTTAL EXPERT REPORT OF MICHAEL R. JONES, PH.D**

6

by serving a true copy of the above-described documents in the following manners:

7

### BY U.S. MAIL

8

    I am familiar with the office practice of Latham & Watkins LLP for collecting and processing documents for mailing with the United States Postal Service.  Under that practice, documents are deposited with the Latham & Watkins LLP personnel responsible for depositing documents with the United States Postal Service; such documents are delivered to the United States Postal Service on that same day in the ordinary course of business, with postage thereon fully prepaid.  I deposited in Latham & Watkins LLP's interoffice mail a sealed envelope or package containing the above-described document and addressed as set forth below in accordance with the office practice of Latham & Watkins LLP for collecting and processing documents for mailing with the United States Postal Service:

9

10

11

12

13

14

DHILLON LAW GROUP
Harmeet K. Dhillon
Brandon Baum
Krista L. Baughman
177 Post St., Suite 700
San Francisco, CA 94108

Dennis J. Herrera, City Attorney
Wayne K. Snodgrass, Deputy City Attorney
Jeremy M. Goldman, Deputy City Attorney
Neha Gupta, Deputy City Attorney
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, CA 94102-4682

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

US-DOCS\101893021.1

PROOF OF SERVICE

**BY ELECTRONIC MAIL**

The above-described documents were transmitted via electronic mail to the following parties on July 20, 2018:

Brandon Baum
bbaum@dhillonlaw.com
Krista L. Baughman
kbaughman@dhillonlaw.com
Harmeet K. Dhillon
harmeet@dhillonlaw.com

Jeremy M. Goldman, Deputy City Attorney
Jeremy.Goldman@sfcityatty.org
Neha Gupta, Deputy City Attorney
neha.gupta@sfcityatty.org

The parties on whom this electronic mail has been served has agreed in writing to such form of service pursuant to agreement.

I declare that I am employed in the office of a member of the Bar of, or permitted to practice before, this Court at whose direction the service was made and declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on **July 20, 2018**, at San Francisco, California.

_____
Victor R. Cayanan

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO