# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

**RIANA BUFFIN, ET AL.,**

Plaintiffs**,**

vs.

**CITY AND COUNTY OF SAN FRANCISCO, ET AL.,**

Defendants**.**

CASE NO. 15-cv-04959-YGR

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; DENYING CBAA'S CROSS-MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFFS' MOTION TO REVOKE CBAA'S INTERVENOR STATUS**

Re: Dkt. Nos. 282, 300, 287

Plaintiffs challenge the use of San Francisco's Felony and Misdemeanor Bail Schedule[1] as a basis for defendant Sheriff Vicki Hennessy (the "Sheriff") to release detainees prior to arraignment where those detainees do not have the means to afford the amounts set forth therein. Plaintiffs argue that plausible alternatives exist which would allow for their release and that the continued use of such a schedule violates the Due Process and Equal Protection clauses of the United States Constitution. When the Sheriff refused to defend the use of the Schedule, the Court granted California Bail Agents Association ("CBAA") limited intervenor status.

Now before the Court are plaintiffs' motion to revoke CBAA's intervenor status, and plaintiffs' and CBAA's cross-motions for summary judgment on plaintiffs' Equal Protection and Due Process claims.[2] Having carefully considered the pleadings in this action, the fully-briefed motions, and the hearing held on January 8, 2019, and for the reasons set forth below, the Court

---

[1] *See* Dkt. No. 283-2 (the "Bail Schedule" or "Schedule"). For purposes of this action, the Court presumes that the parties agree that 2017 Bail Schedule, (*see id.*), is the same or substantially similar to the one in use in 2015.

[2] *See* Plaintiffs' Motion to Revoke CBAA's Intervenor Status ("Motion to Revoke"), Dkt. No. 287; Plaintiffs' Motion for Summary Judgment ("Plaintiffs' MSJ"), Dkt. No. 282; and CBAA's Opposition to Plaintiffs' Motion for Summary Judgment and Cross-Motion for Summary Judgment ("CBAA's Cross-MSJ"), Dkt. No. 300.

United States District Court
Northern District of California

**DENIES** plaintiffs' motion to revoke CBAA's intervenor status; **GRANTS** plaintiffs' motion for summary judgment; and **DENIES** CBAA's cross-motion for summary judgment on the terms set forth herein.

## I.   FACTUAL BACKGROUND

The Court finds the following facts not subject to reasonable dispute:

### A.   Factual Overview[3]

San Francisco police arrested plaintiff Riana Buffin on Monday, October 26, 2015 for "grand theft of personal property" (Cal. Penal Code ("Penal Code") § 487(a)) and "conspiracy to commit a crime" (*id.* § 182(a)(1)).  (Dkt. No. 136-8.)[4]  According to her "booking card," Ms. Buffin, at the time 19 years old, was booked into jail at 11:33 p.m.  (*Id.*)  She was informed that her bail amount was set at $30,000, that is, the combined amount of $15,000 for each booking charge pursuant to the Bail Schedule.  (*Id.*)  The Schedule provides, "[f]or all unscheduled felonies, the bail amount is $15,000[,]" and with respect to conspiracy, if the underlying felony is identified, the amount is the "same as [the] underlying" felony or, if not specified, then $15,000.  (Bail Schedule at 2 (emphases removed).)  Here, Penal Code section 487(a) is not scheduled, hence the $15,000.  Under either formulation for the conspiracy charge, an additional $15,000 was properly set in accordance with the Bail Schedule.

Ms. Buffin did not post bail because she could not afford it, testifying:

> Q.   And why didn't you call a bail agent?
> A.   Because we or my mom didn't have the money for a bail agent, and they want a fortune. . . .
> Q.   Was there an amount that you could have afforded[?] . . . .

---

[3]  The Court notes that the parties cross reference facts found by the Court in its prior summary judgment order.  Order Denying CBAA's Motion for Summary Judgment; Denying Plaintiffs' Motion for Summary Judgment ("MSJ Order"), Dkt. No. 191.  Thus, where appropriate, the Court cites back to the evidence submitted then and which is not in dispute, such as plaintiff Buffin's booking card.

[4]  The Court notes that the exhibit at Docket Number 136-8 was previously locked at plaintiffs' counsel's request, to be refiled at a later date.  The document was never refiled, and no basis exists for sealing.  The Court hereby **UNSEALS** Docket Number 136-8.

A.    No.[5]

The District Attorney's office ultimately decided not to file formal charges against Ms. Buffin, and

she was released.  Despite having been detained on a Monday night, Ms. Buffin was never taken

to court on Tuesday or Wednesday for an initial appearance.  Notably, by the time of her release

on Wednesday night, she had spent approximately 46 hours in custody, and normal court

operations had long since ceased.  As a consequence of her detention, Ms. Buffin lost her job at

the Oakland Airport.  (*See* Buffin Depo Tr. at 52:3– 53:2.)

San Francisco police arrested plaintiff Crystal Patterson on Tuesday, October 27, 2015 at

3:49 p.m. and, according to her booking card, she was detained for "assault with force likely to

cause great bodily injury," Penal Code section "245(a)(1) [sic]."  (Dkt. No. 283-12 at ECF p. 4.)[6]

Ms. Patterson, at the time 29 years old, was booked into jail, where she was informed that her bail

amount was set at $150,000.  Again, this represented the combined amount of $75,000 each for

two separate counts of assault under Penal Code section "245(a)(1) [sic]."  (*Id.*)  Ms. Patterson,

too, could not afford the $150,000 for immediate release, nor was she taken to court:

> Q.    So you told [the bail agent], I can't afford that?
> A.    Right.
> Q.    And then the second number was a number you could afford?
> A.    I couldn't afford it.  I had to borrow from my family.[7]

After approximately 29 hours of incarceration, and prior to her initial appearance, Ms. Patterson

was released after her uncle paid an "initial down payment" of $1,500 on a $15,000 non-

---

[5]  *See* Exh. 1 to Declaration of Robert E. Sims ISO Plaintiffs' Reply ISO Plaintiffs' MSJ and Opposition to CBAA's Cross-MSJ ("Sims Decl. ISO Plaintiffs' Reply"), Dkt. No. 306, ("Buffin Depo Tr.") at 49:4–17, Dkt. No. 306-1.

[6]  The Court notes that "assault with force likely to cause great bodily injury" is found in Penal Code section 245(a)(**4**) and carries a scheduled bail amount of $50,000.  *See* Bail Schedule at 3.  Penal Code section 245(a)(**1**) concerns "[a]ssault with deadly weapon," and the scheduled bail amount for the same is $75,000.  *Id.*  This discrepancy is not relevant for purposes of the instant motions.

[7]  Exh. 2 to Sims Decl. ISO Plaintiffs' Reply at 37:19–24, Dkt. No. 306-2.

refundable premium to secure a bond from a surety bail agent.[8]  The surety bail contract provided:

> **I understand that the premium owing and/or paid on this bond is fully earned upon release of the defendant from custody.  The fact that the defendant may have been improperly arrested or his/her bail reduced, or his/her case dismissed, shall not obligate the return or forgiveness of any portion of the premium.**[9]

Following Ms. Patterson's release, the District Attorney decided not to file formal charges against her and discharged the case.[10]

The evidence gathered in this case reveals that, like Ms. Patterson, over 99% of arrestees who are released on bail in San Francisco obtain surety bonds through contracts with bail agents. In San Francisco, in 2016, the largest number of bonds issued ranged in amounts between $10,000 and $50,000, with the average bail amount posted at $56,000 and the median bail posted at $43,000.[11]  Bail agents are legally allowed to charge a non-refundable premium of up to 10% of the total bail amount for their services.[12]  Often, third-party family members, friends, or employers

---

[8]  Ms. Patterson's uncle paid the surety bail agent the $1,500 down payment on her behalf, and her sister and grandmother co-signed the surety bail contract.  Dkt. No. 136-1 ¶¶ 13–14.  The record does not reveal whether the balance of the $15,000 was paid or demanded.

[9]  Dkt. No. 25-1 at ECF p. 4 (emphasis in original).

[10]  Ms. Patterson's and Ms. Buffin's arrests occurred before Sheriff Hennessy assumed office.  The parties do not dispute that appropriate bail amounts were assigned given both plaintiffs' charges and corresponding Bail Schedule entries.

[11]  *See* Exh. 8 to Declaration of Robert E. Sims ISO Plaintiffs' MSJ ("Sims Decl. ISO Plaintiffs' MSJ"), Dkt. No. 283, ("Do the Math") at 4, Dkt. No. 283-8.

[12]  *See* Do the Math at 2.  CBAA disputes the June 2017 Office of the Treasurer & Tax Collector for the City and County of San Francisco's Financial Justice Project report entitled "Do the Math: Money Bail Doesn't Add Up for San Francisco" as not being properly authenticated and as inadmissible hearsay.  CBAA's Cross-MSJ at 24.

Importantly, at the hearing on the instant motions, CBAA conceded that, while it does "dispute" certain evidence in the record, it does not seek a trial to resolve any such disputes. Dkt. No. 313 ("January 8, 2019 Hearing Tr.") at 4:10–14.  Trial would have obviously allowed for cross-examination of all evidence presented, including challenges to its reliability, but this right was expressly waived.

With respect to the specific objections, the Court finds that as an official publication issued by the Office of the Treasurer & Tax Collector for the City and County of San Francisco, the report is self-authenticating, *see* Fed. R. Evid. 902(5), and admissible under the hearsay exception

of the arrestee will co-sign with a detainee to obtain a surety bond.[13]  In fact, bail companies rely on these co-signors to help ensure that the detainee returns to court.[14]  Moreover, recent studies corroborate plaintiffs' own experiences, estimating in 2017 that "30% of custodial arrests . . . will be declined for prosecution each year . . . ."[15]

Relevant here, California law requires superior court judges to "prepare, adopt, and annually revise a uniform countywide schedule of bail for all bailable felony offenses and for all misdemeanor and infraction offenses except Vehicle Code infractions."  Penal Code § 1269b(c). In so doing, judges are required to consider the seriousness of the offense charged.  *Id.* § 1269b(e). In this case, the San Francisco superior court established the referenced Bail Schedule, which is comprised principally of a three-columned table that identifies an "Offense," or Penal Code section, a short "Description" thereof, and a fixed "Bail" amount.  (*See generally* Bail Schedule.) The Sheriff consults the Bail Schedule to determine an arrestee's bail amount.  Specifically, the Sheriff locates each "booking charge," tabulates the amounts designated per charge, and releases the detainee upon payment of that sum.  The Sheriff applies the process mechanically, making no individualized assessment regarding public safety, flight risk, ability to pay, or strength of the evidence.

The record is devoid of any evidence upon which the amounts in the Bail Schedule are determined or justified.  For sake of comparison, CBAA's 30(b)(6) witness testified:

---

for public records, *see* Fed. R. Evid. 803(8).  Further, this was a study upon which the City was to implement policy, which adds reliability to the factual representations contained therein.  While CBAA may not agree with the report's conclusions, CBAA has not made any specific objection to the process, data collection, or data itself.  Thus, CBAA's evidentiary objections to the report are **OVERRULED**.

[13]  *See* CBAA's Responsive Separate Statement of Disputed and Additional Facts re: Plaintiffs' MSJ ("CRSS") Issue 1 Fact 14, Dkt. No. 301; Do the Math at 2; Exh. 4 to Sims Decl. ISO Plaintiffs' MSJ ("Clayton Depo Tr.") at 105:9–23, Dkt. No. 283-4.

[14]  *See* Dkt. No. 303-7 at 77:17–78:4; Exh. 9 to Declaration of Krista L. Baughman ISO CBAA's Opposition to Plaintiffs' MSJ and Cross-MSJ ("Baughman Decl. ISO CBAA's Cross-MSJ"), Dkt. No. 303, ("Morris Report") at 10, Dkt. No. 303-9.

[15]  *See* Exh. 6 to Sims Decl. ISO Plaintiffs' MSJ ("Sheriff's Department Memo") at 1, Dkt. No. 283-6.

|   |   |
|---|---|
| Q: | So that's 20,000 more than driving under the influence, right? |
| A: | Yes. |
| Q: | And 5,000 more than driving under the influence and actually causing injury; is that right? |
| A: | That's right. |
| Q: | Do you know why receipt of a stolen vehicle has a higher bail than driving under the influence and causing injury? |
| A: | I don't. |
| Q: | Can you tell me how it protects public safety to have a bail that's higher for receipt of a stolen vehicle than it is for driving drunk and injuring someone? |
| A: | I can't -- I don't know what the judges were thinking on this. I don't know what the date [sic] would show in terms of, you know, are some of these offenses more likely to fail to appear than others? Or are some of them more likely to commit additional crimes, which is a consideration under the constitution and the statutory scheme. But I don't know why the judges did this schedule the way they did. |

(Clayton Depo Tr. at 50:1–22.) Rather, the evidence reveals that San Francisco's Bail Schedule is among the highest in the state. (Dkt. No. 283-10 at 37:22–24.) No reason or process is provided for the basis upon which the amounts were determined. Meanwhile, those arrestees who either can afford the amount of bail identified in the Bail Schedule or can post a surety bond for the same are simply released.

Under state law, some arrestees may apply to a magistrate for pre-arraignment release on lower bail or on his or her own recognizance ("OR"). *See* Penal Code § 1269c. This application may be made without a hearing. *Id*. Ironically, individuals charged with certain offenses are ineligible to apply pre-arraignment for either OR release or a reduction in bail, but, if they pay the applicable amount under the Bail Schedule, the Sheriff may release them absent some other legal impediment to their release.[16] *Id*.

In setting bail, a judge or magistrate may consider the information included in a report prepared by an investigative staff employed by the court for the purpose of recommending

---

[16] Subject to narrow exceptions, in California a person accused of committing an offense requiring them to remain in custody must be taken before a magistrate judge for arraignment within 48 hours of his or her arrest, not including Sundays and holidays. Penal Code § 825(a)(1). After a hearing in open court, a judge may order release on the appropriate conditions. *Id*. § 1270.1.

6

whether a detainee should be released on his or her OR.  Penal Code §§ 1275(a)(1), 1318.1.  In San Francisco, the San Francisco Pretrial Diversion Project contracts with the Sheriff's Department to provide certain pretrial services, including the OR Project.  One of the purposes of the OR Project is to provide the court with the same information prior to arraignment.

On April 30, 2016, the OR Project staff began using a Public Safety Assessment Tool (the "PSA Tool") developed by the Laura and John Arnold Foundation.  The purpose of the PSA Tool is to make an individualized assessment regarding the risk that an arrestee, if released pretrial, will fail to appear or will engage in new criminal activity, and to generate a release recommendation based on the assessed risk.  Release recommendations (not decisions) are a function of (1) the score generated by the PSA Tool and (2) a decision-making framework ("DMF") prepared by a working group that includes representatives from the San Francisco Superior Court, Sheriff's Department, District Attorney, Public Defender, and Conflict Counsel.

Since the  PSA Tool has been in use, it has changed the OR Project staff's various procedures.  Previously, the OR Project staff prepared a report called an "OR Workup" after interviewing the arrestee.  The OR Workup consisted of the information gathered from the interview and references, a criminal history report, a summary of the criminal history report, and a cover sheet.  For those arrestees eligible for pre-arraignment release, the OR Workup was presented to the duty judge.[17]  Otherwise, the court considered it at arraignment.

Since implementation of the PSA Tool, the OR Project staff are no longer required to interview the arrestee.  Rather, they prepare an OR Workup for each arrestee eligible for OR release (whether at arraignment or before), which includes a summary of the arrestee's individual and criminal history, the criminal history printouts, the police report, and a cover sheet, supplemented with a release recommendation generated by the PSA Tool and the DMF.  Presentation to the duty judge or at arraignment remain the same.  There is no guaranteed timeline

---

[17]  The duty judge is the judicial officer assigned to rule on applications for pre-arraignment release.

for when the OR Workup will be completed.[18]

In terms of timing, the evidence unequivocally demonstrates that arrestees who post the full amount of bail listed on the Bail Schedule can secure release more quickly than any other category of arrestees.[19] This is true even when an arrestee who posts the full bail amount has been charged with a more serious offense than the indigent arrestee.[20] By way of example only, the Sheriff released on bail within several hours of arrest a person who had been charged in what appeared to be a serious assault case involving an axe and requiring SWAT team management, while an indigent, disabled individual who was also arrested for assault (her "deadly weapon" was a cane) was held in custody for five days because she could not afford the felony bail. (Klement Decl. ¶ 8.) There, the assault charge was ultimately reduced to a misdemeanor, and the individual was released on her own recognizance. (*Id.*) Consistent with this example, research indicates that individuals charged with serious or violent offenses who are able to secure release usually do so

_____

[18] For pre-arraignment applications, it is generally submitted for ruling to the duty judge the same working day the OR Project receives the arrestee's fingerprint record. The OR Project did not prepare an OR Workup for either plaintiff Buffin before she was released or plaintiff Patterson before she posted bail.

[19] *See, e.g.*, Plaintiffs' Responsive Separate Statement ("PRSS") Fact 6, Dkt. No. 307; Clayton Depo Tr. at 84:20–85:2; *id.* at 85:8–10.

[20] *See* Declaration of Tal H. Klement ISO Plaintiffs' MSJ ("Klement Decl.") ¶ 8, Dkt. No. 284. CBAA disputes Mr. Klement's declaration testimony "to the extent that [p]laintiffs appear to be using him as an undisclosed expert offering opinions on the underlying data." *See* CBAA's Cross-MSJ at 25. This objection is **OVERRULED**. Mr. Klement was not proffered as an expert, nor does he provide expert opinions. Instead, plaintiffs are only offering Mr. Klement's testimony as a summary witness for factual information under Federal Rule of Evidence 1006, and he properly testifies as to matters which are squarely within his particularized firsthand knowledge and experience as a San Francisco Deputy Public Defender. His personal knowledge of the Public Defender and the Sheriffs' data from the superior court's case management system is sufficient to testify as a summary witness. *See Ferrari Club of Am., Inc. v. Bourdage*, 6:12-CV-06530 EAW, 2017 WL 1498080, at *6 (W.D.N.Y. Apr. 25, 2017) ("[P]ersonal knowledge of the records themselves is sufficient to testify as a summary witness."); *see also Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 81 (3d Cir. 2009) ("When a lay witness has particularized knowledge by virtue of her experience, she may testify—even if the subject matter is specialized or technical— because the testimony is based upon the layperson's personal knowledge rather than on specialized knowledge within the scope of [Federal Rule of Evidence] 702.").

8

by posting bail.[21]  Moreover, with respect to some offenses, current law elevates bail over OR release.  That is, under the law, arrestees for certain offenses are ineligible for OR release before a bail hearing or arraignment *but* bail is nevertheless an option for those very same offenses.[22]  This effectively means that a wealthy arrestee who is charged with a violent offense can be released from custody within a matter of hours, while an indigent arrestee can remain incarcerated for as many as five days before seeing a judicial officer or the case is discharged for "lack of evidence." (Klement Decl. ¶ 17.)

Evidence further reveals that San Francisco arrestees who are released after posting secured money bail are released, on average, 12.8 hours faster than arrestees who obtain release through the OR Project.  (PRSS Fact 6.)  Nonetheless, "some people currently in California jails who are safe to be released are held in custody solely because they lack the financial resources for a commercial bond, and other people who may pose a threat to public safety have been able to secure their release from jail simply because they could afford to post a commercial bond." (Workgroup Report at 25.)  Consistent with plaintiffs' experiences, and the Sheriff's Department's 2017 internal memorandum, evidence shows that one quarter of the arrests are dismissed or not rebooked prior to arraignment.  Thus, from 2016 to 2018, the number of felony charges filed totaled 42,672.  Of those, 10,923 were dropped or not rebooked, and an additional 441 were reduced to misdemeanors, reflecting a combined total of 26%.  (*See* Exh. B. to Klement Decl. at 1,

---

[21]  *See* Exh. 17 to Sims Decl. ISO Plaintiffs' MSJ ("Workgroup Report") at 25, Dkt. No. 283-17.  CBAA disputes the Workgroup Report as not being properly authenticated and as inadmissible hearsay.  *See* CBAA's Cross-MSJ at 24.  The Court finds that as an official publication issued by a workgroup established by the Chief Justice of the California Supreme Court, the report is self-authenticating, *see* Fed. R. Evid. 902(5), and admissible under the hearsay exception for public records, *see* Fed. R. Evid. 803(8).  Thus, CBAA's evidentiary objection to the report is **OVERRULED**.

[22]  For example, felony bail for domestic violence offenses is high, and those charged with these offenses are ineligible for OR release before arraignment.  However, an arrestee charged with domestic violence who has sufficient resources can be released on bail within a matter of hours, with virtually no supervision, and even if that individual may pose more of a threat than the indigent individual who must remain in custody.  Workgroup Report at 25–26; Klement Decl. ¶ 17.

Dkt. No. 284-2.) Finally, the record corroborates plaintiffs' own experiences while held in pre-arraignment detention. One to five days in jail can take a mental and physical toll on arrestees, impact custody of their children, and, as happened here, lead to loss of employment. (*See* Klement Decl. ¶ 2.)

## B. Case-Related Background

### 1. *Permissive Intervention*

On March 6, 2017, the Court granted CBAA's motion for permissive intervention under Federal Rule of Civil Procedure 24(b). (Dkt. No. 119.) It did so under specific conditions and for a very narrow purpose, namely to serve as a "zealous advocate" given, at that juncture, "the absence of any defendant willing to defend the constitutionality of section 1269b[.]" (*Id*. at 6–7.) The Court concurrently denied CBAA's motion to intervene as of right under Rule 24(a)(2), reasoning, *inter alia*, that "CBAA's interest in continuing to profit from the provision of bail bonds" was "too remote from the core issues involved in the litigation." (*Id*. at 4 (internal quotation marks omitted).) While CBAA's motives are not lost on the Court, in allowing CBAA to intervene permissively the Court sought to ensure "two sets of well-crafted legal arguments and a fully-vetted factual record." (*Id*. at 7.) To that end, the parties engaged in substantial discovery. That said, the Court contained the scope of CBAA's intervention, by prohibiting it from expanding the scope of the action or raising new issues, to simply defending the constitutionality of Penal Code section 1269b.

### 2. *Penal Code section 1269b*

The text of Penal Code section 1269b is restated in pertinent part below. The statute commences with the duties of the Sheriff:

> (a) The officer in charge of a jail in which an arrested person is held in custody . . . may approve and accept bail in the amount fixed by the warrant of arrest, schedule of bail, or order admitting to bail in cash or surety bond executed by a certified, admitted surety insurer . . . , to issue and sign an order for the release of the arrested person, and to set a time and place for the appearance of the arrested person before the appropriate court and give notice thereof.

With respect to the "schedule of bail" at issue here, subsections (b) through (d) require:

///

(b) If a defendant has appeared before a judge of the court . . . , the bail shall be in the amount fixed by the judge at the time of the appearance. If that appearance has not been made . . . [and], if no warrant of arrest has been issued, the amount of bail shall be pursuant to the uniform countywide schedule of bail for the county in which the defendant is required to appear, previously fixed and approved as provided in subdivisions (c) and (d).

(c) It is the duty of the superior court judges in each county to prepare, adopt, and annually revise a uniform countywide schedule of bail for all bailable felony offenses and for all misdemeanor and infraction offenses except Vehicle Code infractions. . . .

(d) A court may, by local rule, prescribe the procedure by which the uniform countywide schedule of bail is prepared, adopted, and annually revised by the judges. If a court does not adopt a local rule, the uniform countywide schedule shall be prepared, adopted, and annually revised by a majority of the judges.

Penal Code §§ 1296b(a)–(d). Among the little guidance in section 1269b regarding the creation of the schedule is that, under subsection (e), the judges are to "consider the seriousness of the offense charged." The schedule is required to contain "a list of the offenses and the amounts of bail applicable for each as the judges determine to be appropriate" plus a "general" catchall clause for any offense not otherwise specifically listed. *Id*. § 1269b(f). Then, "[u]pon posting bail, the defendant or arrested person shall be discharged from custody as to the offense on which the bail is posted." *Id*. § 1296b(g).

### 3. *Previous Summary Judgment Order*

In its previous 20-page summary judgment order, the Court detailed the reasons for concluding that strict scrutiny review applies to plaintiffs' Due Process and Equal Protection claims. In so explicating, the Court cabined the relevant inquiry as follows: "(i) whether the Sheriff, through use of the Bail Schedule, has significantly deprived plaintiffs of their fundamental right to liberty, and, if so, (ii) whether, under the strict scrutiny standard of review, the Sheriff's use of the Bail Schedule is the least restrictive alternative for achieving the government's compelling interests." (MSJ Order at 17.)

The Court concluded that the factual record remained in dispute, especially given the Sheriff's own objection to plaintiffs' interpretation of the Sheriff's data on the length of detention for individuals who could not afford bail as compared to those who could. (*Id*. at 17–18.) Moreover, given the disputes and sparse factual record, the Court determined that plaintiffs had

"not met their initial burden as to the existence of a less restrictive alternative to achieve the government's interests as compared to the Sheriff's use of the Bail Schedule." (*Id*. at 18.)[23]  The Court explained:

> As plaintiffs concede, they must first make a prima facie showing in this regard. . . . That is, they must make a showing of a "*plausible*, less restrictive alternative[]," *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004) (emphasis supplied).  The proposed alternative need not be "*more* effective," *id*. at 669 (emphasis supplied)—plaintiffs must show only that it would be "*at least as effective*," *Reno v. ACLU*, 521 U.S. 844, 874 (1997) (emphasis supplied).  The current record is insufficient on this point. . . .  Plaintiffs' prima facie case need not rise to the level of scientific precision.  However, given the absence of undisputed, competent evidence that the proffered alternative systems could be administered feasibly in the specific context of the County, plaintiffs have failed to meet their initial burden.
>
> Once plaintiffs have made a showing of a plausible, less restrictive alternative, the government has the burden of proof under the strict scrutiny standard.  CBAA, having stepped into the shoes of the Sheriff as intervenor, must show that plaintiffs' proposed alternative would be less effective at serving the government's compelling interest(s) and/or more restrictive.  Here, plaintiffs and CBAA agree that at a minimum the County has a compelling interest in ensuring that arrestees appear for trial. . . .  However, as mentioned previously, the evidence of plausible, less restrictive alternatives to furthering that interest is disputed (and, in many cases, given plaintiffs' evidentiary failures, was not admissible as proffered).

(*Id*. (footnotes omitted).)

The Court repeats herein, only as necessary, its analysis with respect to the finding that strict scrutiny applies.  The instant cross-motions for summary judgment address the parties' respective showings under that standard of review.

### 4.    Class Certification

After denying the prior cross-motions for summary judgment, the Court certified the following class:

> All pre-arraignment arrestees (i) who are, or will be, in the custody of the San Francisco Sheriff; (ii) whose bail amount is determined by the Felony and Misdemeanor Bail Schedule as established by the Superior Court of California, County of San Francisco; (iii) whose terms of pretrial release have not received an individualized determination

---

[23]  The Court required plaintiffs to associate counsel before it would allow the class action to proceed, after which counsel from Latham & Watkins joined the case.  *See* Dkt. No. 186 at 43:10–44:4; *see also* Dkt. No. 178 at 1.

by a judicial officer; and (iv) who remain in custody for any amount of time because they cannot afford to pay their set bail amount.

(Dkt. No. 214 at 3.)[24]

### 5. *Legislative Developments*

On August 28, 2018, Governor Jerry Brown signed the California Money Bail Reform Act ("S.B. 10") into law,[25] which was initially set to go into effect on October 1, 2019. (CRSS Issue 2 Fact 13.) However, earlier this year, a referendum to overturn S.B. 10 qualified for the November 3, 2020 statewide ballot.[26] Approval by a majority of voters will be required before S.B. 10 can take effect.[27]

As for the impetus behind S.B. 10, its authors recognized that "[o]n any given day, approximately 60% of people in jail in California are either awaiting trial or sentencing" and that "[m]any of those in California's jails are there for no reason other than the fact that they are unable to afford money bail."[28] Moreover:

---

[24] CBAA's continued objection to the use of the phrase "cannot afford" in the class definition is rejected. The issue was fully briefed, and the Court will not revisit it now simply because CBAA wants to base additional and irrelevant arguments thereon.

[25] S.B. 10, 2018 Cal. Legis. Serv. Ch. 244 (Cal. 2018).

[26] *See* https://www.sos.ca.gov/elections/ballot-measures/qualified-ballot-measures/.

[27] *See id.*

[28] Exh. 3 to Plaintiffs' Request for Judicial Notice ISO MSJ, Dkt. No. 285, ("Senate Report") at 8, Dkt. No. 285-3. In connection with their motion for summary judgment, plaintiffs request that the Court take judicial notice of: (i) S.B. 10; (ii) a document detailing the actions taken by legislative committees in considering and passing S.B. 10, pulled from the website for California Legislative Information; and (iii) the Report from the Senate Committee on Public Safety regarding S.B. 10.

CBAA opposes only plaintiffs' request as to the Senate Report, "to the extent Plaintiffs seek judicial notice of the truth of any factual representations made in that document." Dkt. No. 292 at 1; *see also* CBAA's Cross-MSJ at 24. CBAA does not challenge the authenticity of the Senate Report itself. The Court refers to the Senate Report here "as part of the familiar process of consulting legislative history in order to illuminate *legislative intent*." *Brown v. City of Pittsburgh*, 586 F.3d 263, 267 n.2 (9th Cir. 2009) (emphasis supplied). The Court does not draw any conclusions about the truth of any factual representations made in the committee report but

13

> Even a short period of pretrial detention can result in loss of employment, housing, and public benefits for the detained person – costs that then must be borne by family members already struggling to make ends meet. Family members who are able to scrape together enough money to pay a non-refundable fee to a for-profit bail company to secure a loved-one's release from jail often end up with long-term debt to the bail company, even when their loved one is innocent of any wrongdoing and is never convicted of a crime. . . .

(Senate Report at 9.) CBAA provides no evidence to the contrary. S.B. 10's statutory history reveals the Legislature's decision to "remedy" California's pretrial system by "reducing reliance on money bail, supporting pretrial defendants with pretrial services, focusing detention resources on those who pose a risk of danger, reducing racial disparities, and ensuring that people are not left in jail simply because they cannot afford to pay for their release." (*Id.*)

In relevant part, S.B. 10 prohibits monetary conditions of release in California, authorizing Pretrial Assessment Services to release, *without court approval and prior to arraignment*, low-risk and medium-risk arrestees with "the least restrictive nonmonetary condition or combination of conditions that will reasonably assure public safety and the person's return to court." S.B. 10 §§ 1320.10(b), (c). More specifically, S.B. 10 requires the following, *inter alia*:

- Individuals arrested for misdemeanors (with certain exceptions) will be released within 12 hours. *Id.* § 1320.8.

- To determine eligibility for release under S.B. 10, all jurisdictions will be required to generate for each arrestee who is arrested and booked, prior to arraignment or pre-arraignment review, the results of a risk assessment "using a validated risk assessment instrument, including the risk score or risk level." *Id.* § 1320.9(a)(1).

---

notes only that certain representations regarding the impetus behind S.B. 10 are consistent with the purposes stated in the text of S.B. 10 itself and the facts gathered in this action. Accordingly, and because courts may take judicial notice of state statutes and their legislative history, plaintiffs' request for judicial notice is **GRANTED** in its entirety. *See Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012) ("Legislative history is properly a subject of judicial notice."); *Lee v. City of L.A.*, 250 F.3d 668, 689 (9th Cir. 2001) (explaining that a court may take judicial notice of undisputed matters of public record but not disputed facts stated therein); *Oceanic Cal., Inc. v. City of San Jose*, 497 F. Supp. 962, 967 n.8 (N.D. Cal. 1980) (explaining that courts may take judicial notice of state statutes).

- Pretrial Assessment Services shall consider the risk score, the criminal charge, supplemental information, and input from the victim to generate a report. *Id.* §§ 1320.9(a)–(c).

- Individuals who are assessed as low risk to public safety and of failure to appear in court (with certain exceptions) shall be released on their own recognizance, prior to arraignment and *without review by the court*, "with the least restrictive nonmonetary condition or combination of conditions that will reasonably assure public safety and the person's return to court." *Id.* § 1320.10(b).

- Individuals who are assessed as medium risk (with certain exceptions) shall be released on their own recognizance or on supervised own recognizance release, prior to arraignment and *without review by the court*, "and with the least restrictive nonmonetary condition or combination of conditions that will reasonably assure public safety and the person's return to court." *Id.* § 1320.10(c).

- Individuals who are assessed as high risk shall be detained until arraignment. *Id.* § 1320.10(h).

- Superior courts shall adopt a local rule with respect to pre-arraignment review of medium-risk arrestees that "support[s] an effective and efficient pretrial release or detention system that protects public safety and respects the due process rights of defendants." *Id.* § 1320.11(a). Moreover, superior courts shall consider annually "the impact of the [local] rule on public safety [and] the due process rights of defendants[.]" *Id.*

- The Judicial Council shall establish options for conditions of release, which shall become part of the recommendations made in the report created by Pretrial Assessment Services. *Id.* § 1320.9(c).

S.B. 10 also requires counties to report to the state pretrial release and detention information biannually, which includes information about the percentage of individuals released pretrial, the percentage of those who fail to appear at a required court appearance, those who commit new crimes while on pretrial release, and the rate of judicial concurrence with recommended conditions of release. *Id.* § 1320.24(b). None of these provisions exist in Penal Code section 1296b.

### 6.    *September 2018 Pretrial Conference*

In anticipation of trial, post a period of additional discovery, the Court held a pretrial conference. (*See* Dkt. Nos. 219, 278.) Thereat, plaintiffs, the Sheriff, and CBAA agreed that, in light of the passage of S.B. 10, a bench trial was unnecessary and opted instead for another round of cross-motions for summary judgment, and plaintiffs' filing of a motion to revoke CBAA's intervenor status. (Dkt. No. 280 at 51:21–57:16.) The Court considers the latter motion first.

## II.    MOTION TO REVOKE CBAA'S INTERVENOR STATUS

Plaintiffs submit that the Court should strip CBAA of its intervenor status on the grounds that CBAA no longer has standing and cannot "stand in the shoes" of the Sheriff in light of the passage of S.B. 10. (Motion to Revoke at 7.) Plaintiffs' arguments fail to persuade.[29]

The Court granted intervenor status under Federal Rule of Civil Procedure 24(b). Admittedly, "intervention does not carry with it an absolute entitlement to continue as a party until termination of the suit." *Tasby v. Wright*, 109 F.R.D. 296, 298 (N.D. Tex. 1985) (citing *Morgan v. McDonough*, 726 F.2d 11, 14 (1st Cir. 1984)). Courts have authority to determine whether intervenor status "continues to be viable" when faced with a motion to revoke that party's intervenor status. *Mishewal Wappo Tribe of Alexander Valley v. Salazar*, No. 5:09-cv-02502 EJD, 2012 WL 4717814, at *1 (N.D. Cal. Sept. 28, 2012), *aff'd*, 534 F. App'x 665 (9th Cir. 2013). This authority stems from courts' "inherent power to control the proceedings" before them. *Id*. A court can therefore terminate intervention should the result of the inquiry weigh in favor of such an order. *Id*.

///

---

[29] In connection with its opposition to plaintiffs' motion to revoke CBAA's intervenor status, CBAA requests that the Court take judicial notice of the California Secretary of State's webpage entitled "Initiatives and Referenda Cleared for Circulation." Dkt. No. 293. Under Federal Rule of Evidence 201, a court can take judicial notice of "[p]ublic records and government documents available from reliable sources on the Internet," such as websites run by government agencies. *Gerritsen v. Warner Bros. Entm't, Inc.*, 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015) (internal quotation marks omitted). Accordingly, the Court **GRANTS** CBAA's unopposed request.

The Court finds that plaintiffs' arguments are premature as they are premised on the notion that Penal Code section 1269b has been repealed, in fact. (*See* Motion to Revoke at 6.) The text of S.B. 10 itself indicates: "This bill would, *as of October 1, 2019*, repeal existing laws regarding bail and require that any remaining references to bail refer to the procedures specified in the bill." (S.B. 10 at ECF p. 1 (emphasis supplied).)[30] Next, the Court finds plaintiffs' claim that CBAA must meet Article III standing requirements misplaced. CBAA did not initiate the instant action, seek review on appeal, or perform any "other function that *invoke[d]* the power of the federal courts." *Vivid Entm't LLC v. Fielding*, 774 F.3d 566, 573 (9th Cir. 2014) (emphasis in original). Thus, CBAA need not satisfy standing separately. The Court's prior rationale for granting intervenor status remains valid.[31] Plaintiffs' motion to revoke CBAA's intervenor status is **DENIED**.

### III.    CROSS-MOTIONS FOR SUMMARY JUDGMENT

#### A.    Legal Standard

A party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact as to the basis for the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

Where the moving party will have the burden of proof at trial, it "must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for

---

[30] This date will extend as the referendum has qualified for the November 2020 ballot. *See supra* at 13.

[31] Plaintiffs' final argument that CBAA can no longer stand in the shoes of the Sheriff due to "changed circumstances" merely repeats the argument relative to the "repeal" of Penal Code § 1269b. *See* Motion to Revoke at 7–8. As explained, the argument is premature.

trial in order to defeat the motion.  *See Anderson*, 477 U.S. at 250; *Soremekun*, 509 F.3d at 984; *see also* Fed. R. Civ. P. 56(c), (e).  The opposing party's evidence must be more than "merely colorable" and must be "significantly probative." *Anderson*, 477 U.S. at 249.  Further, the opposing party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence showing a genuine dispute of material fact exists. *See Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000).  If the opposing party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 325.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).  In making this determination, the court must "view[] the evidence in the light most favorable to the nonmoving party[.]" *Fontana v. Haskin*, 262 F.3d 871, 876 (9th Cir. 2001).  It is not the court's task to "scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal quotation marks omitted).  Moreover, "[d]isputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

"[W]hen parties submit cross-motions for summary judgment, each motion must be considered on its own merits." *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (alteration and internal quotation marks omitted).  Thus, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Id.* (quoting Wright, et al., Federal Practice and Procedure § 2720, at 335–36 (3d ed. 1998)).  If, however, the cross-motions are before the court at the same time, the court must consider the evidence proffered by both sets of motions before ruling on either one. *Riverside Two*, 249 F.3d at 1135–36.

**B.      Short Overview of the History of Bail**

By way of background, a synopsis of the history of bail is warranted.

///

18

Bail originated in medieval England as "a device to free untried prisoners."[32] The penalty for most crimes was a "fine paid as compensation to the victim." (Workgroup Report at 9.) When capital and corporal punishment replaced fines, "abuses in the delay between arrest and trial began to emerge." (*Id*.) In response, the common law right to bail was codified into English law, and the principles that "an accused is presumed innocent and entitled to personal liberty pending trial" were incorporated into the Magna Carta. (*Id*.) Criteria set for determining whether a person should be released on bail included the strength of the evidence against the accused and the accused's criminal history. (*Id*.)

In America, the development and use of bail followed a different course. The United States Constitution does not specifically grant a right to bail, and the Eighth Amendment states only that "[e]xcessive bail shall not be required[.]" U.S. Const. amend. VIII. However, the presumption of innocence and right to freedom pending trial "became the foundation of our current system of bail." (Workgroup Report at 9.) Initially, the system did not contemplate a profit industry or indemnification in the posting of the bond. By the nineteenth century, our bail system had shifted to a surety system "in which secured bonds were typically administered through commercial sureties and their agents, and the deposit of money or the pledge of assets became a principal condition of release." (*Id*. at 10.)

In 1912, when the United States Supreme Court considered the goals and interests of bail, it observed that the "interest to produce the body of the principal in court [was] impersonal and wholly pecuniary." *Leary v. United States*, 224 U.S. 567, 575 (1912). In 1951, the Supreme Court indicated that "[u]nless th[e] right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning." *Stack v. Boyle*, 342 U.S. 1, 4 (1951). Further, since the "function of bail is limited, the fixing of bail for any

---

[32] Daniel J. Freed & Patricia M. Wald, *Bail in the United States: 1964* 1 (National Conference on Bail and Criminal Justice, Working Paper, 1964) ("*Bail in the United States*"). Unless stated otherwise, this summary is pulled largely from the Workgroup Report and *Bail in the United States*. Notably, the Pretrial Detention Reform Workgroup also relied on the latter source, which was extensively cited in the legislative history of the United States Bail Reform Act of 1966 and commentary of the same.

individual defendant *must be based upon standards relevant to the purpose of assuring the presence of that defendant*." *Id*. at 5 (emphasis supplied).

Both federal and state rules outlined more specific criteria for consideration. For example, a prior version of Federal Rule of Criminal Procedure 46(c) provided that "the amount [of bail] . . . will insure the presence of the defendant, having regard to the nature and circumstances of the offense charged, the weight of the evidence against him, the financial ability of the defendant to give bail, and the character of the defendant." Fed. R. Crim. P. 46(c) (amended in 1985). State appellate courts laid down similar criteria, for instance:

> The factual matters to be taken into account include: The nature of the offense, the penalty which may be imposed, the probability of the willing appearance of the defendant or his flight to avoid punishment, the pecuniary and social condition of the defendant and his general reputation and character, and the apparent nature and strength of the proof, as bearing on the probability of his conviction.

*People ex rel. Lobell v. McDonnell*, 296 N.Y. 109, 111 (1947) (internal quotation marks omitted).

Despite the early origins and broad recognition of the right to bail in this country, studies of administration of bail in the twentieth century raised a number of concerns about its widespread misuse.[33] The studies concluded that the system of money bail in the United States discriminates against indigent detainees who lack the financial resources to post bail.[34] Challenges to requiring bail from an impoverished detainee were raised in the courts as early as 1960, questioning whether freedom and liberty could be rightfully denied merely on the basis of indigence. *See Bandy v. United States*, 81 S. Ct. 197, 197–98 (1960); *see also Bandy v. United States*, 82 S. Ct. 11 (1961).

///

---

[33] *See, e.g.*, Field Study, *A Study of the Administration of Bail in New York City*, 106 U. Pa. L. Rev. 693 (1958); Note, *Compelling Appearance in Court: The Administration of Bail in Philadelphia*, 102 U. Pa. L. Rev. 1031 (1954); Arthur L. Beeley, *The Bail System in Chicago* (1927).

[34] *See, e.g.*, Wayne H. Thomas, Jr., *Bail Reform in America* 11, 19 (1976) ("The American system of bail allows a person arrested for a criminal offense the right to purchase his release pending trial. Those who can afford the price are released; those who cannot remain in jail. . . . The requirement that virtually every defendant must post bail causes discrimination against defendants who are poor.").

United States District Court
Northern District of California

Driven by concerns about problems and inequities in bail practices, Congress enacted the Bail Reform Act of 1966, the stated purpose of which was "to assure that all persons, regardless of their financial status, shall not needlessly be detained pending their appearances to answer charges . . . when detention serves neither the ends of justice nor the public interest."[35]  By emphasizing nonmonetary terms of bail, Congress attempted to remediate the negative impacts experienced by defendants who were unable to pay for their pretrial release, including the adverse effect on defendants' ability to consult with counsel and prepare a defense, the financial impacts on their families, a statistically less-favorable outcome at trial and sentencing, and the fiscal burden that pretrial incarceration poses on a society at large.[36]

Congress again revised federal bail procedures with the Bail Reform Act of 1984.[37]  The legislative history of the 1984 Act explains that Congress wanted to "address the alarming problem of crimes committed by persons on release" and to "give the courts adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released."[38]  The 1984 Act, as amended, retains many of the key provisions of the 1966 Act but "allows a federal court to detain an arrestee pending trial if the Government demonstrates by clear and convincing evidence after an adversary hearing that no release conditions 'will reasonably assure . . . the safety of any other person and the community.'"  *United States v. Salerno*, 481 U.S. 739, 741 (1987) (alteration in original) (quoting Bail Reform Act of 1984) (upholding the preventive detention provisions in the 1984 Act); *see also* 18 U.S.C. § 3142(a) (providing generally the current federal procedure for ordering either release or detention of a defendant pending trial).

///

---

[35]  Bail Reform Act of 1966, Pub. L. No. 89-465, § 2, 80 Stat. 214 (repealed 1984).

[36]  *See* H.R. Rep. No. 89-1541 (1966), *reprinted in* 1966 U.S.C.C.A.N. 2293, 2299.

[37]  *See* Bail Reform Act of 1984, Pub. L. No. 98-473, § 202, 98 Stat. 1837, 1976 (codified at 18 U.S.C. §§ 3141–50).

[38]  S. Rep. 98-225, at 3 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3185.

Notwithstanding twentieth-century advances in pretrial justice, there is a growing nationwide "consensus on concerns regarding the administration of bail in the criminal justice system." (Workgroup Report at 13.)

### C. Standard of Review: One's Liberty is a Fundamental Right Necessitating Strict Scrutiny Review

The Court previously found that whether the Sheriff's use of the Bail Schedule violates the Due Process and Equal Protection clauses of the United States Constitution is an issue subject to strict scrutiny analysis. (*See supra* at 11–12.) As the Court explained, heightened scrutiny is required by the United States Supreme Court's *Bearden-Tate-Williams* line of cases,[39] particularly "where fundamental deprivations are at issue and arrestees are presumed innocent." (MSJ Order at 16.) Because the Sheriff's use of the Bail Schedule implicates plaintiffs' fundamental right to liberty, "any infringement on such right requires a strict scrutiny analysis." (*Id*. at 10–11.)

In its cross-motion for summary judgment, CBAA requests that the Court reconsider the standard of review. CBAA's request is procedurally and substantively unwarranted.[40] Civil Local Rule 7-9, which governs motions for reconsideration, applies. While CBAA argues that a material difference in law from that previously presented to the Court justifies reconsideration, the law must be *controlling*. *See* Civ. L.R. 7-9(b)(2); *see also Mason & Dixon Intermodal, Inc. v. Lapmaster Int'l, LLC*, No. C 08-1232 VRW, 2009 WL 10681000, at *1 (N.D. Cal. Sept. 23, 2009) (noting that "[d]espite the imprecise language of [Civ. L.R. 7-9], only a change in <u>controlling</u> law warrants reconsideration") (emphasis in original); *see also Sch. Dist. No. 1J, Multnomah Cty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993) ("Reconsideration is appropriate if . . . there is an intervening change in *controlling* law.") (emphasis supplied). No such change exists here.

---

[39] *See Bearden v. Georgia*, 461 U.S. 660 (1983); *Tate v. Short*, 401 U.S. 395 (1971); and *Williams v. Illinois*, 399 U.S. 235 (1970).

[40] While CBAA is correct that "[t]he law of the case doctrine does not . . . bar a court from reconsidering its own orders before judgment is entered or the court is otherwise divested of jurisdiction over the order[,]" *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1042 (9th Cir. 2018), the Court nevertheless finds no basis to reconsider its previous summary judgment order.

As a preliminary matter, the Court previously considered and rejected CBAA's contention that a 48-hour safe harbor exists under *Gerstein v. Pugh*, 420 U.S. 103 (1975) and *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991) (addressing the window in which the government must make a probable cause determination after a warrantless arrest). (*See* MSJ Order at 11–12.) In summary, the Court found that CBAA read the cited cases too narrowly:

> In *Gerstein*, the Supreme Court held that the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to an extended pretrial detention following a warrantless arrest. 420 U.S. at 124–25. The Court did not specify what would meet the promptness standard, instead noting that "the nature of the probable cause determination usually will be shaped to accord with a State's pretrial procedure viewed as a whole." *Id.* at 123. Subsequently, in considering what constitutes a "prompt" probable cause determination under *Gerstein*, the Supreme Court held in *McLaughlin* that a judicial determination of probable cause within 48 hours of arrest generally will pass constitutional muster. 500 U.S. at 56.

(MSJ Order at 11.) The Supreme Court noted a *presumption*, not a safe harbor. The constitutional question is whether an "arrested individual can prove that his or her probable cause determination was delayed unreasonably." (*Id.* (quoting *McLaughlin*, 500 U.S. at 56).) None of the CBAA's proffered authority compels a different result. *See Walker v. City of Calhoun*, 901 F.3d 1245 (11th Cir. 2018); *ODonnell v. Goodhart*, 900 F.3d 220 (5th Cir. 2018) ("*ODonnell II*"). Neither case is binding, and both are distinguishable.

*ODonnell II* is a non-binding split decision of the Fifth Circuit, which involved a non-dispositive interlocutory decision in the context of granting a stay of an injunction. *See ODonnell II*, 900 F.3d at 223 ("We now grant the motion and enter a stay . . . pending plenary resolution of this appeal by a merits panel.") There, fourteen state trial court judges themselves sought the stay. The injunction arose from procedural due process claims with respect to use of the bail schedule at issue. That court's analysis focused on specific aspects of the injunction's language not at issue here. *Id.* at 222–23. Moreover, the instant case involves substantive due process and equal protection claims. Further, *ODonnell II*'s passing reference to the appropriateness of "rational basis review" ignores its own decision in *ODonnell v. Harris County*, 892 F.3d 147 (5th Cir. 2018) ("*ODonnell I*") calling for "heightened scrutiny." *See ODonnell I*, 892 F.3d at 161–62 & n.6.

Quoting *ODonnell II*, CBAA argues that, in light of *In re Humphrey*, 19 Cal. App. 5th 1006 (2018), rational basis review controls because procedural safeguards exist and this case is premised "solely on inability to afford bail, as distinguished from inability to afford bail *plus* the absence of meaningful consideration of other possible alternatives."[41] This argument contravenes Supreme Court precedent. Indigent arrestees who are detained prior to their individualized hearings solely because they cannot afford secured money bail do not receive any "meaningful consideration of other possible alternatives" that would enable their pre-hearing release. Rather, they "share[] two distinguishing characteristics" which trigger heightened scrutiny: (1) "because of their impecunity they [are] completely unable to pay for some desired benefit"; and (2) "as a consequence, they sustain[] an absolute deprivation of a meaningful opportunity to enjoy that benefit." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 20 (1973).

*Walker*, too, is non-binding and does not necessitate reconsideration. There, again, a split Eleventh Circuit vacated a preliminary injunction based on procedural due process arguments after the City of Calhoun, Georgia itself filed an interlocutory appeal. *Walker*, 901 F.3d at 1253. In short, indigent arrestees brought a putative class action against the city, alleging constitutional violations by conditioning immediate release from jail on an arrestee's ability to pay a preset amount of cash without providing meaningful alternatives to indigent arrestees. The city itself identified concerns with the specifics of the injunction. In relevant part, the *Walker* court determined that indigency determinations for purposes of setting bail are presumptively constitutional if made within 48 hours of arrest, *id.* at 1266, noting that indigent detainees "must merely wait some appropriate amount of time to receive the same benefit as the more affluent" and that an appropriate period of delay, without more, does not offend the Constitution. *Id.* at 1261.

---

[41] CBAA's Cross-MSJ at 8–9 (quoting *ODonnell II*, 900 F.3d at 231–32) (emphasis in original). Under *Humphrey*, during an individual's arraignment, a court must make findings regarding an arrestee's ability to pay the fixed bail amount and alternatives to money bail. *Humphrey*, 19 Cal. App. 5th at 1044–45. If an arrestee's financial resources would be insufficient and the court's order would result in pretrial detention, then the court must find by clear and convincing evidence that no less restrictive alternative conditions of release could serve the government's compelling interests. *Id.*

Accordingly, the court rendered it unnecessary to review the City's practice with heightened scrutiny. *Id.* at 1260–62.

As with *ODonnell II*, the *Walker* court's reasoning regarding *procedural* due process does not bear on the analysis of plaintiffs' equal protection and substantive due process claims here. *See id.* at 1259 ("Walker's claim . . . challenges not the amount and conditions of bail *per se*, but the *process* by which those terms are set . . . .") (emphasis supplied); *id.* at 1265 ("[T]he relief Walker seeks is essentially procedural: a prompt process by which to prove his indigency and to gain release."). That said, *Walker* also reaffirms the notion that only a *presumption* exists. *See id.* at 1266 ("[I]ndigency determinations for purposes of setting bail are *presumptively* constitutional if made within 48 hours of arrest.") (emphasis supplied); *id.* at 1267 n.13 ("The *McLaughlin* Court made clear that the 48-hour presumption was rebuttable: a probable cause hearing held within 48 hours may nonetheless be unconstitutional 'if the arrested individual can prove that his or her probable cause determination was delayed unreasonably.'") (quoting *McLaughlin*, 500 U.S. at 56). In fact, the 48-hour presumption itself was contested as too lengthy in *McLaughlin*. Justice Scalia lambasted the majority for its arbitrary articulation of "48 hours," harkening back to reams of legal authority rooted as far back as 1825, citing *Wright v. Court*, 107 Eng. Rep. 1182 (K.B. 1825) ("[I]t is the duty of a person arresting any one on suspicion of felony to take him before a justice as soon as he reasonably can."). *McLaughlin*, 500 U.S. at 61–62 (Scalia, J., dissenting). Justice Scalia argued that given the data available, law enforcement needed only "24 hours" to obtain probable cause review (perhaps excepting Sunday). *Id.* at 68–69. At that time, twenty-nine states required "presentment or arraignment 'without unnecessary delay' or 'forthwith'; eight [s]tates explicitly require[d] presentment or arraignment within 24 hours; and only seven [s]tates [had] statutes explicitly permitting a period longer than 24 hours." *Id.* at 69.

Ultimately, this Court does not share the same view on the principle of liberty as the *Walker* court. All courts agree that the *Bearden* Court summarized the rule of *Williams* and *Tate* as follows:[42] "[I]f the State determines a fine or restitution to be the appropriate and adequate

---

[42] *See generally* MSJ Order at 13–17.

United States District Court
Northern District of California

penalty for the crime, it may not thereafter imprison a person solely because he lacked the resources to pay it." *Bearden*, 399 U.S. at 667–68. Rather, the Constitution requires the government to use the least restrictive alternative. In so holding, the *Bearden* Court noted that "[d]ue process and equal protection principles converge in the Court's analysis" in cases involving the fair treatment of indigents in the criminal justice system. *Id.* at 665. Answers to constitutional questions in that context "cannot be resolved by resort to easy slogans or pigeonhole analysis, but rather require[] a careful inquiry into such factors as 'the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, [and] the existence of alternative means for effectuating the purpose . . . .'" *Id.* at 666–67 (quoting *Williams*, 399 U.S. at 260 (Harlan, J., concurring)) (alterations in original). Those means are not hard and fast but must be tested, especially given that we live in a technology-driven age where information is readily available, and some courts are even open seven days a week.[43] The question is under what standard.

On that basis, this Court found the instant challenge to be properly reviewed under strict scrutiny and is aligned with the dissenting opinions in both *ODonnell II* and *Walker*. The deprivation of one's liberty cannot, and should not, be easily trampled. Nor should one's liberty be so easily discarded upon strained hypotheticals such as the *Walker* court's comparison of the inability to afford bail with the inability to pay for express mail. *See Walker*, 901 F.3d at 1264. As dissenting Circuit Judge Martin observed in *Walker*, the United States Supreme Court recently reaffirmed that "[a]ny amount of actual jail time is significant and has exceptionally severe consequences for the incarcerated individual and for society which bears the direct and indirect costs of incarceration." *Id.* at 1275 (quoting *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1907 (2018)) (citation and internal quotation marks omitted). Here, the bonds of history remind us that the "presumption of innocence, secured only after centuries of struggle,"[44] should not vanish

___

[43] *See, e.g.*, http://www.courts.state.ny.us/courts/nyc/criminal/generalinfo.shtml. The Court takes judicial notice of the New York Courts' website, which shows that certain New York City criminal courts are open Monday through Sunday.

[44] *See Boyle*, 342 U.S. at 4.

under the guise of the universal benefits of a bail option.  While "indigency," by definition, indicates a lack of wealth, the constitutional principle is what controls.  That principle here is grounded in liberty.  We need not be concerned with hysteric claims of floodgates to wealth-based claims opening.  *Cf. Walker*, 901 F.3d at 1262, 1277–78.

In sum, CBAA's efforts to establish rational basis as the applicable standard of review in this case, again, are unavailing.  The Court proceeds with its analysis based on a strict scrutiny standard of review.[45]

### D.  Analysis

#### 1.  *Step 1: Does the Sheriff's use of the Bail Schedule significantly deprive plaintiffs of their fundamental right to liberty by sole season of their indigence?*

In summary, strict scrutiny applies because the fundamental right to liberty is implicated by plaintiffs' claims.  The question then is whether a significant deprivation has occurred.  Contrary to CBAA's position, the existence of a significant deprivation is not a threshold requirement which *triggers* strict scrutiny,[46] but rather the first inquiry in a strict scrutiny

---

[45] *See* MSJ Order at 10–11, 16; *see also* Erwin Chemerinsky, Constitutional Law Principles and Policies at 827 (Erwin Chemerinsky et al. eds., 5th ed. 2015) ("[O]nce a right is deemed fundamental, under due process or equal protection, strict scrutiny is generally used."); *see also id*. at 828 ("If a right is deemed fundamental, the government usually will be able to prevail only if it meets strict scrutiny; but if the right is not fundamental, generally only the rational basis test is applied.").

[46] CBAA cites *Tsosie v. Califano*, 630 F.2d 1328 (9th Cir. 1980) in support of its contention that plaintiffs must first show that they have suffered a genuinely significant deprivation of a fundamental right in order for strict scrutiny to apply.  *See* Dkt. No. 308 ("CBAA's Reply ISO Cross-MSJ") at 4.  Specifically, CBAA describes *Tsosie* as having "appl[ied] strict scrutiny only where [a] classification *impermissibly interferes* with the exercise of a fundamental right[.]"  *Id*. (emphasis in original) (internal quotation marks omitted).  However, the court in *Tsosie* applied the *rational basis* standard because "no fundamental rights [were] *implicated* by th[e] case in such a way as to require strict scrutiny."  *Tsosie*, 630 F.2d at 1337 (emphasis supplied).  Specifically, "[a]s the class of after-adopted children receiving public or other outside assistance is not a suspect class," the court determined it "must examine the statutory distinctions [at issue] in light of the rational-basis standard . . . ."  *Id*.  CBAA similarly misleads with its citation to *Halet v. Wend Investment Co.*, 672 F.2d 1305 (9th Cir. 1982).  There, the court reaffirmed that strict scrutiny is required in the equal protection context when a classification impermissibly interferes with the exercise of a fundamental right and in the due process context when fundamental rights are at issue.  *Id*. at 1310.  While the *Halet* court recognized that "[n]ot every state action that infringes on a fundamental right triggers strict scrutiny[,]" it cited *Tsosie*

analysis.[47] Here, plaintiffs have established a significant deprivation, beginning with longer detention by sole reason of their indigence.[48]

As a threshold matter, the Court disagrees with plaintiffs' contention that the passage of S.B. 10 "unequivocally establish[es] that . . . the Sheriff's use of the Bail Schedule significantly deprives the class of its fundamental right to liberty[.]" (Plaintiffs' MSJ at 2.) Simply because a state chooses to change its laws does not mean that the previous law was unequivocally unconstitutional.

With respect to whether longer periods of pre-arraignment detention actually exist simply because indigent detainees cannot afford bail, the evidence firmly establishes this component. Admissions from CBAA and the Sheriff, as well as statistical and summary evidence, demonstrate that the use of the Bail Schedule results in longer statutory detention of the plaintiff class. The proposition is not credibly challenged. Its truth is grounded in logic.

The Sheriff, whose day-to-day activities include managing this process, concedes: "Plaintiffs' general point . . . that individuals who are able to pay the amount in the bail schedule . . . can obtain release more quickly than those who obtain release through a prearrangement application to a magistrate facilitated by the OR Project . . . is undoubtedly true." (Dkt. No. 149 at 1; *see also* Dkt. No. 101 at 1 ("Those who can pay are released at a time of their choosing . . . . Those who cannot pay must wait.").) CBAA's own Rule 30(b)(6) witness concurs. When asked to identify the "fastest way to secure a release in the City and County of San Francisco" in the

_____

and *Socialist Workers Party v. March Fong Eu*, 591 F.2d 1252 (9th Cir. 1978), *cert denied*, 441 U.S. 946 (1979) in support thereof, neither of which involved the right at issue here. *Halet*, 672 F.2d at 1311.

[47] Moreover, CBAA's position is disingenuous given that a key issue being litigated on the last round of motions for summary judgment was whether "pretrial liberty" was fundamental in the pre-arraignment context such that the detention at issue here implicates a fundamental right triggering strict scrutiny review. *See* Dkt. No. 132 at 16, 19.

[48] In any event, CBAA appears to concede that application of the strict scrutiny standard is appropriate if the Court finds that the Sheriff's use of the Bail Schedule in the pre-arraignment period significantly deprives plaintiffs of their fundamental right to liberty. *See* CBAA's Cross-MSJ at 8. As discussed herein, the Court finds that such a deprivation exists.

period between arrest and arraignment, he responded: "100 percent cash." (Clayton Depo Tr. at 84:20–85:2.) "And then . . . working with the bail agent [would be] the second fastest[,]" *i.e.*, the posting of a surety bond. (*Id.* at 85:8–10.)

CBAA's response to these longer detention periods merely reinforces their existence. For instance, CBAA suggests that a detainee would prefer detention because a public defender may have advised the detainee to wait for rebooking. Other justifications proffered by CBAA are that the OR Project may be slow at processing arrestees, or that a duty judge may have been unavailable to consider a section 1269c application or OR application immediately following its submission, or may have decided the arrestee should be detained.[49]  None of these arguments persuade.[50]

As to the first, CBAA misconstrues the testimony. The San Francisco Public Defender's Office's 30(b)(6) witness testified that a public defender may advise a detainee to wait for rebooking *in light of the arrestee's indigent status and ability to pay the 10% bail bond premium*. Namely, a public defender "basically . . . explain[s] the consequences of bailing out" to an individual who may be able to "scrape up the 10 percent fee," that is "that the 10 percent will not be returned even if the case is discharged."[51]  Ms. Patterson's surety bail contract corroborates this view.

As to the other possible causes, CBAA offers no evidence in support thereof. Nonetheless, CBAA's assertions regarding the same do not surprise. The purported "causes" of longer detention are, in fact, merely collateral consequences of the sole cause, that being, indigence. Given that all parties agree that cash and the posting of a surety bond are the fastest ways to be released, the longer detention stems from the generic use of San Francisco's Bail Schedule, which

---

[49]  *See* CBAA's Cross-MSJ at 6–7.

[50]  The Court disregards a myriad of irrelevant, unsubstantiated, or non-evidentiary based arguments which CBAA proffers. *See, e.g.*, CBAA's Cross-MSJ at 7 (arguing that "an arrestee may choose to bail out because their scheduled bail amount was lower than the opportunity cost of awaiting duty judge review").

[51]  *See* Exh. 1 to CBAA's Cross-MSJ at 33:23–34:4, 34:8–14.

mandates detention unless the scheduled amount is paid. Said differently, arrestees who can afford to bail themselves out are never in the position of having to deal with such collateral consequences.[52]

As for the issue of whether plaintiffs' deprivation is "significant," it is undisputed that San Francisco arrestees who are released after posting secured money bail are detained, on average, 12.8 hours *less* than arrestees who obtain release through the OR Project and who spend an average of 25.4 hours in jail. (*See* PRSS Fact 6.) Thus, those who obtain release through the OR Project spend, on average, *more than twice as much time behind bars* than those who are able to post bail. The time detained can be even greater for others, such as Ms. Buffin, who was incarcerated for 46 hours.

Here, the time differential is but one component of the analysis. "Significance" is measured by more than just a difference in hours.[53] Plaintiff Buffin's experience evidences the real-world consequences of such a deprivation; she lost her job. She is not alone. The evidence reveals that individuals can also lose their housing, public benefits, and child custody, and be burdened by significant long-term debt due to a short period of detention.[54] Moreover, many detainees "plead guilty (or no contest) at an early stage in the proceedings to secure their release from custody." (Workgroup Report at 14.)[55]

---

[52] CBAA creates a new argument based on the definition of "indigence," namely "[t]he fact that an arrestee might be able to post a $5,000 bond (or a surety bond for 10% or less of that amount) does not mean that the same arrestee could do the same thing for a $50,000 bond; in the latter case, the sole reason for the detention could be the severity of the offense charged." CBAA's Cross-MSJ at 7. CBAA does not persuade. In either case, if class members could afford to post bail, they would be released faster. The *only difference* is their inability to pay the higher $50,000 bail amount. Moreover, the argument does not impact the constitutional analysis.

[53] CBAA cites no authority in support of its suggestion that plaintiffs must show how the extra 12.8-hour detention causes negative consequences. *See* CBAA's Cross-MSJ at 2, 4, 13. Rather, plaintiffs must offer evidence showing "significance." In that context, evidence of negative consequences is relevant to the Court's analysis.

[54] *See* Workgroup Report at 13, 51; Klement Decl. ¶ 2; Do the Math at 16.

[55] Plaintiffs argue that the Sheriff's practice of "charge stacking" and charging "wobbler" offenses as felonies broadens the class and exacerbates the harm to the same. Plaintiffs' MSJ at 15–16. However, these allegations are mentioned nowhere in plaintiffs' 3AC, are irrelevant to

Further, the 48-hour presumption must be viewed in context. Nothing stopped the government from taking Ms. Buffin to court on Tuesday morning, ten hours after she was booked, or even on Wednesday. Had it done so, Ms. Buffin would have seen a judge who could have made a determination as to her continued detention prior to arraignment. Holding her four and one-half times longer and well after the court had closed on Wednesday suggests that the government is unjustifiably taking advantage of the 48-hour window.[56] Such "delay for delay's sake" has been condemned by the Supreme Court. *See McLaughlin*, 500 U.S. at 56.

Given the consequences which flow from an extended duration of pre-arraignment detention, the Court finds the deprivation significant. Accordingly, plaintiffs have shown that the Sheriff, through use of the Bail Schedule, has significantly deprived plaintiffs of their fundamental right to liberty by sole reason of their indigence.

### 2. *Step 2: Have plaintiffs established a prima facie case under the strict scrutiny standard?*

Plaintiffs bear the burden of identifying a plausible alternative that is less restrictive and at least as effective at serving the government's compelling interests, here identified as protecting public safety and assuring future court appearances.[57] The burden is not high, and it

---

plaintiffs' claims, and appear to concern practices of entities not before the Court. Thus, the Court disregards them.

[56] The factual record gathered in this case illuminates the need to test and maintain the classification of a presumption. Namely, the evidence suggests law enforcement is abusing the "48" hours by not moving the cases forward. Rather than taking Ms. Buffin promptly to court, law enforcement waited until the 48 hours had almost expired. That Ms. Buffin spent 46 hours in custody is consistent with the Sheriff's Department's observation that "most arrestees are presented within the last four hours of the legal time limit." *See* Sheriff's Department Memo at 3. For those incarcerated before the weekend, the 48 hours can stretch as far as five days.

[57] In their motion for summary judgment, plaintiffs take the position that there are *three* compelling government interests at issue: (i) protecting public safety; (ii) protecting the rights of arrestees; and (iii) encouraging future court appearances. *See* Plaintiffs' MSJ at 22. However, presumably in response to CBAA's argument that the liberty interest of detainees is a countervailing individual interest to be weighed *against* the two compelling government interests, (*see* CBAA's Cross-MSJ at 16), plaintiffs have retreated from their position that "protecting the rights of the accused" is a compelling interest at issue in this case and focused their Reply in Support of Plaintiffs' Motion for Summary Judgment and Opposition to CBAA's Cross Motion

need not rise to the level of scientific precision. *See, e.g., Ashcroft*, 542 U.S. at 666–68 (upholding injunction enjoining Child Online Protection Act ("COPA"), which imposed criminal liability for commercially disseminating online material harmful to minors, in light of existing non-legal alternatives, namely online blocking and filtering software equally effective and less restrictive than COPA); *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 965 (9th Cir. 2009) (relying on hypothetical alternative to affirm a permanent injunction of newly enacted California statute imposing labeling requirements on the sale of violent video games to minors). Plaintiffs are correct that in the context of strict scrutiny, when a court asks whether a proposed alternative is "less restrictive," it is making an inquiry into whether the challenged law is *necessary* as a means to accomplishing the end. *See* Constitutional Law Principles and Policies at 567 ("[T]he law must be shown to be 'necessary' as a means to accomplishing the end. This requires proof that the law is the least restrictive or least discriminatory alternative.") (footnote omitted).[58]

Here, plaintiffs' proposed alternative is to "rely solely on a computerized risk assessment process (such as the current San Francisco Public Safety Assessment ('PSA')[,]"[59] with S.B. 10 having "essentially implemented" this alternative, serving as a "more detailed version" of the same.[60] The Court previously outlined the relevant portions of S.B. 10, on which plaintiffs now

---

for Summary Judgment, (Dkt. No. 305), on the other two stated interests. The Court proceeds with its discussion accordingly.

[58] CBAA attacks plaintiffs' reliance on cases finding alternatives less concrete and specific than plaintiffs' alternative to be plausible. *See* CBAA's Cross-MSJ at 16. However, CBAA cites no authority supporting the notion that a proposed alternative must be more precise than the one proffered. In any event, S.B. 10 serves as *evidence* that a plausible alternative to the current system exists.

[59] Dkt. No. 221 at 2. While plaintiffs' notice of proposed alternatives identified two other alternatives—namely, "re-institute the San Francisco interview process" or "use a combination computerized risk assessment and interview process," (*id.*)—plaintiffs' instant motion for summary judgment focuses on the first of the three proposed alternatives. Indeed, plaintiffs concede that "the best evidence of [p]laintiffs' position is the passage of S.B. 10." Plaintiffs' MSJ at 19–20. The Court tailors its analysis accordingly.

[60] CBAA's last-ditch attempt to evade its burden on the ground that S.B. 10 was not previously identified as an alternative is disingenuous. *See* CBAA's Cross-MSJ at 17. Indeed, the parties submitted several filings with the Court regarding the passage of S.B. 10 and discussed it at

rely.  (*See supra* at 14–15.)  Importantly, the government *itself* concurs that the alternative is plausible; that is, the state has now enacted what it believes to be a less restrictive yet at least as effective alternative, with the express goal of reasonably assuring public safety and individuals' return to court.[61]

Unlike the current reliance on a bail schedule, S.B. 10 requires all jurisdictions to generate *prior to arraignment* for each arrestee "[t]he results of a risk assessment using a validated risk assessment instrument, including the risk score or risk level." S.B. 10 § 1320.9(a)(1); *see also supra* at 14–15.  Amongst its provisions, individuals who are assessed as low- or medium-risk to public safety and of failure to appear in court shall be released on their own recognizance, prior to arraignment and *without review by the court*, "with the least restrictive nonmonetary condition or combination of conditions that will reasonably assure public safety and the person's return to court." *Id.* §§ 1320.10(b), (c).  This will allow for release when court is not in session.  Further, individuals arrested for misdemeanors, with some exceptions, will be released within 12 hours (*id.* § 1320.8), *i.e.*, roughly the average length of those posting bail for release under the current system.

CBAA disputes the plausibility of the proposed alternative.  First, CBAA argues that, to the extent plaintiffs' alternative would eliminate use of the Bail Schedule for all arrestees, "it is not plausible because it would deprive individuals of their right to be released on bail by sufficient sureties, as memorialized in California's Constitution (Art. 1, § 12)."  (CBAA's Cross-MSJ at 23.)  In so doing, CBAA effectively attempts to challenge the constitutionality of S.B. 10 by proxy.  This Court is not faced with an affirmative challenge to the constitutionality of S.B. 10 itself.  It has repeatedly cautioned that this action is narrow in scope.  Principles of federalism limit the Court's review and counsel in favor of narrow relief to the extent required.  *See U.S. v. Ron Pair*

---

length at the September 7, 2018 pretrial conference.  In that context, CBAA did not seek leave of court to conduct further discovery on that topic.  Rather, it conceded that renewed motions for summary judgment were the appropriate course.  Accordingly, CBAA's argument that S.B. 10's framework is an objectionable *fourth* proposed alternative does not persuade.

[61] This concession further distinguishes this case from *Walker* and *ODonnell II*.

United States District Court
Northern District of California

*Enters., Inc.*, 489 U.S. 235, 245 (1989) ("[A] basic principle of our federalism [is] that 'the States' interest in administering their criminal justice systems free from federal interference is one of the most powerful of the considerations that should influence a court considering equitable types of relief.") (quoting *Kelly v. Robinson*, 479 U.S. 36, 49 (1986)).  The Court is not considering the wholesale elimination of bail as it is outside the scope of this action.

Next, CBAA argues that the proposed alternative is not plausible because it would pose "insurmountable administrative problems" for the Sheriff in determining which arrestees "cannot afford" bail.  (CBAA's Cross-MSJ at 5.)  However, CBAA has proffered *no* evidence in support thereof aside from the bald conclusion of its expert.  Nor has the Sheriff conceded such "insurmountable" problems.[62]

Plaintiffs' burden is not high, nor is scientific precision required.  Against that backdrop, the Court notes that S.B. 10 was passed after a year of study by the California Chief Justice's Pretrial Detention Reform Workgroup, which included the then-presiding judge of the San Francisco superior court.  (*See* Workgroup Report at ECF p. 3.)  The Workgroup found that as many as 60 pretrial risk assessment instruments exist in the United States, which, after study, revealed various common factors as "good predictors of court appearance and/or danger to the community."  (*Id*. at 47.)  Such indicators include current charges, outstanding warrants, pending charges, and active community supervision at the time of arrest, and criminal history, history of violence, residential stability over time, employment stability, community ties, and history of substance abuse.  (*Id*.)  San Francisco has already deployed a risk assessment unit, the results of which are constantly being used to enhance its effectiveness.  (*See* Do the Math at 1.)  The Workgroup found similar urban areas which have successfully used such a model, including neighboring Santa Clara County and Washington, D.C.  (*Id*. at 40–41, 90–93.)[63]  Collectively, the

---

[62]  For instance, other jurisdictions have had indigent detainees execute affidavits, plus public defenders routinely evaluate such issues.  *See, e.g., Walker*, 901 F.3d at 1253 (describing City of Calhoun's affidavit-based process for determining inability to pay); *ODonnell II*, 900 F.3d at 222 (referencing Harris County's use of affidavits showing inability to pay).

[63]  *See also* Exh. 20 to Sims Decl. ISO Plaintiffs' MSJ ("Weisberg Report") ¶ 37, Dkt. No. 283-20 (plaintiffs' expert opinion regarding Washington, D.C. as "the so-called gold standard for

evidence demonstrates that a plausible alternative to the current system exists.

In order to analyze whether plaintiffs' proposed alternative is less restrictive and at least as effective than the Bail Schedule in serving the government's compelling interests, the Court must also consider how the Bail Schedule itself enhances public safety and ensures future court appearance. Importantly, the record is devoid of *any* evidence showing that the Bail Schedule considers either of the articulated goals.[64] CBAA's own Rule 30(b)(6) witness testified that he do[esn't] know why the judges did th[e] schedule the way they did[,]" noting that "there's no requirement for any input, data collection, deviation reports, [or] comparative data . . . in putting together the schedule."[65] Further, CBAA's own expert admitted that there are no peer-reviewed studies that have empirically addressed questions specifically regarding the effectiveness of bail schedules, and that such schedules are simply used for "operational efficiency."[66]

Absent any evidence justifying the Bail Schedule as a means for accomplishing the government's compelling interests, the Court finds that "operational efficiency" does not trump a significant deprivation of liberty.[67] Merely assigning a random dollar amount to a Penal Code

_____

bail reform").

[64] In response to the Court's observation that "there seems to be no indication in the Schedule[,] and there's certainly nothing in the record that has been established[,] that identifies any relationship between the money being demanded in the Schedule and [the] compelling governmental interest[s,]" CBAA conceded, "[t]hat evidence is not in the record, your honor." January 8, 2019 Hearing Tr. at 22:24–23:8.

This is unsurprising considering that under the Bail Schedule, the bail for a DUI is relatively low, even if an individual arrestee has a history of prior DUI arrests, but the bail for a non-violent drug offense involving small quantities of drugs can be two to five times higher. Klement Decl. ¶ 7. Moreover, as CBAA concedes, some arrestees who are not eligible for pre-arraignment OR release due to a "release not recommended" score on the PSA/DMF nevertheless have the option to secure release under the Bail Schedule. PRSS Fact 23.

[65] Clayton Depo Tr. at 50:21–22, 66:15–18.

[66] *See* Morris Report at 40.

[67] The claim of "operational efficiency" in any case is questionable. For instance, Kentucky "requires its pretrial officers to interview individuals within 12 hours of arrest[,]" which expedites review considerably. Weisberg Report ¶ 28 n.12 (internal quotation marks omitted). Here, the record suggests operational *in*efficiencies as a source of the lengthy detentions.

1  section does not address an actual person's ability or willingness to appear in court or the public

2  safety risk that person poses. At most, all that can be discerned is that the amounts are so high as

3  to keep all arrestees detained except for those who can afford to be released. This practice, then,

4  replaces the presumption of innocence with the presumption of detention. Accordingly, the Bail

5  Schedule, which merely associates an amount of money with a specific crime, without any

6  connection to public safety or future court appearance, cannot be deemed *necessary*.[68]

7       CBAA's primary evidentiary showing posits that release on bail produces lower failure to

8  appear ("FTA") rates, namely "Release on Bail" at 20.6% versus "Project O.R." at 27.3%, a delta

9  of 6.7 percentage points.[69] (*See* Morris Report at 5.)[70] The Court understands that data on the

10  topics raised is limited. Nonetheless, CBAA's expert has analyzed the little data that does exist in

11  a manner ignoring the narrow scope of this case, presumably to support CBAA's view.[71] Given

_____

Consistent with Ms. Buffin's experience, the Sheriff's Department's Work Group to Re-Envision the Jail Replacement Project identified law enforcement's failure to provide the district attorney charging information until four hours before the end of the statutory period and the Treasurer's report confirmed the chronic delay. *See* Sheriff's Department Memo at 3; Do the Math at 16–17. Law enforcement appears to respond to deadlines, suggesting faster review is plausible, whereas under the current model, delay until the end of the 48 hours has become the operational protocol.

[68] In fact, the use of such an arbitrary schedule may not even satisfy an analysis under a rational basis review. *See* Constitutional Law Principles and Policies at 706 (explaining that the basic requirement of the rational basis test is "that a law meets rational basis review if it is rationally related to a legitimate government purpose"). The presumption of detention is not a legitimate government purpose.

[69] Professor Morris also presents FTA statistics on other types of release such as Assertive Case Management, Supervised Pretrial Release, and Court OR, all of which typically occur at or after arraignment. *See* Morris Report at 5; Klement Decl. ¶ 15.

[70] CBAA's reference to this delta as "32% lower" seeks to imply a greater disparity than exists by comparing the 20.6 and 27.3 rates in terms of a percentage. CBAA's Cross-MSJ at 28. In terms of sheer numbers of detainees, according to the Morris Report, 10,553 were released on bail, and 20.6 percent, or 2,174, failed to appear, while 1,622 were released under Project OR, and 27.3 percent, or 443, failed to appear. Morris Report at 5.

[71] The Court notes that Professor Morris claims there are only four empirical assessments which have comparatively addressed the impact of pretrial release mechanisms on FTA and bond forfeiture, three of which he prepared. *See* Morris Report at 9. Moreover, Professor Morris was the expert witness in the *ODonnell* case. *Id*. Because of the lack of a trial in this case, it is not clear whether a financial connection exists between Professor Morris and the bail industry.

36

the data provided, the Court finds CBAA's statistical analysis flawed and unconvincing. First, this case is focused on *pre-arraignment* release. Thus, the relevant comparison of FTA rates is those who, pre-arraignment, were released on bail versus those released under the OR Project, and who failed to appear at arraignment. These parameters are particularly important given the large percentage of detainees who are *never charged*, *i.e.*, 25 to 33 percent. Professor Morris' analysis based on historical FTA rates relates to "'*any*' failure to appear associated with an individual booking[,]" including those rendered after judicial review at arraignment. (Morris Report at 5 (emphasis supplied).)

Second, the data used to generate comparisons of historical FTA rates spans beyond the period of use of the PSA Tool, which forms the basis of plaintiffs' plausible alternative. The Court finds the combined effect of Professor Morris' data choices less reliable and persuasive than other data presented. His approach raises concerns that he is exaggerating the supposed differences between bail release and OR release.

Next, Professor Morris' Propensity Score Matching ("PSM") analysis—which, unlike his analysis based on historical FTA rates, addresses "questions specific to whether an individual defendant would be more or less likely to FTA if he/she were released via one method over another (e.g., O.R. versus Surety)[,]" (Morris Report at 7)—found that surety FTA rates were 14.0 percentage points lower than OR FTA rates. (*Id*. at 7–8.) However, his analysis, again, does not distinguish between arrestees released on bail or the OR Project who failed to appear *at arraignment* versus those who failed to appear at a later proceeding. (*See id*. at 7.) Moreover, the analysis appears to include *Court OR* (as opposed to only Project OR) to reach his conclusions regarding FTA rates.[72]

By contrast, San Francisco Deputy Public Defender Tal Klement, who has served in that capacity since 2003, focused his FTA review on data pertaining only to the relevant *pre-*

---

[72] To the extent CBAA claims that Professor Morris did an "apples-to-apples comparison," the analysis remains elusive and the Court will scour no further. January 8, 2019 Hearing Tr. at 33:4–5.

*arraignment* period.  Out of a total 1,697 individuals who failed to appear at arraignment between 2016 and 2018, *215 of those individuals had been released on bail, and 145 had been released through Project OR.*  (*See* Klement Decl. ¶ 28.)[73]  Thus, a more appropriate FTA comparison reveals better FTA results through the OR Project over bail.

In sum, plaintiffs' proposed alternative—which entails an individualized inquiry into the risk an arrestee has to public safety and of failure to appear—is consistent with the government's goals of enhancing public safety and ensuring court appearance and does not perpetuate the deprivation of one's liberty.[74]  Accordingly, plaintiffs have made a prima facie showing that it is less restrictive and at least as effective at serving the state's compelling interests than the Sheriff's

---

[73]  CBAA has no response to Mr. Klement's analysis other than a general objection to his declaration testimony "to the extent that [p]laintiffs appear to be using him as an undisclosed expert offering opinions on the underlying data."  CBAA's Cross-MSJ at 25.  As discussed above, *see supra* note 20, this objection fails.

Moreover, CBAA mischaracterizes Mr. Klement's testimony to argue that "[p]laintiffs' own evidence calls into question the PSA's effectiveness at ensuring court appearance."  *See* CBAA's Cross-MSJ at 19 (citing Klement Decl. ¶ 26).  The cited paragraph actually shows that Mr. Klement doubts the effectiveness of *cash bail*, not the PSA, to wit:

> Having represented thousands of indigent arrestees in San Francisco, I do not believe that cash bail is the but-for cause for defendants to appear in court as directed. Indeed, many bail agents in San Francisco require arrestees and/or third parties to continue making installment payments whether or not the defendant appears in court. In my experience, the likelihood that a given defendant will appear in court as directed has much more to do with the defendant's individual circumstances, such as the charges faced, resources available, family stability, mental health, available transportation, and homelessness.

Klement Decl. ¶ 26.

[74]  For this reason, CBAA's argument that plaintiffs' proposal is more restrictive because it would eliminate one current option for pre-arraignment release (albeit an option available only to non-class members who can afford it) extends too far.  As the Court has noted, this case presents a narrower question.  Moreover, CBAA's argument that plaintiffs' alternative "has the *potential* to implement impermissible discrimination into the release/detain decision-making process on the basis of race, ethnicity, gender, and/or income level" lacks an evidentiary basis.  CBAA's Reply ISO Cross-MSJ at 11 (emphasis supplied).  Press releases are not evidence.  Moreover, that the Judicial Council is inquiring into the topic may produce evidence, but none yet exists.  Presumably, if found, and not rectified, battle lines will be drawn for some future dispute.

use of the Bail Schedule.

### 3. *Step 3: Has CBAA shown that plaintiffs' proposed alternative would be less effective at serving the government's compelling interests or more restrictive?*

Once a plaintiff makes a prima facie showing under a strict scrutiny analysis, the burden shifts to the government to show that the proposed alternative would be less effective or more restrictive. Most of the CBAA's arguments in this regard overlap with its arguments in response to plaintiffs' initial burden. As for those not previously addressed, they are unavailing given that plaintiffs' proposed alternative entails an individualized inquiry into the risk an arrestee has as to either public safety or a failure to appear and thus does not result in the deprivation of one's liberty solely due to one's indigence.[75] The Bail Schedule, by contrast, is arbitrary in that it sets amounts without regard to any objective measurement and thus bears *no* relation to the government's interests in enhancing public safety and ensuring court appearance. It merely provides a "Get Out of Jail" card for anyone with sufficient means to afford it. In light thereof, CBAA cannot show that plaintiffs' proposed alternative would be less effective at serving the

---

[75] As for CBAA's separate argument that it must show only that plaintiffs' proposed alternative is less effective at achieving *either* state interests (as opposed to both), the Court disagrees. In its previous summary judgment order, the Court referred explicitly to the government's compelling "interest(s)," in plural form because at that point, "plaintiffs and CBAA agree[d] that *at a minimum* the County has a compelling interest in ensuring that arrestees appear for trial." MSJ Order at 20 (emphasis supplied). However, in the event other compelling interests were identified, CBAA's showing as to the effectiveness of plaintiffs' alternative(s) would have to address *each* interest. Thus, Professor Morris' failure to consider public safety in his evaluation of the efficacy of proposed alternatives, except to the extent that he treated FTA/bond forfeiture as a proxy for public safety, deems any showing with respect to efficacy unavailing. *See* Exh. 7 to Sims Decl. ISO Plaintiffs' MSJ at 68:9–25, Dkt. No. 283-7 (when asked how consideration of public safety factored into his opinions in this case, Professor Morris responded: "Sadly, there was no data that I could use to effectively assess it quantitatively, which is what I was tasked with, so I didn't have information on recidivism rates. . . . [Public safety is] built in, in part, through bond forfeiture.") CBAA's attempt to evade its burden is particularly disingenous given its insistence that plaintiffs' initial burden is to propose an alternative that is at least as effect as the Bail Schedule "at achieving *both* of the government's compelling interests[.]" CBAA's Reply ISO Cross-MSJ at 9 (emphasis in original); *see also id.* (arguing that "[e]ven if [p]laintiffs could show that their proposed alternative is at least as good as the Bail Schedule at ensuring public safety . . . , this showing would be insufficient to meet [p]laintiffs' initial burden of an 'as effective' alternative, *because that alternative would only meet half of the government's compelling interests.*") (emphasis supplied).

government's compelling interest or more restrictive and has thus failed to meet its burden under the strict scrutiny standard.

Accordingly, and within the confines of the issues defined herein, plaintiffs' motion for summary judgment is **GRANTED**, and CBAA's cross-motion is **DENIED**.[76]

## IV. CONCLUSION

Plaintiffs' motion to revoke CBAA's intervenor status is **DENIED** as it is based on the premature argument that Penal Code section 1269b has been repealed.

Plaintiffs' motion for summary judgment is **GRANTED**, and CBAA's cross-motion for summary judgment is **DENIED**. The evidence demonstrates that the Sheriff's use of the Bail Schedule significantly deprives plaintiffs of their fundamental right to liberty, and a plausible alternative exists which is at least as effective and less restrictive for achieving the government's compelling interests in protecting public safety and assuring future court appearances. Operational efficiency based upon a bail schedule which arbitrarily assigns bail amounts to a list of offenses without regard to any risk factors or the governmental goal of ensuring future court appearances is insufficient to justify a significant deprivation of liberty.

In terms of injunctive relief, the parties have not briefed the topic. In general, relief must be narrowly tailored to address the extent of the constitutional violations found. *See Dayton Bd. of Ed. v. Brinkman*, 433 U.S. 406, 420 (1977) ("Once a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation.") (internal quotation marks omitted); *Missouri v. Jenkins*, 515 U.S. 70, 88 (1995) ("[T]he nature of the . . . remedy is to be determined by the nature and scope of the constitutional violation.") (internal quotation marks omitted). Accordingly, the Court will issue an injunction enjoining the Sheriff from using the Bail Schedule as a means of releasing a detainee who cannot afford the amount but will delay issuing the injunction pending briefing. A separate scheduling

---

[76] The Court need not rule on the remainder of CBAA's evidentiary objections because the Court did not need to consider such evidence to resolve the instant cross-motions for summary judgment.

order shall issue.

This Order terminates Docket Numbers 282, 287, and 300.

**IT IS SO ORDERED.**

Dated: March 4, 2019

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**